

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division

SUMMER CRUMP,

       Plaintiff,

v.                            Civil Action No. 2:13cv707

TCOOMBS & ASSOCIATES, LLC,
TRADING AS TCASSOCIATES,

TCMP HEALTH SERVICES, LLC,

and

UNITED STATES DEPT OF NAVY,
BY AND THROUGH RAY MABUS,
SECRETARY OF DEPT OF NAVY,

       Defendants.

### OPINION AND ORDER

This matter is before the Court on a Motion for Summary Judgment, ECF No. 82, filed by the United States Department of the Navy, by and through Ray Mabus, Secretary of the Department of the Navy ("the Navy"), a Motion for Summary Judgment, ECF No. 85, filed by TCoombs & Associates, LLC ("TCoombs") and TCMP Health Services, LLC ("TCMP" and, collectively with TCoombs, "TCA"), a cross-motion for partial summary judgment, ECF No. 135, filed by Summer Crump ("Plaintiff"), and a Motion for Leave to Submit Additional Evidence, ECF No. 171, also filed by Plaintiff. On August 31, 2015, the Court held a hearing on the parties' summary judgment motions. With respect to Plaintiff's

Motion for Leave to Submit Additional Evidence, examining the briefs and the record, the Court determines that oral argument is unnecessary because the facts and legal contentions are adequately presented and oral argument would not aid in the decisional process. Fed. R. Civ. P. 78(b); E.D. Va. Loc. R. 7(J).

## I. FACTUAL AND PROCEDURAL HISTORY[1]

### A. The Navy's Contract with TCMP

TCMP is a United States Government ("Government") contractor that provides medical personnel to the Government, including the Navy. Its affiliate, TCoombs, provides back office support, including human resources services, for employees working on TCMP's Government contracts. The Navy operates Naval Medical Center – Portsmouth, and a number of Branch Medical Clinics associated therewith, including Sewells Point Branch Medical Clinic ("BMC Sewells"), at which active duty military personnel, their dependents, and certain other eligible persons can receive medical treatment.

On September 14, 2008, the Navy entered into a contract with TCMP ("the contract"). Navy's Mem. Supp. Mot. for Summ. J. Ex. 4, Attachment A, ECF No. 83-5. Under the contract, TCMP

---

[1] As a general matter, the Court has described any genuinely disputed facts in a light most favorable to Plaintiff, the non-moving party. However, Plaintiff seeks partial summary judgment on whether the Navy qualifies as Plaintiff's employer and, therefore, the Court has considered the disputed facts with respect to Plaintiff's cross-motion in a light most favorable to the Navy.

agreed to furnish certain categories of healthcare workers ("HCW(s)"), including physician assistants and nurse practitioners, to the Navy in accordance with task orders issued by the Navy. Id. § B.1. The duration of the entire contract was capped at sixty months; each task order was limited to twelve months. Id. §§ B.8, B.10.

The contract between the Navy and TCMP created the framework through which HCWs from TCMP would provide medical services to the Navy. The contract and subsequently issued task orders pursuant thereto established the qualifications for the HCWs, including physician assistants, that TCMP would furnish to the Navy. See id. §§ C.5-C.7; e.g., id. Ex. 4, Attachment B, § 8, at 6, ECF No. 83-6 (Task Order 25).[2] Under the contract, each HCW was assigned to a primary location; however, the Navy retained the authority to assign an HCW to another Naval Medical Center - Portsmouth facility within certain parameters. Id. Ex. 4, Attachment A, § C.3.3.11. The contract provided that TCMP's HCWs would be "subject to day-to-day supervision and control by Government personnel" and defined "supervision and control" as "the process by which the individual HCW receives technical guidance, direction, and approval with regard to a task(s) within the requirements of this contract." Id. § C.2.3; see

_____

[2] For ease of reference, the Court relies on the pagination of the exhibits as entered on the Court's electronic docket, rather than the exhibits' original pagination.

3

also id. § C.3.3.12. Furthermore, the contract directed that the Navy personnel supervising TCMP's HCWs were "best served by supervising the contract personnel in the same manner as they supervise the government personnel on their staff." Id. § 9.6, at 45. And, although the contract required TCMP to maintain general liability, automobile liability, workers' compensation and employer's liability insurance, id. § H.8, the Navy did not require HCWs to maintain medical malpractice insurance, id. § C.2.2. The contract also included provisions governing continuing education, training, and orientation. Id. §§ C.3.3.8-9, C.7.12. The contract did not prohibit HCWs from conducting their own private practice or engaging in other employment, and it forbade the use of non-compete agreements to prevent TCMP's employees from accepting future employment with the Government or another contractor. See id. §§ C.5.3, H.9.

Under the contract, TCMP was required to provide HCWs that met the qualifications set forth by the Navy in the contract and task orders and to ensure that its employees underwent proper criminal history background checks. Id. §§ C.6, H.7.2. Upon the award of a task order, TCMP agreed to submit a "technical package" containing "specific information with regard to qualifying degrees and licenses, past professional experience and performance, education and training, health status, and competency" for each HCW. Id. § C.7.11. The Contracting

Officer's Representative ("COR")—the Government employee whom the Contracting Officer appointed to serve as a technical liaison between the Government and the contractor, id. § C, at 12 (Note 5)—then would evaluate the package to ensure it satisfied the requirements in the statement of work. Id. Ex. 4 ¶ 9, ECF No. 83-4 (Carpenter Declaration). Additionally, for a subset of positions—"coverage positions" (which included the "physician extender" position that Plaintiff eventually held)—the contract only required TCMP to provide a person, rather than any specific person, to cover hours of service required by a task order. Id. Ex. 4, Attachment A, § C.3.2. The contract authorized TCMP to use up to three qualified individuals to cover each full-time coverage position, subject only to the requirement that each individual work a minimum of sixteen hours per month. Id. However, if an HCW in a coverage position missed more than two hours of a shift, the contract required TCMP to provide another qualified HCW to cover the remaining hours of the shift. Id. Regarding scheduling, unless otherwise ordered in the task order, the contract required TCMP to submit, six weeks in advance, a schedule including the names of the specific individuals providing the required coverage. Id. TCMP managed leave for all coverage employees. Id.; see also Navy's Mem. Supp. Mot. for Summ. J. Ex. 1 at 11, ECF No. 83-1 (Plaintiff's Admissions Responses).

As to firing and discipline, the Navy used the COR to relay major issues regarding HCWs to TCMP.[3]  The contract established that the Government could require TCMP to "attend face-to-face meetings at the Government's facilities each 30-90 days."  Id. § C.13.1.  At such meetings, referred to in the contract as "contract status review meetings," the Navy was required to inform TCMP "of any employee-related issues that require corrective action on the part of [TCMP]."  Id. § C.13.1.1. Moreover, under the "Surveillance Plan," the contract mandated that the COR document significant HCW performance problems using contract discrepancy reports ("CDRs") and that the COR present such reports to TCMP, rather than the individual HCW.  Id. § 8.8, at 44; see, e.g., Pl.'s Mem. Opp'n Navy's Mot. for Summ. J. Ex. A1 at 3-8, ECF No. 112-1 (February 16, 2012 CDR). However, the contract did not require the COR to submit a CDR for every "deviation from contract requirements."  Navy's Mem. Supp. Mot. for Summ. J. Ex. 4, Attachment A, § 8.8, at 44.

---

[3] In her brief in opposition to the Navy's motion, Plaintiff purports to dispute the Navy's factual contention that "[a]ny issues regarding a contract employee's status in the federal workplace were required to be relayed through and resolved between the [COR] and the contracting agency."  Pl.'s Mem. Opp'n Navy's Mot. for Summ. J. at 2, ECF No. 112.  However, the portions of the record Plaintiff relies on to dispute a statement do not controvert it.  That said, the Court does not infer that the Navy's statement of fact relates to issues regarding Plaintiff's alleged request for accommodation from the Navy because Plaintiff has devoted a large portion of her brief in opposition to the Navy's motion, and the entirety of her summary judgment motion, to whether the Navy was her employer, thereby triggering the protections of the Rehabilitation Act.

Rather, the contract advised that it was best to attempt to resolve performance problems "at the lowest level possible and in the least threatening manner possible" and "to seek cooperative resolution, and then resort to formal documentation via a CDR if resolution cannot be reached." Id.; see also id. § 9.8. Indeed, the contract directed Navy personnel supervising HCWs to provide to such HCWs "the normal feedback that should be provided to any employee regarding the quality of their performance" and to document "[c]ounseling sessions regarding both good performance and poor performance." Id. § 9.7, at 45 (emphasis added). If the Navy reported an HCW's misconduct to TCMP, TCMP would act on such report to improve performance or terminate the HCW. Navy's Mem. Supp. Mot. for Summ. J. Ex. 7 at 8-9, ECF No. 83-10 (Robles Deposition). Although the parties dispute the extent to which the Navy itself could terminate Plaintiff, it is undisputed that the Navy could restrict Plaintiff from Government premises for public safety reasons. Pl.'s Mem. Supp. Mot. for Summ. J. Ex. 1 at 28, ECF No. 136-1 (Navy's Admissions Responses).[4]   Additionally, the contract

---

[4] The Navy has challenged much of Plaintiff's declaration as self-serving and based on inadmissible evidence. So long as Plaintiff's sworn statements indicate that she could competently testify to the facts asserted therein based on her personal knowledge, the mere fact that Plaintiff's statements are favorable to her case does not render them insufficient to support or contest a motion for summary judgment. That said, to the extent Plaintiff's declaration provides an insufficient foundation to demonstrate that Plaintiff has personal knowledge of the facts averred, the Court will not consider

provided that "[i]f clinical privileges of a HCW have been summarily suspended pending an investigation into questions of professional ethics or conduct, performance under the Task Order may be suspended until clinical privileges are reinstated." Navy's Mem. Supp. Mot. for Summ. J. Ex. 4, Attachment A, § C.4.2.

Pursuant to the contract, the Navy awarded a number of task orders to TCMP. The Navy issued: Task Order 25 from September 30, 2009 through September 15, 2010 (although the Navy modified such order four times, such modifications are immaterial to this matter); Task Order 68 from September 16, 2010 through September 15, 2011; and Task Order 81 from September 16, 2011 through September 15, 2012. Navy's Mem. Supp. Mot. for Summ. J. Ex. 4, Attachment B, ECF No. 83-6 (Task Order 25); id. Attachment C, ECF No. 83-7 (Task Order 68); Pl.'s Mem. Opp'n Navy's Mot. for Summ. J. Ex. A2 at 70, 83, ECF No. 112-2 (Task Order 81). Each task order required TCMP to provide physician extenders—physician assistants or nurse practitioners—to staff BMC Sewells. The task orders also established the hours physician

---

such declaration. See Fed. R. Civ. P. 56(c)(4). Plaintiff avers, in conclusory fashion, that "[t]he Navy reserved the right to terminate my placement under the contract." Pl.'s Mem. Opp'n Navy's Mot. for Summ. J. Ex. B ¶ 65, ECF No. 112-3 (Plaintiff's Declaration). Plaintiff relies on such declaration to support her contention that the Navy reserved the right to terminate Plaintiff's placement under the contract. However, Plaintiff's declaration provides an insufficient foundation for the Court to conclude that she possessed personal knowledge of the fact averred in paragraph 65 of such declaration.

extenders would work, the orientation and training physician extenders were required to undergo, the clinical responsibilities for physician extenders, and minimum qualifications (in addition to those set forth in the contract) for each physician extender. The task orders further stated that "[e]ach HCW's productivity is expected to be comparable to that of other HCWs authorized the same scope of practice." Navy's Mem. Supp. Mot. for Summ. J. Ex. 4, Attachment B, § 7.1 (Task Order 25); id. Attachment C, § 7.1 (Task Order 68); Pl.'s Mem. Opp'n Navy's Mot. for Summ. J. Ex. A2 at 76 (Task Order 81). Under the task orders, the Navy would pay TCMP an hourly rate for each physician extender it provided, up to a certain maximum number of hours over the course of the one-year task order.

### B. Plaintiff's Background and Position at BMC Sewells

Plaintiff is a physician assistant who suffers from bilateral profound sensorineural hearing loss. Pl's Mem. Opp'n Navy's Mot. for Summ. J. Ex. B ¶¶ 1, 8, ECF No. 112-3. Plaintiff states, in her May 29, 2015 Affidavit, that she was diagnosed at age five. Id. at ¶ 1. Plaintiff's "hearing loss was prior to language development," and she "did not start speaking until the age of five." Id. at ¶ 4. At the time of signing her Affidavit, she was 34 years old. Id. at ¶ 1. "During [Plaintiff's] developmental years, [she] was

9

academically delayed in reading, writing, reading comprehension, and spelling, until [she] started college." Id. at ¶ 5. "During college, [Plaintiff] was able to have full access to American Sign Language ("ASL") interpreters which allowed [her] to excel in these areas of weakness." Id. at ¶ 5. Plaintiff's "preferred language is ASL." Id. at ¶ 6. Plaintiff received her first cochlear implant in approximately 2001. Id. at ¶ 3. She has experience with TTY, IP-Relay, SIP Relay, NTouch Mobile, NTouch PC, Sorenson Video Relay Services (SVRS), and Purple Video Relay Services. Id. at ¶ 7. Plaintiff has "worked as a Physician Assistant since [she] graduated from Eastern Virginia Medical School (EVMS) in 2007 with a Masters of Physician Assistant." Id. at 8. The Commonwealth of Virginia has licensed Plaintiff as a physician assistant since 2007. Id. at ¶¶ 8-9.

On November 2, 2009, Plaintiff applied for a physician assistant position at TCMP. See Navy's Mem. Supp. Mot. for Summ. J. Ex. 1 at 2. Initially, Plaintiff interviewed with a TCA recruiter, Cliff Murray. Mr. Murray then submitted to the Navy a technical package of privileging documents for Plaintiff. On February 23, 2010, Marivic Williams, the COR for the contract, reviewed Plaintiff's privileging documents. Although the parties dispute the nature of the Navy's credentialing process (and the extent to which such process involved an

interview with Plaintiff and the Navy approving Plaintiff's application), it is undisputed that, on March 15, 2010, Captain Andrew Nelson, a physician and the Navy's Senior Medical Officer, conducted a phone interview with Plaintiff and discussed Plaintiff's "education, training, prior and current work experience, health status, and adverse credentialing/legal action." Pl.'s Mem. Supp. Mot. for Summ. J. Ex. 4 at 8, ECF No. 136-10; id. Ex. 1 at 8-9, ECF No. 136-1. Based on such interview and his review of Plaintiff's documentation, Captain Nelson believed that Plaintiff was "well trained with skills suitable for the position of Physician Extender." Id. Ex. 1 at 8-9. On March 15, 2010, Captain Nelson determined that Plaintiff was "technically acceptable" for the position of physician extender. Id. Ex. 4 at 9. The next day, the COR informed the Navy's Medical Staffing Services Department that Plaintiff met all contracting requirements. Id. Ex. 5 at 1, ECF No. 136-11. On May 6, 2010, the Navy completed credentialing for Plaintiff and approved her to perform services for the Navy. Id. On May 14, 2010, TCMP offered Plaintiff employment as a physician assistant. Navy's Mem. Supp. Mot. for Summ. J. Ex. 1 at 3, ECF No. 83-1. Four days later, Plaintiff accepted the position. Id.

Plaintiff negotiated her salary with TCMP and TCMP set her wages. Id. at 3-4. TCMP "paid Plaintiff's wages, provided

earning statements, withheld from her pay all applicable withholdings required by law, paid the employer's share of social security and Medicare taxes owed on her behalf, and provided her with federal tax form W-2s." Navy's Mem. Supp. Mot. for Summ. J. at 6, ECF No. 83. In addition, "Plaintiff was eligible for and enrolled in various employee benefits offered (and paid for) by TCMP, including a 401(k) plan, health insurance, dental insurance benefits, vision care benefits, group life insurance and short term disability benefits while working at BMC Sewells." Id. Plaintiff accrued leave from TCMP, but did not accrue leave from the Navy. Id. Ex. 1 at 10-11.

In her capacity as a physician extender, the Navy provided Plaintiff's place of employment—BMC Sewells—as well as her equipment (aside from her stethoscope). The Navy also provided Plaintiff with a CAC identification card to permit Plaintiff to access the Navy's facilities and computer networks and with parking tags to allow Plaintiff to access the employee parking lot. The Navy also assigned Plaintiff an email account specific to its domain.

While Plaintiff worked as a physician extender at BMC Sewells, the Navy established the core medical privileges that defined the scope of her practice. Although the Navy scheduled Plaintiff's patients, the parties dispute the extent to which

12

the Navy controlled Plaintiff's schedule. However, the Navy did monitor Plaintiff's attendance, and it is clear that physician assistant services are an integral part of the medical care provided at BMC Sewells. Pl.'s Mem. Supp. Mot. for Summ. J. Ex. 1 at 2, ECF No. 136-1.

Throughout Plaintiff's time at BMC Sewells, Navy physicians supervised Plaintiff's performance, and such supervisors conducted periodic reviews of Plaintiff's patients' charts. Information from the chart reviews "supplied data for Plaintiff's Performance Appraisal Report (PAR) which is used in the privileging process." Pl.'s Mem. Supp. Mot. for Summ. J. Ex. 1 at 23. The Navy also conducted a "Focused Professional Practice Evaluation (FPPE)" of Plaintiff, as required for any new provider at Naval Medical Center – Portsmouth. Id. at 23-24. As part of the FPPE, the Navy: assessed Plaintiff's competence in stated core privileges; monitored and evaluated Plaintiff's performance and her diagnostic and treatment techniques; and discussed Plaintiff's performance with other individuals involved with patient care. Id. at 24. In addition, the Navy conducted an "Ongoing Professional Practice Evaluation (OPPE)" of Plaintiff that included an "evaluation of patient care, medical knowledge, practice-based learning and improvement, interpersonal and communication skills, professionalism, systems-based practice and patient/staff

13

compliments and complaints." Id. at 24-25. Additionally, on one occasion, Commander Sarah Neill, the officer in charge at BMC Sewells, counseled Plaintiff about a patient's complaint. Pl.'s Mem. Opp'n Navy's Mot. for Summ. J. Ex. B ¶ 46.

The parties dispute the amount of training that Plaintiff received from the Navy. It is undisputed that Plaintiff received CHCS/AHLTA, HIPAA, FEMA, OSHA, and CBRNE training from the Navy and that the Navy required Plaintiff to attend a radiology conference at Naval Medical Center – Portsmouth from September 29 to October 1, 2010. Likewise, the parties agree that Plaintiff received two days of command and unit orientation. However, "TCA was responsible for providing [Plaintiff's] Continuing Medical Education (CME)," id. ¶ 213, and "Plaintiff received monetary assistance from TCMP to offset costs for continuing medical education requirements," Navy's Mem. Supp. Mot. for Summ. J. Ex. 1 at 10.

### C. Plaintiff's Request for Accommodation

On April 26, 2011, Plaintiff underwent a "right cochlear implant revision due to an internal device failure." Pl's Mem. Opp'n Navy's Mot. for Summ. J. Ex. B ¶ 12, ECF No. 112-3. Thereafter, Plaintiff sought, and TCA provided, medical leave for Plaintiff to recover from her surgery.

At the August 31, 2015 hearing in this matter, Plaintiff's attorney explained that prior to this cochlear implant revision

14

surgery Plaintiff was able to perform her job without accommodation. However, after the surgery, she was unable to do so without accommodation. Plaintiff stated in her Affidavit that "[a]fter my right cochlear implant revision, I struggled significantly with communicating without visual cues, such as lip reading, making it difficult to communicate via phone." Id. at 67. Therefore, on June 17, 2011, when Plaintiff attempted to return to work, she requested accommodations from TCMP that would allow her to use an alternative form of telecommunication with patients and colleagues, other than a telephone, and to work in an environment free from excessive noise. On June 20, 2011, Jessica George, a member of TCA's human resources staff, informed Plaintiff that the Navy's COR and Nurse Manager had indicated that Plaintiff, like all persons with "impairments necessitating a leave of absence," could not return to work until she was "able to return at full duty." Pl.'s Mem. Opp'n TCA's Mot. for Summ. J. Ex. B1 at 21, ECF No. 113-2. Ms. George instructed Plaintiff to have her physician complete an "RTW certification" once he concluded that Plaintiff was able to return to work. Id. In response, Plaintiff requested the opportunity to reach out to the Navy to discuss her abilities and the issues once she was cleared by her physician. Id. at 19-20. Ms. George instructed Plaintiff not to contact the Navy

15

and directed Plaintiff to first speak with TCMP Site Leader Angela Green.  Id. at 18-19.

On June 23, 2011, Ms. Green contacted someone with the Navy named "Jackie."  Id. at 17.  Regarding Plaintiff's request for accommodation, "Jackie" indicated that, at that time, BMC Sewells had not been involved before in a situation requiring ADA accommodations for contract workers in a clinical setting.  Id.  Thus, "Jackie" suggested that, to determine whether any ADA accommodation of Plaintiff was feasible, TCMP would need to contact someone higher in the chain of command than the contracting officer for TMCP's BMC Sewells contract.  Id.

On June 27, 2011, Plaintiff met with Ms. Green (TCMP's Site Leader) and requested a number of accommodations for her hearing impairment.  Pl.'s Mem. Opp'n Navy's Mot. for Summ. J. Ex. A1 at 9-10, ECF No. 112-1.  Plaintiff requested: the ability to see patients without children in the room; the ability to see only adult patients until she acclimated to her new cochlear implant; a video relay service ("VRS") phone attachment that would permit her to use an interpreter to interpret her phone calls; an attending physician who would be available to assist her with questions; and that nurses assist with making "some of the necessary phone calls."  Id. at 9-10.  More specifically, with respect to the VRS system, Plaintiff indicated that the company Sorenson could provide a camera device and install a VRS system

for free, and that such system would require only a basic television and a cable connection. Id. at 9.

On July 28, 2011, Lieutenant Commander Robert Propes asked Marivic Williams, the COR, to contact TCMP to determine what accommodations Plaintiff sought. Navy's Mem. Supp. Mot. for Summ. J. Ex. 18 at 3, ECF No. 83-21. On August 1, 2011, the COR informed Lieutenant Commander Propes and Commander Neill of the accommodations that Plaintiff requested. Id. at 2-3. That same day, Commander Neill responded to the COR and stated that the Navy could meet the following requests for accommodation:

> 1) Preference to treat adult patients with no children in the exam room in order to minimize excessive noise[;] 2) An attending physician available to assist her with questions and a supportive nursing staff[;] 3) Requirement for VRS connectivity/phone attachment free for the hearing impaired and installed at no cost to the government.

Id. at 1. Commander Neill stated that "[a] clinic office/telephone will be made available to establish VRS connectivity." Id.

On August 8, 2011, TCA, through Noelle Jackson, informed Plaintiff that the Navy had agreed to meet Plaintiff's request for accommodations and would allow her to "return to work ASAP." Id. Ex. 19 at 1, ECF No. 83-22. Ms. Jackson (TCA) instructed Plaintiff to contact Lieutenant Commander Lina Badura "to schedule setting up the VRS connectivity/phone attachment" and directed Plaintiff, after speaking with Lieutenant Commander

17

Badura, to "confirm the first day you will be able to return to work." Id. The next day, Plaintiff responded that she needed TCMP and the clinic to coordinate Sorenson setting up the video phone. Id. Plaintiff stated that she would report to Lieutenant Commander Badura within forty-eight hours after the accommodations were in place. Id.

The parties dispute the extent to which the Navy and TCMP would permit Plaintiff to return to work prior to the installation of the accommodations Plaintiff sought. On August 11, 2011, Lieutenant Commander Badura emailed Plaintiff and told her that the Navy planned:

> to provide a staff office space which can be equipped with your video relay equipment and we can discuss these details further in person. I understand that it may take some time to get everything set up, but as you know, this will not limit your ability to perform your job since phone use is not often required for this position.

Id. Ex. 15, ECF No. 83-18. On August 15, 2011, at 11:11 a.m., Plaintiff emailed Lieutenant Commander Badura "regarding [her] accommodation requests. Navy's Mem. Supp. Mot. For Summ. J. Ex. 17, ECF No. 83-20. Plaintiff stated she was "still waiting for a response from TCMP regarding my RTW and accommodations." Id. Plaintiff noted in the email that "[p]reviously TCMP would not allow me to RTW without the accommodations due to my 'limitations' as stated in the contract." Id. Plaintiff then, in the same email, adds that "[m]y attorney has advised me not

to RTW until accommodations are in place. She will be contacting TCMP today as well." <u>Id.</u> Lieutenant Commander Badura responded at 11:15 a.m. that she :[w]as hoping you would be coming in sooner since installation of the video phone may take [a while]. This was not my understanding and I thought you would be in even though we might have to wait for video." <u>Id.</u>

At 11:42 a.m. on that same day (August 15, 2011), TCMP Site Leader Angela Green emailed Marivic Williams, the Navy COR, with a copy going to Plaintiff, stating that she was "trying to coordinate the return of PA Summer Crump below." Pl.'s Mem. Opp'n Navy's Mot. For Summ. J. Ex. A2 at 42, ECF No. 112-2. "Below" seems to refer to an email from Plaintiff to Noelle Jackson at TCA, saying Plaintiff had received an email "from LCDR Badura asking me to report to work. I need to know how you wish for me to respond to this." <u>Id.</u> Three minutes later, Lieutenant Commander Propes, who had been copied on TCMP Site Leader Green's 11:42 a.m. email to Ms. Williams, emailed back to Ms. Green telling her to please "send all future emails to LCDR Badura, since she is [Ms. Crump's] Department Head now," and Propes included Lieutenant Commander Badura in the "To" line of the email. <u>Id.</u> at 41, ECF No. 112-2.

At 15:22:40 (3:22 p.m.) the same day (August 15, 2011), Lieutenant Commander Badura wrote Ms. Green at TCMP with a copy to Plaintiff, advising that "[w]e will be glad to have PA Crump

19

return to work ASAP while we await the video phone installation." Id. At 5:02 p.m. that day, Ms. Green responded to Lieutenant Commander Badura (apparently with a copy to Plaintiff) that Green had "no issue with [Crump] returning prior to the installation [of the videophone] but I need to verify that is OK with my benefits department . . . Can you manage till it['] s installed Summer?" Id. at 40, ECF No. 112-2. At 7:44 p.m. that day, Plaintiff responded to Ms. Green, with a copy to Lieutenant Commander Badura, stating she was eager and excited to RTW, and her "understanding is the only things I will need for installation of the video phone is a television and Internet hook up." Id.

The next morning, August 16, 2011 at 9:00 a.m., Plaintiff wrote Lieutenant Commander Badura asking if she had heard "from anyone." Pl's Mem. Opp'n Navy's Mot. For Summ. J. Ex. A2 at 87, ECF No. 112-2. At 9:45 a.m. that day, Lieutenant Commander Badura responded that she just heard from someone "at COR that states TCMP is responsible for providing equipment for installation." Id. Lieutenant Commander Badura then concluded: "Bottom line, we need to wait for TCMP to coordinate with Sorenson and have all equipment available . . . so that I can coordinate with our communications dept about actual installation. I guess you can't come back until all in place. Sorry, out of my hands from here." Id. At 10:11 a.m. that day

(August 16, 2011), TCMP Site Leader Ms. Green emailed Plaintiff in response to Plaintiff's email of 7:44 p.m. the night before. Id. at 39-40, ECF No. 112-2.   Ms. Green informed Plaintiff that "[a]ll equipment has to be handled through yourself since you know the company.   The government had approved the accommodations but all equipment cannot be billed to either the government nor TCMP as this falls outside of our contract." Id. Ms. Green then stated that "we have to wait until the installation is complete prior to you returning FTE.   This is due to us listing these items as a need in order for you to fulfill your positions . . . ." Id.   Plaintiff responded at 10:19 a.m. to Ms. Green:   "I really need TCMP to provide a small, but reasonably sized TV so that Sorenson VRS can be installed.   The TV does not need to be large, just big enough for me to see the interpreter etc." Id. at 39, ECF No. 112-2. Then, at 10:26 am., Ms. Green responded by email, telling Plaintiff "TCMP nor the government can be accountable for any added expense.   This is truly outside our contract.   The government and TCMP have worked diligently to get this approved but in accommodations, we stated there could be no expense per our previous conversations." Id.   Furthermore, Plaintiff avers that Lieutenant Badura "informed [her] on different occasions that she was instructed by Marivic Williams, Cynthia Carpenter, and CDR Neill that I could not return to work until

21

accommodations were in place." Pl's Mem. Opp'n Navy's Mot. for Summ. J. Ex. B ¶ 87, ECF No. 112-3.

Later that same morning (August 16, 2011), TCA offered a "TTY system" to Plaintiff for the first time.[5] TCA's Mem. Supp. Mot. for Summ. J. Ex. 1 ¶ 9, ECF No. 86-1 (Coombs Declaration). In an email to Plaintiff, a TCA employee, Ms. Jackson, explained that she had spoken with a representative from Sorenson and confirmed that Plaintiff was approved for "ntouch pc services," but that Sorenson did not install VRS services at employer locations, and there was therefore need for installation of a TV. Id. Ex. B at 3, ECF No. 86-3. Until the nTouch PC services

---

[5] The record before the Court reflects that a TTY, or teletypewriter, involves a keyboard and monitor attached to a telephone. The TTY permits a hearing-impaired user to transmit typed messages through a phone line, rather than speaking. The ADA requires common carriers to provide a telecommunications relay service ("TRS") that allows hearing-impaired users to communicate with other persons in a manner that is functionally equivalent to communication between hearing individuals. See 47 U.S.C. § 225; 47 C.F.R. § 64.603. TRS essentially permits a hearing-impaired individual to communicate with another individual using a third party operator as an intermediary. A TTY allows a hearing-impaired individual to transmit text messages to a third party operator at a relay service who will then relay the messages to the intended recipient. When the operator receives messages from the other party, he sends them to the hearing-impaired user by typing the other person's message and transmitting the typed message. The typed message then appears on the TTY screen. The record also reflects that a "voice carry over" ("VCO") TRS allows a hearing-impaired individual who can speak to communicate directly to the other end user, rather than having the operator voice the conversation by reading the hearing-impaired individual's typed message. However, even with VCO, the operator will type the other user's messages and transmit them to the hearing-impaired individual's TTY. Throughout their briefs, the parties often refer to TTY interchangeably with TRS, but it appears that a TTY is a form of TRS. To the extent the parties refer simply to TTY, the Court has interpreted such references to involve a TTY-based TRS.

system was in place, TCA offered Plaintiff the use of a TTY system. Id. Plaintiff responded that the nTouch system appeared to be an appropriate accommodation. Id. at 2. However, Plaintiff rejected the use of the TTY system in the meantime because it involved at least an eight second delay "when someone speaks after the call is connected," which often causes people to hang up the phone, and it would not adequately permit Plaintiff to convey medical jargon. Id. at 2-3.

On August 22, 2011, TCMP submitted, to the Navy, three potential options for video relay service for Plaintiff. TCMP's email indicated that Sorenson had denied the use of Plaintiff's preferred accommodation, the VP-200, because Sorenson did not provide that technology for employment settings. However, TCMP indicated that "NTouch Software," "SIPRELAY," and "NTouch Mobile" were potential accommodations for Plaintiff. Navy's Mem. Supp. Mot. for Summ. J. Ex. 21, ECF No.83-24. That same day Anthony Roberts (Navy employee) submitted to Lieutenant Commander Badura a report of the Sorenson systems that were approved for use in the Department of Defense network. See Pl.'s Mem. Opp'n Navy's Mot. for Summ. J. Ex. A2 at 90, ECF No. 112-2; id. Ex. H at 15, ECF No. 112-9 (Roberts Deposition). On August 29, 2011, the Navy requested that TCMP provide additional technical information about the three options in TCMP's original

23

email. Navy's Mem. Supp. Mot. for Summ. J. Ex. 23, ECF No. 83-26.

While the Navy was communicating with TCMP, on August 24, 2011, TCA offered Plaintiff Sorenson's SIPRelay system. TCA's Mem. Supp. Mot. for Summ. J. Ex. 1 ¶ 10. In the email, TCA indicated that Sorenson had rejected the VP-200 for use in the workplace, but that TCA had submitted requests for the "Ntouch Software, "SIPRELAY – IM Service," and "NTouch Mobil[e] Services" to the Government for approval. Id. Ex. 1, Ex. C, at 3, ECF No. 86-4. In a responsive email the next day, Plaintiff rejected SIPRelay as an accommodation because it was a TTY system and, therefore, suffered from the same deficiencies expressed in her August 16, 2011 email. Id. at 2. Additionally, Plaintiff stated that she had "spoke[n] with several people at Sorenson . . . regarding the VP[-]200" and "could definitely receive this accommodation if I submit an email to them requesting why I would need one." Id.

On September 1, 2011, Plaintiff stated to TCA that relay services that did not involve a "permanent means of accommodations in the form of a video phone (NTouch PC or Sorenson VP-200)" would not be a reasonable accommodation. Navy's Mem. Supp. Mot. for Summ. J. Ex. 24 at 2, ECF No. 83-27. However, the next day, Plaintiff suggested that nTouch Mobile would be an effective accommodation, if TCMP provided a data

24

plan and an iPad2 with a forward facing camera.  Id. at 1.  On September 10, 2011, Plaintiff stated that interpreters would also be a reasonable accommodation.  Id. Ex. 26 at 5, ECF No. 83-29.

On September 12, 2011, Commander Neill stated to the COR for the contract that the Navy needed TCMP to "provide an explanation of what exactly is being requested and for what purpose."  Id. at 1.  That same day, the Navy, through Cynthia Carpenter, advised TCMP that it "need[ed] to have a clear concise understanding of what TCMP is requesting of the government."  Id.

On September 29, 2011, TCMP suggested—for a third time—that it would provide TTY services to Plaintiff as a reasonable accommodation for her hearing impairment.  TCA's Mem. Supp. Mot. for Summ. J. Ex. 1 ¶ 11, ECF No. 86-1.  Plaintiff again rejected a TTY system on the basis that it was an unreasonable accommodation.  Id. Ex. D at 2, ECF No. 86-5.

On October 6, 2011, the Navy advised TCMP that it would be sending the form that it uses for "GS employees" to Plaintiff for Plaintiff and her physician to complete so that the Navy could have specific information on the accommodations Plaintiff requested and her need therefor.  Navy's Mem. Supp. Mot. for Summ. J. Ex. 27, ECF No. 83-30.  Additionally, the Navy noted that, although TCMP had requested a meeting with the Government

to discuss Plaintiff's situation, prior to any meeting, TCMP needed to submit a request in writing providing details of what it wanted to discuss. Id.

On October 17, 2011, Plaintiff transmitted to TCA the completed request for accommodation form. Pl.'s Mem. Opp'n Navy's Mot. for Summ. J. Ex. A2 at 106, ECF No. 112-2. On October 31, 2011, TCMP returned such completed form to the Navy. On the form, Plaintiff requested: (1) certified American Sign Language ("ASL") interpreters; (2) Sorenson VP-200; (3) Sorenson nTouch PC; and (4) nTouch Mobile on an iPad 2 or similar device. Navy's Mem. Supp. Mot. for Summ. J. Ex. 28 at 5-6, ECF No. 83-31. Additionally, Plaintiff commented that "TTY, Skype, [and] [r]elay services do not act as a reasonable accommodation." Id. at 7. That same day, counsel for Plaintiff submitted, to counsel for TCA, a proposed agenda for a meeting with the Government, as the Navy had requested as a prerequisite for a meeting. Pl.'s Mem. Opp'n Navy's Mot. for Summ. J. Ex. A2 at 61.

On December 7, 2011, Diana DeLucia, a communications manager for the Navy, suggested that "a free service within the state of Virginia called 'Virginia Relay'" that "works with TTY phones, which we have on site," might be a "viable solution" to Plaintiff's request for accommodation. Navy's Mem. Supp. Mot. for Summ. J. Ex. 29, ECF No. 83-32. According to Ms. DeLucia,

26

through the Virginia Relay system, "[t]he end user dials 7-1-1, types [her] information into the phone, the interpreter will make the phone call and read the information to the called party." Id. The next day, the Navy directed TCMP to ask Plaintiff whether the following options would meet her needs: (1) the Virginia Relay system described by Ms. DeLucia; (2) the use of another staff member to make telephone calls for Plaintiff; and (3) a hard of hearing handset. Id. Ex. 30 at 1-2, ECF No. 83-33. The Navy did not receive a response from TCA regarding Plaintiff's response to those three options until March 26, 2012. Pl.'s Mem. Opp'n TCA's Mot. for Summ. J. Ex. B2 at 84, ECF No. 113-3.

While the Navy was considering the Virginia Relay service as a potential accommodation, on December 9, 2011, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") against TCA. Navy's Mem. Supp. Mot. for Summ. J. Ex. 11, ECF No. 83-14. In such charge, Plaintiff alleged that TCA had violated the Americans with Disabilities Act ("ADA") by refusing to provide Plaintiff with a reasonable accommodation for her hearing impairment.

Shortly after Plaintiff filed her EEOC charge against TCA, on December 14, 2011, the Navy informed TCA that it required an answer to its December 8 email—in which the Navy had instructed TCA to determine whether the Virginia Relay service was

acceptable to Plaintiff—to allow it to further review Plaintiff's case. Id. Ex. 31, ECF No. 83-34. On December 16, 2011, TCA formally offered the Virginia Relay service as an accommodation to Plaintiff. Id. Ex. 32, ECF No. 83-35. In the email offering such accommodation, TCA stated that the offer of accommodation "has been approved for use by the government at the Naval Hospital." Id. Furthermore, in such email, TCA explained the Virginia Relay service using language very similar to the Navy's description thereof to TCA. See id.; id. Ex. 30. The December 16 email was the fourth time TCA had proposed the use of a TTY system as an accommodation for Plaintiff. Plaintiff declined the offered accommodation. TCA's Mem. Supp. Mot. for Summ. J. Ex. 1 ¶ 12, ECF No. 86-1.

On December 22, 2011, Plaintiff began working as a physician assistant for CompHealth. Navy's Mem. Supp. Mot. for Summ. J. Ex. 2 at 2, ECF No. 83-2. Plaintiff describes her job at CompHealth as a "temporary position." Id.

On February 22, 2012, Plaintiff sent a letter to the Navy to follow up on her October 2011 request for accommodation, which she had submitted on the form that the Navy prescribed. Pl.'s Mem. Opp'n Navy's Mot. for Summ. J. Ex. A2 at 117-18. In the letter, Plaintiff complained that the Navy had not set a conference with Plaintiff, despite Plaintiff's submission of an agenda in October. Id. at 117. In light of her belief that

28

"[a]ttempts to dialogue and resolve the matter have gone on for far too long and ample time has been given to [the Navy] and TCA/TCMP to resolve this matter," Plaintiff and her counsel submitted an ultimatum: "if we do not hear from you within ten (10) days of receipt of this letter, we will consider our request for accommodation to be denied and will proceed with consulting a Counselor pursuant to 29 C.F.R. § 1614.105 in order to resolve the matter." Id. at 117-18.

Plaintiff did not receive a response from the Navy within the ten-day period she demanded. Consistent with her letter, on April 11, 2012, Plaintiff initiated equal employment opportunity ("EEO") counseling with the Navy. Navy's Mem. Supp. Mot. for Summ. J. Ex. 12, ECF No. 83-15. In her initial contact, Plaintiff alleged that the Navy had failed to reasonably accommodate her hearing impairment and had constructively discharged her in violation of the Rehabilitation Act.

On May 24, 2012, the Navy issued a memorandum offering to accommodate Plaintiff in response to her October 2011 request for accommodation. Id. Ex. 33 at 1, ECF No. 83-36. In such memorandum, Commander Neill offered: a properly trained staff member with the appropriate medical background to assist Plaintiff in making telephone calls; the Virginia Relay system; sign language services through interpreters within the agency; and the Z-150 video phone, subject to such phone meeting

29

security and network requirements. Id. at 2. The Navy indicated that it could not approve Plaintiff's request for the Sorenson VP-200 or the Sorenson nTouch PC "because they are not approved devices for the Agency's computer network." Id. However, though the Navy's memorandum is dated May 24, 2012, Plaintiff did not receive a copy of it until June 15, 2012. Pl.'s Mem. Supp. Mot. for Summ. J. Ex. B ¶ 198, ECF No. 112-3.

On June 19, 2012, although the Navy had not yet approved the Z-150 video phone as meeting security and network requirements, Plaintiff communicated that she "was willing to try the device as an accommodation if it were ultimately approved." Id. ¶ 202. Commander Neill advised Plaintiff that she would keep Plaintiff updated. Id. ¶ 203.

On July 2, 2012, Commander Neill instructed the Communications Manager at Naval Medical Center – Portsmouth to proceed to process the DSL Line required to increase the available bandwidth to accommodate the Z-150 video phone. Navy's Mem. Supp. Mot. for Summ. J. Exs. 34-35, ECF Nos. 83-37 to 83-38. On July 9, 2012, the Navy's IT and HIPAA compliance departments approved the Z-150 video phone. Id. Ex. 36, ECF No. 83-39. On August 2, 2012, the Navy ordered the Z-150 phone.

Around the same time that the Navy was arranging to obtain the Z-150 video phone, Plaintiff resigned from TCA. Specifically, on July 27, 2012, Plaintiff resigned her position

30

with TCA because she believed TCA had constructively discharged her by failing to respond to her request for accommodation for more than thirteen months. Id. Ex. 38 at 2, ECF No. 83-41.

One week after the Navy ordered the Z-150 video phone, on August 9, 2012, Plaintiff rejected the offers of accommodation included in the Navy's May 24, 2012 letter to Plaintiff. Id. at 1. In Plaintiff's response, she indicated that such letter was inadequate because it "did not propose an accommodation that was approved by the Government, or which would confirm when the equipment could, if ever, be ordered/approved." Id. Plaintiff further noted that, though she had indicated that she was amenable to the Z-150 video phone, she had not received any response from the Navy since June 19, 2012. Id. Plaintiff then stated that the offer of another staff person to make phone calls was inadequate because it was "not responsive to an emergency situation and requires the staff person to paraphrase, which is potentially dangerous in such situations" and Plaintiff reiterated her view that forms or relay, such as Virginia Relay and SIPRelay, were inadequate. Id. Finally, Plaintiff asserted that she believed she had been constructively discharged. Id. As noted above, Commander Neill had advised Plaintiff that she would keep Plaintiff updated; however, Commander Neill "later explained that she did not do so because she was not sure if [Plaintiff] was still a TCA employee." Pl.'s Mem. Opp'n Navy's

Mot. for Summ. J. Ex. B ¶ 203.  However, Commander Neill never asked Plaintiff whether she was still a TCA employee.  See id.

At some point following her resignation, Plaintiff asserts that she has "learned that the Navy has made false statements to future employers stating that [her] privileges were adversely denied, suspended, limited, or revoked at Naval Medical Center [- Portsmouth]."  Id. ¶ 216.  In February 2015, counsel for the Bureau of Medicine told Plaintiff that the Navy had not disseminated any false information about Plaintiff.  Id. ¶ 217. Plaintiff asserts that such statement was not true.  Id. ¶ 218. Plaintiff received recurring responses and inquiries from potential employers that caused Plaintiff to question the Navy again.  Id.  On April 1, 2015, the Navy "corrected the falsehood."  Id. ¶ 219.  However, Plaintiff avers that the Navy "has failed to correct, or commit to correct, other inaccurate information contained in [Plaintiff's] Performance Appraisal Report" that Plaintiff discovered after the Navy produced such documents.  Id.  Instead, the Navy has advised Plaintiff "to file an appeal to obtain corrections."  Id.

### D. Procedural History

On December 19, 2013, Plaintiff filed an action in this Court alleging claims under the ADA and the Rehabilitation Act. Compl., ECF No. 1.  Plaintiff alleged that TCA had failed to accommodate her and had constructively discharged her, in

32

violation of the ADA, and that the Navy had violated the Rehabilitation Act under the same two theories.

On March 31, 2014, the Navy moved to dismiss both of Plaintiff's Rehabilitation Act claims for failure to exhaust administrative remedies through EEO counseling and to dismiss Plaintiff's constructive discharge claim for failure to state a claim upon which relief can be granted. Navy's Mot. to Dismiss, ECF No. 9. On April 14, 2014, Plaintiff moved to amend her complaint. Pl.'s Mot. to Amend, ECF No. 11. On September 23, 2014, the Court dismissed Plaintiff's motion to amend as moot because the Federal Rules of Civil Procedure permitted her to amend her Complaint as a matter of course and the Court denied the Navy's motion to dismiss. Opinion and Order, ECF No. 23. TCA and the Navy answered Plaintiff's amended complaint on October 7, 2014.

On May 8, 2015, with the Court's leave, Plaintiff filed a second amended complaint. Second Am. Compl., ECF No. 75. TCA and the Navy timely answered such complaint.

Three motions for summary judgment are currently pending before the Court. On May 12, 2015, the Navy moved for summary judgment, arguing that the Court should enter judgment in its favor because: (1) Plaintiff is not an employee of the Navy (and, therefore, Plaintiff's Rehabilitation Act claims that depend on an employer-employee relationship necessarily fail);

(2) Plaintiff did not timely initiate EEO counseling; and (3) Plaintiff has not demonstrated that the Navy constructively discharged her. Navy's Mot. for Summ. J., ECF No. 82. On May 13, 2015, TCA moved for summary judgment. TCA's Mot. for Summ. J., ECF No. 85. TCA contends that the undisputed facts demonstrate that TCA is entitled to judgment as a matter of law on Plaintiff's ADA claims because Plaintiff rejected its offer of a reasonable accommodation in the form of a TTY and TRS, and because TCA did not constructively discharge Plaintiff. On June 17, 2015, Plaintiff moved for partial summary judgment on the issue of whether the Navy was her employer for purposes of liability under the Rehabilitation Act. Pl.'s Mot. for Summ. J., ECF No. 135. The parties have fully briefed all three motions for summary judgment. On August 26, 2015, pursuant to Federal Rule of Civil Procedure 56(d), Plaintiff moved for leave to submit additional evidence to oppose the Navy's and TCA's motions for summary judgment. On August 31, 2015, the Court heard argument from the parties on their summary judgment motions.

## II. STANDARD OF REVIEW

The Federal Rules of Civil Procedure provide that a district court shall grant summary judgment in favor of a movant if such party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter

of law." Fed. R. Civ. P. 56(a). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby Inc., 477 U.S. 242, 247-48 (1986). A fact is "material" if it "might affect the outcome of the suit," and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. A party opposing a summary judgment motion "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." Othentec Ltd. v. Phelan, 526 F.3d 135, 140 (4th Cir. 2008) (quoting Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985)).

If a movant has properly advanced evidence supporting entry of summary judgment, the non-moving party may not rest upon the mere allegations of the pleadings, but instead must set forth specific facts in the form of exhibits, sworn statements, or other materials that illustrate a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986); Fed. R. Civ. P. 56(c). At that point, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249. In doing so, the judge must construe the facts and all "justifiable inferences" in the light

35

most favorable to the non-moving party, and the judge may not make credibility determinations. _Id._ at 255; Reyazuddin v. Montgomery Cty., 789 F.3d 407, 413 (4th Cir. 2015).

When confronted with cross motions for summary judgment, the court must review "each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." Defs. of Wildlife v. N.C. Dep't of Transp., 762 F.3d 374, 392 (4th Cir. 2014) (quoting Bacon v. City of Richmond, 475 F.3d 633, 638 (4th Cir. 2007)). As to each motion, the Court must separately resolve factual disputes and competing rational inferences in favor of the non-movant. _Id._ at 392-93 (citing Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003)).

### III. DISCUSSION

Three motions for summary judgment are currently before the Court. First, the Court will consider Plaintiff's motion for partial summary judgment and the Navy's motion for summary judgment regarding whether the Navy employed Plaintiff. Second, the Court will consider the remaining contentions in the Navy's motion for summary judgment. Third, the Court will address TCA's motion. However, before turning to the parties' summary judgment motion, the Court will resolve Plaintiff's motion for leave to submit additional evidence.

36

## A. Plaintiff's Motion for Leave to Submit Additional Evidence

Shortly before the Court's hearing on the parties' motions for summary judgment, Plaintiff filed a motion under Federal Rule of Civil Procedure 56(d) and Local Civil Rule 7(F)(1) requesting leave to submit additional evidence to oppose the Navy's and TCA's motions. Plaintiff seeks to supplement the summary judgment record to include evidence that has become a part of the record as a result of supplemental discovery that the Court ordered as a sanction for discovery violations by the parties. By Order of July 17, 2015, the Court permitted Plaintiff to conduct a supplemental deposition of the Navy's Rule 30(b)(6) representative and directed Plaintiff to supplement certain interrogatory responses. Order, ECF No. 147. In her motion to submit additional evidence, Plaintiff seeks to submit testimony, from the supplemental deposition of the Navy's Rule 30(b)(6) witness that occurred after the Navy submitted its motion for summary judgment, regarding the absence of posters informing Plaintiff, and other contractors, of the right to file an EEO charge against the Navy. Additionally, Plaintiff requests leave to submit the supplemental and amended answers to interrogatories that Plaintiff provided to the Navy, as directed by the Court, and supplemental and amended answers to interrogatories that Plaintiff provided to TCA.

37

Federal Rule of Civil Procedure 56(d) concerns situations in which facts are unavailable to a party opposing a motion for summary judgment.  Such rule provides:

> If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
> (1)  defer considering the motion or deny it;
> (2)  allow time to obtain affidavits or declarations or to take discovery; or
> (3)  issue any other appropriate order.

Fed. R. Civ. P. 56(d).  "Rule 56(d) mandates that summary judgment be denied when the nonmovant 'has not had the opportunity to discover information that is essential to his opposition.'"  Pisano v. Strach, 743 F.3d 927, 931 (4th Cir. 2014) (quoting Ingle ex rel. Estate of Ingle v. Yelton, 439 F.3d 191, 195 (4th Cir. 2006)).  Thus, parties normally seek relief under Rule 56(d) when they have had an insufficient opportunity to conduct the discovery necessary to oppose a motion for summary judgment.  See 10B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2740 (3d ed. 1998 & Supp. 2015).  Importantly, the Fourth Circuit has recognized that "the failure to file an affidavit under Rule 56(f) is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate."  Harrods Ltd. v. Sixty Internet Domain Names, 302 F.3d 214, 244 (4th Cir. 2002) (quoting Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 961 (4th Cir. 1996)) (referring to Rule 56(f), the predecessor

38

to Rule 56(d)).  Likewise, "a court may deny a Rule 56(d) motion
when the information sought would not by itself create a genuine
issue of material fact sufficient for the nonmovant to survive
summary judgment."  Pisano, 743 F.3d at 931 (citing Ingle, 439
F.3d at 195).

After considering Plaintiff's motion for leave to submit
additional evidence and the parties' submissions, the Court will
**DENY** such motion with respect to TCA's motion for summary
judgment and will **DENY AS MOOT** such motion as to the Navy's
motion for summary judgment.  Plaintiff's Rule 56(d) motion is
procedurally deficient because Plaintiff has not "show[n] by
affidavit or declaration that, for specified reasons, [she]
cannot present facts essential to justify [her] opposition" to
TCA's and the Navy's motions for summary judgment.  Fed. R. Civ.
P. 56(d).  Moreover, as to TCA, Plaintiff has not adequately
explained why the information contained in the supplemental
answers to interrogatories that she wishes to add to the record
was not available to her prior to her response in opposition to
TCA's motion.  Therefore, the Court will **DENY** Plaintiff's motion
for leave to submit additional evidence, pursuant to Rule 56(d),
in response to TCA's motion for summary judgment.  See Harrods
Ltd., 302 F.3d at 244.  Likewise, the Court finds that Plaintiff
has not demonstrated that relief is appropriate under Local
Civil Rule 7(F)(1), and, with respect to TCA's motion for

summary judgment, the Court will **DENY** Plaintiff's motion for leave to submit additional evidence pursuant to such local rule. Regarding the Navy's motion for summary judgment, in her brief in opposition thereto, Plaintiff stated that she had not had the opportunity to discover information essential to opposing such motion because of alleged discovery violations by the Navy. Yet, as with her motion with respect to TCA's motion for summary judgment, Plaintiff has not submitted the affidavit or declaration required under Rule 56(d). Nonetheless, assuming _arguendo_ that the Court overlooked Plaintiff's noncompliance with Rule 56(d)'s affidavit requirement, after reviewing the additional evidence that Plaintiff submitted, the Court finds that such evidence would not alter the Court's decision regarding any of the issues the Navy raised in its motion. Thus, a formal ruling on the merits of Plaintiff's motion for leave to submit additional evidence to oppose the Navy's motion for summary judgment is unnecessary because Plaintiff's additional evidence does not affect the Court's ruling on the Navy's motion. Therefore the Court will **DENY AS MOOT** Plaintiff's motion for leave to submit additional evidence to oppose the Navy's motion for summary judgment.

## B. Plaintiff's Motion and the Navy's Motion: Joint Employer Doctrine

### 1. The Joint Employer Doctrine

The Rehabilitation Act prohibits the Navy from discriminating against its employees on the basis of disability. Section 501 of such Act establishes:

> The standards used to determine whether this section has been violated in a complaint alleging nonaffirmative action employment discrimination under this section shall be the standards applied under title I of the Americans with Disabilities Act of 1990 (42 U.S.C. 12111 et seq.) and the provisions of sections 501 through 504, and 510, of the Americans with Disabilities Act of 1990 (42 U.S.C. 12201-12204 and 12210), as such sections relate to employment.

29 U.S.C. § 791(f); see also 29 C.F.R. § 1614.203(b). Under Title I of the ADA, "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Furthermore, the ADA defines: a "covered entity" as "an employer, employment agency, labor organization, or joint labor-management committee," id. § 12111(2); an "employee," in pertinent part, as "an individual employed by an employer," id. § 12111(4); and an "employer," again, in pertinent part, as "a person engaged in an industry affecting commerce who has 15 or more employees for each working day in

41

each of 20 or more calendar weeks in the current or preceding calendar year, and any agent of such person," id. § 12111(5)(A).[6] Thus, under the statutory framework of Section 501 of the Rehabilitation Act and the provisions of the ADA incorporated therein, the Navy cannot discriminate against its employees on the basis of disability.  Put differently, a cause of action under Section 501 of the Rehabilitation Act depends on the existence of an employer-employee relationship between the Navy and the plaintiff.[7]

---

[6] The ADA incorporates the definition of "person" set forth in Title VII of the Civil Rights Act of 1964.  42 U.S.C. § 12111(7); see also id. § 2000e(a).  Additionally, while the ADA expressly exempts the United States from its definition of "employer," see id. § 12111(5)(B)(i), as noted above, Section 501 of the Rehabilitation Act establishes a cause of action against the Government.

[7] In a footnote, Plaintiff argues that she has asserted claims under Section 501 and Section 504 of the Rehabilitation Act and that her Section 504 claim does not depend on the existence of an employer-employee relationship between the Navy and Plaintiff.  See Pl.'s Mem. Opp'n Navy's Mot. for Summ. J. at 6 n.1.  Section 504(a) provides:

> No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

29 U.S.C. § 794(a).  The courts of appeals are divided regarding whether Section 504 applies outside of an employment relationship. Compare, e.g., Fleming v. Yuma Reg'l Med. Ctr., 587 F.3d 938, 939 (9th Cir. 2009), with, e.g., Wojewski v. Rapid City Reg'l Hosp., Inc., 450 F.3d 338, 345 (8th Cir. 2006).  However, even if Section 504 provides a cause of action to non-employees, the United States has not waived its sovereign immunity from actions for damages under Section 504. Lane v. Pena, 518 U.S. 187, 200 (1996).  Thus, if successful on her Section 504 action, the Court may grant Plaintiff only equitable

Importantly, in the context of Title VII, the Fourth Circuit has recognized that, under the joint employer doctrine, when two entities exercise control over a person, one entity may exercise sufficient control over such individual so as to qualify as that person's employer, even if the other entity formally employed the individual. As explained in Butler v. Drive Automotive Industries of America, Inc., "[t]he basis for the finding that two companies are 'joint employers' is that one employer[,] while contracting in good faith with an otherwise independent company, has retained for itself sufficient control of the terms and conditions of employment of the employees who are employed by the other employer." 793 F.3d 404, 408 (4th Cir. 2015) (quoting Torres-Negrón v. Merck & Co., 488 F.3d 34, 40 n.6 (1st Cir. 2007)). Therefore, the Fourth Circuit has held that "multiple entities may simultaneously be considered employers for the purposes of Title VII." Id. at 410. Although

---

relief. In this case, the parties limited their briefing regarding Section 504 to an exchange of footnotes. See Pl.'s Mem. Opp'n Navy's Mot. for Summ. J. at 6 n.1; Navy's Reply Supp. Mot. for Summ. J. at 6 n.1, ECF No. 117. In the operative complaint, Plaintiff does not expressly seek reinstatement. Second Am. Compl. ¶ C, at 15, ECF No. 75. Therefore, though the Court has not had the benefit of briefing on the issue, it is not clear that Plaintiff would be entitled to most of the relief she seeks in light of the Navy's sovereign immunity from actions for damages under Section 504. Cf. Sailor v. Hubbell, Inc., 4 F.3d 323, 325-26 (4th Cir. 1993); Hubbard v. Adm'r, EPA, 982 F.2d 531, 539 (D.C. Cir. 1992) (en banc). In any event, the Court's resolution of the instant motions renders unnecessary any further analysis of Section 504 at this stage of the proceedings. However, the parties should be prepared to address the issue further at any trial that may occur in this matter.

this claim against the Navy involves the Rehabilitation Act, the parties agreed during the summary judgment hearing that the joint employer doctrine applies in this context as well.

To determine whether an entity is an employer under the joint employer doctrine, the Court must apply the multi-factor analysis set forth in Butler. The following factors are relevant, though none is dispositive:

(1) authority to hire and fire the individual;
(2) day-to-day supervision of the individual, including employee discipline;
(3) whether the putative employer furnishes the equipment used and the place of work;
(4) possession of and responsibility over the individual's employment records, including payroll, insurance, and taxes;
(5) the length of time during which the individual has worked for the putative employer;
(6) whether the putative employer provides the individual with formal or informal training;
(7) whether the individual's duties are akin to a regular employee's duties;
(8) whether the individual is assigned solely to the putative employer; and
(9) whether the individual and putative employer intended to enter into an employment relationship.

Id. at 414. Additionally, the Court may "modify the factors to the specific industry context," and "the common-law element of control remains the 'principal guidepost' in the analysis." Id. The purpose of an analysis of the Butler factors is "to pierce the legal formalities of an employment relationship to determine the loci of effective control over an employee, while not discounting those formalities entirely." Id. at 415.

That said, not all _Butler_ factors are created equal. Instead, "[t]hree factors are the most important":

> The first factor, which entity or entities have the power to hire and fire the putative employee, is important to determining ultimate control. The second factor, to what extent the employee is supervised, is useful for determining the day-to-day, practical control of the employee. The third factor, where and how the work takes place, is valuable for determining how similar the work functions are compared to those of an ordinary employee.

_Id._ at 414-15 (emphasis added). Conversely, the ninth factor, "whether the individual and the putative employer intended to enter into an employment relationship," "ordinarily will be of minimal consequence in the joint employment analysis," though "the intent of the parties should be part of the overall fact-specific inquiry into the putative employee's circumstances." _Id._ at 414 n.12.

Beyond the court's explanation of the factors relevant to the joint employment determination, the Fourth Circuit's application of such factors in _Butler_ is instructive. In _Butler_, the court considered whether the trial court had erred in granting summary judgment to an automotive-parts manufacturer on the basis that the manufacturer did not employ the plaintiff within the meaning of Title VII and, therefore, could not be liable for any sexual harassment discrimination against the plaintiff. In that case, a staffing agency had hired the plaintiff to work at the automotive-parts manufacturer's facility. _Id._ at 406. The plaintiff wore the staffing

company's uniform, parked in its parking lot, and received her pay from such company. Id. at 406-07. And the staffing company "had ultimate responsibility for issues related to discipline and termination." Id. at 407. On the other hand, the automotive-parts manufacturer set the plaintiff's work schedule and "arranged portions of [the plaintiff's] training." Id. Furthermore, the automotive-parts manufacturer's employees supervised the plaintiff, and she worked on the floor of the manufacturer's factory. Id. The staffing company told the plaintiff that she worked for both it and the manufacturer. Id. Based on those facts, the trial court concluded that the manufacturer did not exercise sufficient control over the plaintiff to qualify as her employer under Title VII.

On appeal, the Fourth Circuit reversed the trial court and held that, as a matter of law, the automotive-parts manufacturer was the plaintiff's employer. Id. at 415. The Court emphasized four factors. First, the court concluded that the manufacturer "exhibited a high degree of control over the terms of [the plaintiff's] employment" because it had sent an email to the staffing company stating that the plaintiff should be "add[ed] to the list for replacement," and, after a delay, the staffing company then terminated the plaintiff. Id. Thus, although the staffing company "formally fired [the plaintiff]," the court found that the manufacturer had "effective control" over her

46

employment, especially in light of testimony from the staffing company's manager that he "could not recall an instance" when the staffing company declined a request from the manufacturer to discipline or terminate a staffing-company employee. Id. Second, the court underscored that the manufacturer exercised "day-to-day supervision" of the plaintiff on the floor of the manufacturer's factory. Id. Third, the court noted that, although the plaintiff wore a staffing-company uniform, she and other staffing-company employees "performed the same tasks, and used the same equipment" as the manufacturer's employees, which indicated that there was "little or no effective difference between the work performed by the two sets of employees." Id. Fourth, and finally, the court found that the plaintiff's "labor was not tangential or peripheral to [the manufacturing company]" because "[the plaintiff] performed the same tasks as [the manufacturer's] employees and produced goods that were [the manufacturer's] core business." Id. This indicated that the seventh factor—"whether the individual's duties are akin to a regular employee's duties"—militated towards a finding that the manufacturer employed the plaintiff. Id. The Butler court concluded that the district court had failed to give appropriate weight to those four factors and determined that, taken together, they established that the manufacturer was the plaintiff's employer under the joint employer doctrine.

47

## 2. Whether the Navy Employed Plaintiff

Both the Navy and Plaintiff contend that the undisputed facts demonstrate that they are entitled to judgment as a matter of law regarding whether the Navy employed Plaintiff. To support such contention, the Navy relies heavily on the Fourth Circuit's decision in Cilecek v. Inova Health System Services, 115 F.3d 256 (4th Cir. 1997), in which the court held that a physician was an independent contractor and, therefore, that a hospital did not employ such physician for the purposes of Title VII liability. In particular, the Navy refers to the portions of Cilecek indicating that a hospital's degree of control over, provision of equipment to, and scheduling the hours of, a physician are unreliable indicators of whether such physician is an independent contractor or an employee of the hospital. In light of Cilecek, the Navy emphasizes that TCMP was Plaintiff's employer because it recruited Plaintiff, set and paid Plaintiff's wages, withheld taxes when required for Plaintiff, paid employee benefits to Plaintiff, managed Plaintiff's leave, and had the authority to fire and discipline Plaintiff. Additionally, the Navy underscores that its relationship with Plaintiff was of limited duration and that the Navy did not prohibit Plaintiff from working for other entities. The Navy further notes that, under the contract, TCA determined who would fill the physician extender position—be it Plaintiff or one of

48

the other two HCWs who, under the contract, could fill such position. Finally, the Navy asserts that the qualifications it set for the physician extender position and its review of Plaintiff's technical package prior to credentialing her constitute routine quality assurance actions that do not render the Navy Plaintiff's employer.

As noted above, the Butler factors guide the Court's analysis with regard to the joint employer doctrine. The Court will begin by considering such factors as they apply to Plaintiff's motion, with the disputed facts construed in a light most favorable to the Navy.

The first factor—the authority to hire and fire Plaintiff—weighs, to some degree, in favor of a finding that the Navy employed Plaintiff. In this case, it is undisputed that the Navy had some role in hiring Plaintiff because, among other things, it set the qualifications for the physician extender position in Task Orders 25, 68, and 81. Navy's Mem. Supp. Mot. for Summ. J. Ex. 4, Attachment B, § 8, at 6 (Task Order 25), ECF No. 83-6; id. Attachment C, § 8, at 7-8 (Task Order 68), ECF No. 83-7; Pl.'s Mem. Opp'n Navy's Mot. for Summ. J. Ex. A2 § 7, at 76-77 (Task Order 81), ECF No. 112-2. Furthermore, although Plaintiff applied to TCA for the physician extender position, the Navy reviewed Plaintiff's technical package, and, as part of such review, Captain Nelson conducted a phone interview with

49

Plaintiff to ensure that she met the qualifications in the Task Order. Therefore, even if the Navy merely reviewed Plaintiff's technical package to ensure compliance with the contract (including the qualifications for the physician extender position that the Navy set), Plaintiff could not have worked at BMC Sewells without the Navy's approval. For the purposes of determining whether the Navy employed Plaintiff while she worked at BMC Sewells, this suggests that the Navy at least shared, with TCA, the authority to hire Plaintiff.

Additionally, the record establishes that the Navy had at least partial authority to terminate Plaintiff's work at BMC Sewells because the Navy retained the authority to report an HCW's misconduct or deficiencies to TCA for corrective action and the contract generally required TCA to take such action. In this case, viewing the evidence in a light most favorable to the Navy, TCA retained the exclusive authority to formally terminate Plaintiff. Although the Navy itself could only bar Plaintiff from its premises for safety reasons, it is undisputed that the Navy could report an HCW's misconduct or performance deficiencies to TCA and that the contract generally required TCA to correct such issues. Under the contract, the Navy reserved the right to require TCA to attend contract status review meetings. Navy's Mem. Supp. Mot. for Summ. J. Ex. 4, Attachment A, § C.13.1, ECF No. 83-5. The contract further provided that,

at such meetings, "the Government shall inform the Contractor of any employment-related issues that <u>require</u> corrective action on the part of the Contractor." <u>Id.</u> § C.13.1.1 (emphasis added). The use of the term "require" suggests that, at a contract status review meeting, once the Government informed TCA of an employment-related issue, some corrective action on the part of TCA was mandatory.[8]   Additionally, the uncontroverted testimony of Ms. Robles establishes that the Navy could report misconduct by, or problems with, a TCA employee, and TCA would "act upon a performance improvement and/or termination, depending on what the person's actions are."   Navy's Mem. Supp. Mot. for Summ. J. Ex. 7 at 9, ECF No. 83-10.   Likewise, although she states that "[t]he Navy does not have the ability under the Contract or a Task Order to terminate or fire a contract employee," Ms. Carpenter (the Head Contract Administrator at Naval Medical Center – Portsmouth) has averred that "any deficiencies of a contractor are reported to the COR, which is then responsible for addressing the issue as a contract performance matter with the contractor which (generally) is responsible for taking any

---

[8] <u>See</u> <u>Merriam Webster's Collegiate Dictionary</u> 995 (10th ed. 1997) (defining "require" as "to claim or ask for by right and authority . . ."); <u>Webster's Third New International Dictionary</u> 1929 (1993) (defining "require" as "to demand as necessary or essential (as on general principles or in order to comply with or satisfy some regulation). . . ."); <u>Require, v.</u>, <u>Oxford English Dictionary Online</u>, http://www.oed.com/view/Entry/163258 (updated June 2015) (defining "require" as "[o]f a law, custom, a general principle, etc.: to demand as necessary or essential. . . .").

necessary corrective or disciplinary action." Id. Ex. 4 ¶ 11, ECF No. 83-4. Considered as a whole, and in a light most favorable to the Navy, the above undisputed facts demonstrate that, like any HCW, the Navy could report Plaintiff's misconduct or deficiencies to TCA and that, at least as a general matter, TCA was required to take corrective action. To be sure, whether the Navy's authority to report misconduct or deficiencies to TCA, which generally required TCA to take corrective action, was akin to the authority to effectively terminate Plaintiff's work at BMC Sewells is less clear than in Butler. Here, unlike Butler, there is no evidence that TCA always disciplined or terminated an HCW if the Navy made such a request. Nonetheless, under Butler, the Navy's authority to report an HCW's misconduct or deficiencies to TCA, which generally would take corrective or disciplinary action, establishes a significant level of authority on the part of the Navy to terminate Plaintiff, at least for severe misconduct or performance deficiencies. See id. Ex. 7 at 9 (noting that TCA would "act upon a performance improvement and/or termination, depending on what the person's actions are"). Although such authority to terminate is less clear than in Butler, when combined with the Navy's ability to set the qualifications for Plaintiff's position and its interview of Plaintiff (at minimum, to ensure that she met such

qualifications), the Court finds that the first _Butler_ factor slightly favors a finding that the Navy employed Plaintiff.

With respect to "day-to-day supervision of employees, including employee discipline," the second _Butler_ factor, the Court finds that such factor militates towards a finding that the Navy employed Plaintiff. The parties do not dispute that the Navy exercised day-to-day supervision over Plaintiff. Indeed, the contract provided that TCMP's HCWs would be "subject to day-to-day supervision and control by Government personnel." Navy's Mem. Supp. Mot. for Summ. J. Ex. 4, Attachment A, § C.2.3. And, as part of such supervision, the Navy conducted FPPE and OPPE evaluations of Plaintiff and Navy physicians periodically reviewed Plaintiff's patients' charts. Pl.'s Mem. Supp. Mot. for Summ. J. Ex. 1 at 23-24, ECF No. 136-1. Furthermore, uncontroverted evidence in the record demonstrates that the Navy provided Plaintiff with "standard 'blurbs'" for telephone consults regarding cancer screenings, diabetes, referrals, and lab or test results, which shows that the Navy exercised day-to-day control over Plaintiff. _Id._ Ex. 3C, ECF No. 136-9. Moreover, even viewing the facts in a light most favorable to the Navy, the record establishes that the Navy possessed the authority to discipline Plaintiff to some extent, and exercised that authority on at least one occasion. The contract contemplated that Plaintiff's supervisors might

discipline her for minor misconduct. The contract advised supervisors to "supervis[e] the contract personnel in the same manner as they supervise the government personnel on their staff." Navy's Mem. Supp. Mot. for Summ. J. Ex. 4, Attachment A, § 9.6, at 45. Also, the contract directed Navy personnel supervising HCWs to provide to such HCWs "the normal feedback that should be provided to any employee regarding the quality of their performance," "inform[ing] [them] when they have performed well, or performed poorly," and to document "[c]ounseling sessions regarding both good performance and poor performance." Id. § 9.7, at 45. On at least one occasion, Commander Neill exercised such supervision by counseling Plaintiff regarding a patient's complaint.[9] Pl.'s Mem Opp'n Navy's Mot. for Summ. J. Ex. B ¶ 46, ECF No. 112-3. Finally, it is undisputed that the Navy possessed the unilateral authority to transfer Plaintiff to "any Navy medical Center, Portsmouth medical treatment facility within a 50-mile commuting radius of the NMCP proper." Navy's Mem. Supp. Mot. for Summ. J. Ex. 4, Attachment A, § C.3.3.11.

---

[9] The Navy attempts to dispute the fact that Commander Neill counseled Plaintiff by asserting that Plaintiff has only supported such fact with her declaration. However, Plaintiff's sworn declaration sufficiently establishes her personal knowledge of the fact stated therein with respect to such counseling (namely, that Plaintiff was aware of the counseling because she was the person whom Commander Neill counseled) and, therefore, the Navy's bare assertion that such fact is unsupported does not establish a genuine dispute. Although the Navy provides an explanation for Commander Neill's actions—ensuring that Plaintiff was providing quality care—that explanation does not rebut the fact that Commander Neill counseled Plaintiff.

Accordingly, in light of the forgoing, the undisputed facts in the record establish that the Navy exercised day-to-day supervision of Plaintiff, which favors a finding that the Navy employed Plaintiff.

Along with the first and second Butler factors, the third factor also favors Plaintiff because the undisputed facts reflect that the Navy "furnish[ed] the equipment used and the place of work." See 793 F.3d at 414. The Navy does not dispute that it "provided Plaintiff's place of employment as well as all equipment (both medical and technical)," aside from Plaintiff's stethoscope. Pl.'s Mem. Supp. Mot. for Summ. J. at 9-10, ECF No. 136. Thus, the Navy furnished the equipment Plaintiff used and the place of her employment. For the purposes of potential Rehabilitation Act liability, the Court concludes that the third factor suggests that the Navy employed Plaintiff.

Before turning to the remaining Butler factors, the Court will consider the Navy's contention that Butler factors two and three are unreliable indicia of control in cases involving medical professionals. The Navy correctly notes that Cilecek establishes that, for the purposes of determining whether a medical professional is an employee or independent contractor, the degree to which a hospital exercises control over aspects of patient care is not a "reliable indicator" of whether such professional is an employee because hospitals have a

professional responsibility to their patients and, therefore, require the ability to ensure that physicians maintain standards of patient care. See 115 F.3d at 261-62. Similarly, the fact that a medical professional uses instruments and equipment that a hospital supplies is not a "reliable indicator of employee status" because such use generally is inherent in the provision of certain medical services, such as emergency medical services. See id. at 262.

Although the Navy cites Cilecek as indicating that day-to-day supervision and the provision of equipment and the place of work are unreliable factors for assessing joint employment status for a physician assistant, Cilecek is distinguishable from this case because it did not involve the joint employer doctrine. An independent contractor analysis, such as that in Cilecek, arguably differs from the joint employer determination that the Court must undertake in this case. In determining whether a plaintiff worked as an independent contractor, a court evaluates the balance of control between the plaintiff and the alleged employer to determine whether the plaintiff exercised sufficient control over her own work, such that she operated as an independent contractor rather than an employee. On the other hand, a court's joint employer inquiry focuses on the balance of control over the plaintiff's work between two purported employers to determine whether both entities exercised

sufficient control over the plaintiff, such that they both operated as the plaintiff's employer. Thus, though the independent contractor and joint employer analyses both focus on control over the plaintiff's work, they compare the exercise of control from different vantage points. The independent contractor analysis considers the degree of control an entity exercises over an individual vis-à-vis such individual; the joint employer analysis considers the degree of control an entity exercises over an individual, vis-à-vis another entity.[10] Accordingly, while the degree of day-to-day supervision and the provision of the instrumentalities of work may be unreliable for determining whether a medical professional is an independent contractor or employee, it does not necessarily follow that they are irrelevant to ascertaining whether a medical professional who undisputedly is an employee of one entity—not an independent contractor—also should be considered an employee of another entity. In other words, where it is undisputed that a medical professional is an employee, the extent to which a hospital exercises control over such professional and to which the

---

[10] Cf. Zheng v. Liberty Apparel Co., 355 F.3d 61, 67-68 (2d Cir. 2003) (noting that factors used to ascertain whether an individual is an independent contractor under the Fair Labor Standards Act "do not bear directly on whether workers who are already employed by a primary employer are also employed by a second employer. Instead, they help courts determine if particular workers are independent of all employers."); Bristol v. Bd. of Cnty. Comm'rs, 312 F.3d 1213, 1217-18 (10th Cir. 2002) (en banc) (distinguishing between the factors relevant to an independent contractor analysis and those relevant to a joint employer analysis).

professional uses hospital equipment aids the Court in "determin[ing] the loci of effective control over [the professional]" as between the hospital and other employer, because such factors are probative of the relative balance of control between the two entities. See Butler, 793 F.3d at 415. Even if, under Cilecek, day-to-day supervision of a medical professional and such professional's use of an entity's instrumentalities while providing patient care are inherent in the provision of medical services at a hospital (and, therefore, not probative of whether the medical professional is an employee or independent contractor), it matters which entity exercised such inherent control and provided such instrumentalities. For example, if a company contracts with a hospital to provide physician assistants to serve the hospital's patients, but such physician assistants operate from a clinic owned and equipped by the contracting company and under the supervision of the contracting company's physicians, the hospital would exercise a much lesser degree of effective control over the physician assistants than if such professionals operated on-site at the hospital and under the supervision of the hospital's physicians. Accordingly, in a joint employer case, the fact that one purported employer exercised the control inherent in, and provided the equipment required for, the provision of medical services, instead of the other conceded employer, weighs in

favor of a finding that the former entity also is an employer.
For those reasons, the Court is not persuaded that Cilecek and
the medical professional context in which this case arises
render irrelevant two of the three factors that the Butler court
considered to be the most important in determining whether an
entity is a joint employer.[11]

---

[11] The Court also finds that Robb v. United States, 80 F.3d 884
(4th Cir. 1996), is distinguishable from this case.  In Robb, the
court considered whether the United States was liable under the
Federal Tort Claims Act for the negligence of two physicians employed
by a provider of primary care medical services that had entered into a
"Partnership Memorandum of Understanding" ("MOU") with the United
States Air Force.  80 F.3d at 885-86.  The Robb court concluded that
one of the physicians was an independent contractor, rather than an
employee of the Air Force, because the Air Force did not pay the
physician, the primary care provider that employed the physician
operated a "stand alone clinic" on Government property and provided
malpractice insurance coverage for the physician, and the Air Force
lacked control over the physician's independent medical judgment.  In
addition, the Robb court emphasized "the clear expression of intent in
the MOU to establish an independent contractor relationship."  Id. at
893.  For the same reasons noted with respect to Cilecek, the Court
finds that the independent contractor analysis in Robb differs from
the joint employer analysis required in this case.  Furthermore, Robb
is factually dissimilar from this case.  Unlike Robb, Plaintiff did
not work at a "stand alone clinic," and the Navy provided malpractice
insurance coverage for Plaintiff.  See Navy's Mem. Supp. Mot. for
Summ. J. Ex. 4, Attachment A, §§ C.2, C.3.3.11.  Moreover, the Navy
exercised a greater degree of control over the independent medical
judgment of Plaintiff, a physician assistant, than the Air Force
exercised over the physician in Robb.  As the Navy's Guidelines for
the Utilization of Physician Assistants establish, "[a]lthough
[physician assistants] exercise a substantial degree of independence
in the performance of their duties, they must, by definition, function
with the supervision of a doctor of medicine or osteopathy, when
performing medical services."  Pl.'s Mem. Opp'n Navy's Mot. for Summ.
J. Ex. C at 3, ECF No. 112-4.  And although Plaintiff, as a physician
assistant, was "expected to exercise a substantial degree of clinical
judgment," id. at 4, she remained subject to significant supervision
by Navy physicians, see id. at 4-5.  Finally, to the extent the Robb
court emphasized the "clear expression of intent in the MOU," 80 F.3d
at 893, Robb is inconsistent with the Fourth Circuit's most recent
authority on the joint employer doctrine, which suggests that "the

The fourth Butler factor, "possession of and responsibility over the individual's employment records, including payroll, insurance, and taxes" weighs in favor of the Navy's position. The undisputed facts establish that "TCMP paid Plaintiff's wages, provided earning statements, withheld from her pay all applicable withholdings required by law, paid the employer's share of social security and Medicare taxes owed on her behalf, and provided her with federal tax form W-2s." Navy's Mem. Supp. Mot. for Summ. J. at 6, ECF No. 83. And "Plaintiff was eligible for and enrolled in various employee benefits offered (and paid for) by TCMP, including a 401(k) plan, health insurance, dental insurance benefits, vision care benefits, group life insurance and short term disability benefits while working at BMC Sewells." Id. Moreover, the contract required TCMP, not the Navy, to maintain general workers' compensation and employer's liability insurance. Id. Ex. 4, Attachment A, § H.8, ECF No. 83-5. That said, the Navy provided malpractice insurance for Plaintiff. Nonetheless, even though the Navy was responsible for Plaintiff's malpractice insurance, considering that TCA retained most of the responsibility for Plaintiff's "employment records, including payroll, insurance, and taxes" and viewing the evidence in a light most favorable to the Navy, the Court

subjective intentions of the parties ordinarily will be of minimal consequence in the joint employment analysis." Butler, 793 F.3d at 414 n.12.

finds that the fourth _Butler_ factor militates _against_ a finding that the Navy employed Plaintiff.

With regard to "the length of time during which the individual has worked for the putative employer," the fifth _Butler_ factor, such factor favors the Navy because the Court concludes that Plaintiff worked for the Navy for a relatively short period of time. Viewing the evidence in a light most favorable to the Navy, Plaintiff worked for the Navy from May 18, 2010 until April 26, 2011 (the date on which Plaintiff underwent cochlear implant revision surgery and after which Plaintiff never returned to work at BMC Sewells). Thus, Plaintiff worked for the Navy for approximately one year. The one-year duration of Plaintiff's work relationship with the Navy is relatively short. _See, e.g._, _Lockett v. Allstate Ins. Co._, 364 F. Supp. 2d 1368, 1375 (M.D. Ga. 2005) (finding that three years was a relatively short period in considering the duration of employment); _cf. e.g._, _EEOC v. Zippo Mfg. Co._, 713 F.2d 32, 34, 38 (3d Cir. 1983) (finding that a ten-year duration of work indicated that the length of time the plaintiffs worked for a defendant was the only factor that "point[ed] toward their status of employees"). Therefore, viewing the evidence in a light most favorable to the Navy, the Court finds that the fifth _Butler_ factor favors a finding that the Navy did not employ Plaintiff.

The sixth Butler factor slightly favors Plaintiff. Under Butler, the Court looks to "whether the putative employer provides the individual with formal or informal training." In this case, the parties dispute the extent to which the Navy trained Plaintiff. It is undisputed that "TCA was responsible for providing [Plaintiff's] Continuing Medical Education (CME)," Pl.'s Mem Opp'n Navy's Mot. for Summ. J. Ex. B ¶ 213, ECF No. 112-2, and "Plaintiff received monetary assistance from TCMP to offset costs for continuing medical education requirements," Navy's Mem. Supp. Mot. for Summ. J. Ex. 1 at 10, ECF No. 83-1. Based on such evidence, the Navy contends that TCA, rather than the Navy, provided training to Plaintiff. However, the undisputed evidence also establishes that the Navy provided Plaintiff with CHCS/AHLTA, HIPAA, FEMA, OSHA, and CBRNE training. In the Navy's view, such training simply reflects an effort to have Plaintiff "learn and comply with the Navy medical facility's rules and procedures," Navy's Mem. Opp'n Pl.'s Mot. for Summ. J. at 25, ECF No. 141, and to fulfill its professional obligation to provide its patients with adequate care. Yet, even assuming that is the case, undisputed evidence in the record also indicates that the Navy provided at least some substantive training to Plaintiff: from September 29 to October 1, 2010, the Navy required Plaintiff to attend a radiology conference at Navy Medical Center - Portsmouth. See id. at 17.

Accordingly, although TCA may have shouldered the primary burden of training Plaintiff, the record establishes that the Navy provided some training to Plaintiff beyond simply ensuring that Plaintiff understood procedures at BMC Sewells. Therefore, the Court finds that the sixth Butler factor slightly favors a finding that the Navy employed Plaintiff.

Regarding the seventh Butler factor—whether the individual's duties are akin to a regular employee's duties—the undisputed facts indicate that such factor militates towards a finding that the Navy employed Plaintiff. The applicable task orders reflect that Plaintiff's duties were akin to a regular employee's duties. The task orders required Plaintiff to perform "a full range of Physician Extender services, within the scope of clinical privileges granted by the Commander," Navy's Mem. Supp. Mot. for Summ. J. Ex. 4, Attachment B, § 7, at 5, ECF No. 83-6 (Task Order 25); id. Attachment C, § 7, at 6, ECF No. 83-7 (Task Order 68); Pl.'s Mem. Opp'n Navy's Mot. for Summ. J. Ex. A2 § 6, at 75, ECF No. 112-2 (Task Order 81), and Plaintiff's clinical privileges included the core privileges for a physician assistant, Pl.'s Mem. Supp. Mot. for Summ. J. Exs. 4-5, ECF Nos. 136-10 to 136-11. Thus, Plaintiff's duties as a physician extender were akin to those of other physician extenders. Moreover, evidence in the record indicates that the Navy expected Plaintiff's supervisors to supervise Plaintiff in

the same manner that they supervised Government personnel and to "not impose on contractor personnel burdens or privileges which are contrary to those imposed on other staff performing the same function." Navy's Mem. Supp. Mot. for Summ. J. Ex. 4, Attachment A, § 9.6, at 45, ECF No. 83-5. Furthermore, the Navy actually performed an FPPE for Plaintiff, as it did for any new provider at Naval Medical Center - Portsmouth. Pl.'s Mem. Supp. Mot. for Summ. J. Ex. 1 at 23-24, ECF No. 136-1. Finally, Plaintiff's work as a physician assistant was "an integral part of the medical care provide[d] at [BMC Sewells]," id. at 2, which indicates that Plaintiff performed the same tasks as the Navy's personnel, see Butler, 793 F.3d at 415 (finding that the plaintiff's "labor was not tangential or peripheral to [the putative employer]," "[i]nstead, she performed the same tasks as [the putative employer's] employees and produced goods that were [the putative employer's] core business," and therefore that factor seven favored a finding of joint employer status). Considered as a whole, the above undisputed facts demonstrate that, in her role as a physician extender, Plaintiff performed duties akin to the Navy's regular employees' duties. Accordingly, Butler factor seven favors a finding that the Navy employed Plaintiff.

As to "whether the individual is assigned solely to the putative employer," the eighth Butler factor, the Court

concludes that such factor suggests that the Navy employed Plaintiff. At the hearing, the Navy conceded that TCA only assigned Plaintiff to work for the Navy, even though, under the contract, TCA may have had the right to assign her elsewhere. Therefore, the eighth Butler factor militates against the Navy.

The ninth and final Butler factor, "whether the individual and putative employer intended to enter into an employment relationship," favors the Navy. Plaintiff has admitted that she was not a party to the contract, or task orders issued pursuant thereto, under which Plaintiff provided services as a physician extender to the Navy on behalf of TCA. Navy's Mem. Supp. Mot. for Summ. J. Ex. 1 at 15-16, ECF No. 83-1. Consequently, the Court finds that the Navy and Plaintiff did not intend to enter into an employment relationship. The ninth Butler factor, thus, favors a finding that the Navy did not employ Plaintiff. However, the Court recognizes the Fourth Circuit's suggestion that "the ninth factor regarding the subjective intentions of the parties ordinarily will be of minimal consequence in the joint employment analysis." Butler, 793 F.3d at 414 n.12.

After considering the factors set forth in Butler, and mindful that "control" is the Court's "principal guidepost" in applying the joint employer doctrine, the Court finds that the specific undisputed facts of this case, viewed in a light most favorable to the Navy, demonstrate that the Navy was Plaintiff's

employer for purposes of the Rehabilitation Act.  Two of the three most important factors, day-to-day supervision and furnishing the equipment used and place of work, weigh in favor of a finding that the Navy employed Plaintiff.  Furthermore, the third of the triad of important factors—authority to hire and fire—at least slightly favors a finding that the Navy employed Plaintiff.  Together, those three factors indicate that the Navy exercised some degree of ultimate control, and a high degree of practical control, over Plaintiff.  In addition, as noted above, a number of other Butler factors also favor Plaintiff's position on the joint employer doctrine.  Although Butler factors four, five, and nine militate against employer status, in light of the factors favoring Plaintiff, the Court concludes that such factors are insufficient to create a triable issue regarding the Navy's status as a joint employer.  Accordingly, the Court concludes that, under the joint employer doctrine, the Navy was Plaintiff's employer.[12]    Therefore the Court will **GRANT**

---

[12] The Court notes that its decision is consistent with the EEOC's enforcement guidance.  U.S. Equal Emp. Opportunity Comm'n, EEOC Notice No. 915.002, Enforcement Guidance: Application of EEO Laws to Contingent Workers Placed by Temporary Employment Agencies and Other Staffing Firms (1997), 1997 WL 33159161, at *6 ("the client [of a contract firm] is an employer of the worker if it supplies the work space, equipment, and supplies, and if it has the right to control the details of the work to be performed, to make or change assignments, and to terminate the relationship. On the other hand, the client would not qualify as an employer if the staffing firm furnishes the job equipment and has the exclusive right, through on-site managers, to control the details of the work, to make or change assignments, and to terminate the workers."). However, the Court further notes that such

Plaintiff's motion and will **DENY IN PART** the Navy's motion as to the joint employer doctrine.[13]

## C. The Navy's Motion

In light of the Court's decision with respect to the joint employer issue, the Court must consider the remainder of the Navy's motion. In addition to contesting whether it employed Plaintiff, the Navy asserts that Plaintiff failed to timely initiate EEO counseling and that Plaintiff has not demonstrated a triable issue of fact with respect to her constructive discharge claim.

## 1. Timeliness

The Navy contends that the undisputed facts establish that Plaintiff failed to timely initiate EEO counseling with the Navy and, therefore, that Plaintiff's failure to exhaust her administrative remedies bars her claims against the Navy. The Navy primarily contends that Plaintiff should have initiated EEO counseling within forty-five days of December 12, 2011.

---

guidance is entitled to deference only to the extent of its power to persuade the Court. See Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2533 (2013); Butler, 739 F.3d at 411 n.6.

[13] The Court has independently considered Plaintiff's and the Navy's motions—as the Court must when reviewing cross-motions for summary judgment. However, the forgoing explanation of the Court's decision with respect to Plaintiff's motion necessarily renders superfluous a further explication of the Court's reasoning as to the Navy's motion. If the undisputed facts viewed in a light most favorable to the Navy demonstrate that the Navy was Plaintiff's employer, it follows that viewing such facts in a light most favorable to Plaintiff does not alter the Court's conclusion that the Navy employed Plaintiff.

According to the Navy, on that date, Plaintiff filed an EEOC charge against TCA alleging ADA violations that were nearly identical to the Rehabilitation Act violations she later alleged in her EEO initial contact with the Navy and, therefore, given such similarity, Plaintiff was aware of a potential claim against the Navy at the same point she asserted her claim against TCA. Additionally, the Navy contends that, at the latest, Plaintiff was aware of any potential claim against the Navy on February 22, 2012, the date she submitted a letter to the Navy indicating that, if the Navy did not respond within ten days of receipt of the letter, she would "consider [her] request for accommodation to be denied and will proceed with consulting a Counselor pursuant to 29 C.F.R. § 1614.105 in order to resolve the matter." Pl.'s Mem. Opp'n Navy's Mot. for Summ. J. Ex. A2 at 117-18, ECF No. 112-2.

In response, Plaintiff asserts that the Court must consider her request for accommodation from the Navy independently of her request for accommodation from TCA. According to Plaintiff, on December 12, 2011, although she may have been aware of a potential cause of action against TCA for failure to reasonably accommodate her hearing impairment, at that point, she did not have reason to know that the Navy had unreasonably denied her request for accommodation. In Plaintiff's view, at the time she filed her EEOC charge against TCA, the only communication she

had received from the Navy was an August 8, 2011 email indicating that the Navy had approved the use of a video phone, "Plaintiff understood that the Navy in fact was in the process of evaluating the specific accommodations proffered," "the parties had communicated about meeting to resolve issues regarding the set-up of accommodations previously approved by the Navy," the Navy had stated in response to a request for the use of "nTouch PC" that the "process might take a few months" and that "this was not a 'denial of anything,'" and she had not yet received any response from the Navy regarding her October 2011 request for accommodation. Pl.'s Mem. Opp'n Navy's Mot. for Summ. J. at 17, ECF No. 112 (quoting id. Ex. A1 at 28, ECF No. 122-1). In light of such situation, Plaintiff contends that a reasonable person in her position would have no reason to believe that the Navy had denied her request for accommodations as of December 12, 2011. Furthermore, at the August 31, 2015 hearing in this matter, relying on Hill v. Hampstead Lester Morton Court Partners LP, 581 F. App'x 178 (4th Cir. 2014) (unpublished), Plaintiff presented the additional argument that her February 22, 2012 letter qualified as a renewal of her prior requests for accommodation, purportedly, such that it would re-start the forty-five day period to initiate EEO counseling. Although Plaintiff's position is somewhat unclear, Plaintiff also argues that the Navy's alleged repeated failure to

accommodate her hearing impairment constitutes a continuing violation for purposes of timely administrative exhaustion.

Prior to filing an action in a district court, a plaintiff alleging a Rehabilitation Act employment discrimination claim against the Navy must initiate EEO counseling with the Navy. Under federal regulations applicable to "complaints of employment discrimination . . . prohibited by . . . the Rehabilitation Act" and filed against, among others, the Navy, 29 C.F.R. § 1614.103(a), (b) provides:

> (a) Aggrieved persons who believe they have been discriminated against on the basis of . . . disability . . . must consult a Counselor prior to filing a complaint in order to try to informally resolve the matter.
>> (1) An aggrieved person must initiate contact with a Counselor within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action.

29 C.F.R. § 1614.105(a)(1). Thus, a plaintiff alleging a Rehabilitation Act employment discrimination claim against the Navy must initiate EEO counseling within forty-five days of the date of the alleged unlawful employment practice. The unlawful employment practice occurs when the Plaintiff knows, or has reason to know, of such action. See Del. State Coll. v. Ricks, 449 U.S. 250, 258-59 (1980); A Soc'y Without a Name v. Virginia, 655 F.3d 342, 347-48 (4th Cir. 2011); see also Green v. Donahoe, 760 F.3d 1135, 1143 (10th Cir. 2014).

The crux of the parties' dispute regarding timeliness is when Plaintiff knew, or had reason to know, of the Navy's alleged unlawful employment practices, triggering the requirement that Plaintiff initiate EEO counseling within forty-five days. At the hearing in this matter, Plaintiff's counsel clarified when Plaintiff contends the Navy unlawfully rejected her requests for reasonable accommodation. In Plaintiff's view, the discrete act of discrimination regarding failure to accommodate occurred on June 15, 2012, the date on which Plaintiff received the Navy's proposed accommodations responsive to Plaintiff's October 2011 request for accommodation. Additionally, Plaintiff has suggested that the Navy's failure to accommodate Plaintiff was a continuing violation, and that Plaintiff's last request for accommodation occurred in Plaintiff's letter to the Navy on February 22, 2012.

To begin, the Court rejects Plaintiff's contention that the Navy's alleged failure to accommodate Plaintiff constituted a continuing violation for purposes of timely initiating EEO counseling. In National Railroad Passenger Corp. v. Morgan, the Supreme Court established that "[a] hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice,'" 536 U.S. 101, 117 (2002), and, therefore, that an EEOC charge predicated on a hostile work environment is considered timely filed "so long as

an act contributing to that hostile work environment takes place within the statutory time period," id. at 105.   Thus, this theory, the continuing violation theory, "allows for consideration of incidents that occurred outside the time bar when those incidents are part of a single, ongoing pattern of discrimination."   Holland v. Wash. Homes, Inc., 487 F.3d 208, 219 (4th Cir. 2007) (citing Morgan, 536 U.S. at 118).   However, an employer's failure to accommodate an employee's disability is a discrete act of discrimination, rather than a continuing violation.   Hill, 581 F. App'x at 181 ("a defendant's failure to accommodate constitutes a discrete act rather than an ongoing omission"); accord, e.g., Ayala v. Shinseki, 780 F.3d 52, 57 (1st Cir. 2015); Mayers v. Laborers' Health & Safety Fund of N. Am., 478 F.3d 364, 368-69 (D.C. Cir. 2007).   Accordingly, although Plaintiff relies on Hill to support her argument that her February 22, 2012 letter to the Navy revived prior requests for accommodation, Hill, in fact, states that the continuing violation doctrine is inapplicable to a claim for failure to accommodate.   Thus, Plaintiff's failure-to-accommodate claim is timely only if the discriminatory acts alleged in her April 11, 2012 initial contact with an EEO counselor occurred within forty-five days prior to April 11, 2012.

The Court concludes that the Navy has failed to demonstrate that it is entitled to judgment as a matter of law, on the

affirmative defense of administrative exhaustion, as to Plaintiff's failure-to-accommodate claim because a reasonable finder of fact could determine that the Navy's failure to respond within ten days of Plaintiff's February 22, 2012 letter constituted a rejection of Plaintiff's October 2011 request for accommodation and that such rejection occurred within forty-five days of Plaintiff's initial contact with the EEO counselor. On October 6, 2011, the Navy provided TCA with a request for accommodation form for Plaintiff to complete. Navy's Mem. Supp. Mot. for Summ. J. Ex. 27, ECF No. 83-30. Plaintiff completed such form and submitted it to TCA on October 17, 2011. Pl.'s Mem. Opp'n Navy's Mot. for Summ. J. Ex. A2 at 106, ECF No. 112-2. The Navy received Plaintiff's form on October 31, 2011. Navy's Mem. Supp. Mot. for Summ. J. Ex. 27 at 5-6, ECF No. 83-31. On February 22, 2012, Plaintiff sent a letter to the Navy regarding her October 2011 request for accommodation, and indicated that she would consider her request denied if she did not hear from the Navy within ten days of its receipt of the letter. Pl.'s Mem. Opp'n Navy's Mot. for Summ. J. Ex. A2 at 117-18. The Navy did not respond within ten days. Considering the evidence in a light most favorable to Plaintiff, the Court concludes that a reasonable finder of fact could find that the Navy, through its failure to respond, rejected Plaintiff's October request for accommodation ten days after receipt of

Plaintiff's February 22, 2012 letter.   Thus, a finder of fact reasonably could conclude that a cause of action for the Navy's alleged rejection of Plaintiff's October 2011 request for accommodation accrued on March 4, 2012.   Plaintiff initiated EEO counseling thirty-eight days after such date, on April 11, 2012. Accordingly, in light of Plaintiff's February 22, 2012 letter, the Navy has not demonstrated that no reasonable finder of fact could conclude that Plaintiff's failure-to-accommodate claim, predicated on her October 2011 request for accommodations, accrued within forty-five days of Plaintiff's April 11, 2012 initial contact with an EEO counselor.[14]   Therefore, the Court will **DENY IN PART** the Navy's motion for summary judgment regarding the timeliness of Plaintiff's failure-to-accommodate claim.[15]

## 2. Constructive Discharge

The Court now will turn to the Navy's challenge to Plaintiff's constructive discharge claim.   Although a

---

[14] Although the Navy relied heavily on Plaintiff's December 12, 2011 EEOC charge against TCA as the date on which Plaintiff should have known of the Navy's allegedly unreasonable rejection of her request for accommodation, even assuming the truth of that proposition, the Court finds that a reasonable finder of fact could conclude that Plaintiff's February 22, 2012 letter to the Navy qualified as a renewal of Plaintiff's October 2011 request for accommodation, such that the Navy's alleged rejection thereof was an independent and discrete act of discrimination separate from any prior failure to accommodate. See, e.g., Hill, 581 F. App'x at 181.

[15] In light of the Court's ruling with respect to Plaintiff's constructive discharge claim, the Court need not resolve the timeliness of such claim.

constructive discharge claim requires Plaintiff to establish two elements, the Court will focus its discussion on only one element: deliberateness.  An assessment of the extent to which the undisputed facts, viewed in a light most favorable to Plaintiff, establish whether the Navy intended to force Plaintiff to quit her position is dispositive of her claim.

To establish a claim for constructive discharge under the Rehabilitation Act, Plaintiff must prove two elements.  "An employee is considered constructively discharged 'if an employer deliberately makes the working conditions intolerable in an effort to induce the employee to quit.'"  Freeman v. Dal-Tile Corp., 750 F.3d 413, 425 (4th Cir. 2014) (quoting Honor v. Booz-Allen & Hamilton, Inc., 383 F.3d 180, 186-87 (4th Cir.2004)).  Thus, a constructive discharge claim involves two elements: deliberateness and intolerability.  "Deliberateness can be demonstrated by actual evidence of intent by the employer to drive the employee from the job, or circumstantial evidence of such intent, including a series of actions that single out a plaintiff for differential treatment."  Johnson v. Shalala, 991 F.2d 126, 131 (4th Cir. 1993) (citations omitted).  In short, the deliberateness inquiry turns on the extent to which a plaintiff demonstrates—by direct or circumstantial evidence—that "the actions complained of were intended by the employer as an effort to force the employee to quit."  Martin v. Cavalier Hotel

Corp., 48 F.3d 1343, 1354 (4th Cir. 1995) (internal quotation marks omitted).   The intolerability element requires a plaintiff to demonstrate that her working conditions were objectively intolerable.   See Honor, 383 F.3d at 187 (citations omitted). Working conditions are objectively intolerable if "a 'reasonable person' in the employee's position would have felt compelled to resign." Bristow v. Daily Press, Inc., 770 F.2d 1251, 1255 (4th Cir. 1985) (citations omitted); see Pa. State Police v. Suders, 542 U.S. 129, 134 (2004) ("[T]o establish 'constructive discharge,' the plaintiff must . . . show that the abusive working environment became so intolerable that her resignation qualified as a fitting response."). Notably, "dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign." Honor 383 F.3d at 187 (quoting Williams v. Giant Food Inc., 370 F.3d 423, 434 (4th Cir. 2004)).

Importantly, the Fourth Circuit has indicated that courts should exercise caution to avoid transforming every failure-to-accommodate claim into a claim for constructive discharge.   As the court expressed in Johnson:

> The consequences of regarding every failure to accommodate an employee as a constructive discharge would be significant. Under this standard, if a plaintiff can prove that the government has violated the Act, she can automatically quit her position

without first resorting to the administrative and judicial remedies provided by Congress to mediate these disputes while the employment relationship can still be salvaged. . . . In the interval between a constructive discharge and reinstatement of the employee, both sides lose. . . . Moreover, once the employment relationship has terminated, the parties may harden their positions and become unable to resolve their dispute. It is far better for all concerned to resolve the dispute while the employment relationship is ongoing.

991 F.2d at 131. However, the Fourth Circuit has suggested that "a complete failure to accommodate, in the face of repeated requests, might suffice as evidence to show the deliberateness necessary for constructive discharge." Id. at 132.

In this case, Plaintiff contends that she has adduced sufficient evidence to create a triable question of fact regarding the deliberateness element of her constructive discharge claim. First, Plaintiff asserts that she has demonstrated deliberateness, under Johnson, because a reasonable jury could conclude that the Navy completely failed to accommodate Plaintiff in the face of repeated requests. Second, even if the Navy did not completely fail to accommodate her, Plaintiff argues that a reasonable jury could conclude, based on circumstantial evidence, that the Navy intended to force Plaintiff to quit. Specifically, Plaintiff asserts that she has demonstrated that the Navy: (1) misrepresented receiving Plaintiff's request for accommodation in June 2011; (2) never retracted the August 2011 approval of Plaintiff's request for a

VRS phone, instead, failing to implement such approval until one year later; (3) never communicated that an interpreter was available, even though there was "internal agreement that an interpreter would be appropriate;" (4) failed to engage in an interactive process with Plaintiff and, therefore, misunderstood her disability; (5) failed to schedule a meeting with Plaintiff, despite prior indications that it was interested in such a meeting; (6) failed to adequately research and submit waivers for the products Plaintiff requested; (7) inadequately responded to Plaintiff's Freedom of Information Act ("FOIA") requests; (8) failed to make the Z-150 video phone available until two months after offering it to Plaintiff; (9) did not communicate that it had acquired such phone until March 2013; and (10) made false statements to future potential employers of Plaintiff. See Pl.'s Mem. Opp'n Navy's Mot. for Summ. J. at 20-24.

Neither of Plaintiff's contentions are availing. As set forth below, on this record, no reasonable finder of fact could conclude that the Navy intended to force Plaintiff to quit through either a complete failure to accommodate or the purported circumstantial evidence of intent upon which Plaintiff relies.

### a. The Navy Did Not Completely Fail to Accommodate Plaintiff

Based on the undisputed facts of this case, the Court concludes that no reasonable finder of fact could determine that

the Navy completely failed to accommodate Plaintiff in the face
of repeated requests.   It is undisputed that the Navy made
multiple offers to accommodate Plaintiff.   First, in an email
from Lieutenant Commander Badura to Plaintiff on August 11,
2011, Lieutenant Commander Badura stated that "[w]e plan to
provide a staff office space which can be equipped with your
video relay equipment and we can discuss these details further
in person," Navy's Mem. Supp. Mot. for Summ. J. Ex. 15, ECF No.
83-18, which communicated to Plaintiff that the Navy tentatively
had approved her request for a VRS system, see id. Ex. 18 at 1-
2, ECF No. 83-21.[16]   After a dispute arose over provision of a

---

[16] There is also substantial evidence in the record that the Navy
offered to allow Plaintiff to return to work without having to make
phone calls until the VRS system was in place.   See Navy's Mem. Supp.
Mot. for Summ. J. Ex. 15; id. Ex. 10 at 3, ECF No. 83-13 (testimony of
Lieutenant Commander Badura that "[a]t one point we did offer that we
could make phone calls for her, she would just have to use other staff
members to do that."); id. Ex. 16, ECF No. 83-19 (letter from
Plaintiff's counsel stating her understanding, "through LCDR [Badura],
that [Plaintiff] will not be required to utilize a telephone if she is
to return to work without the accommodation in place," and asking for
confirmation thereof).   Even if making telephone calls was an
essential function of Plaintiff's job (a proposition the Navy
contests), the elimination of such function would qualify as an
accommodation to Plaintiff.   See 29 C.F.R. pt. 1630.2(o)(2)(ii); 1
Barbara T. Lindemann et al., Employment Discrimination Law 13-138 to
13-140 (5th ed. 2012) ("[A]lthough an employer may choose to eliminate
essential functions to allow a disabled employee to perform 'light
duty,' the employer is not required to do so.").   However, there is a
genuine dispute of fact regarding whether Plaintiff could return to
work before her requested accommodations were in place.   See
Plaintiff's Mem. Opp'n Navy's Mot. for Summ. J. Ex. B ¶ 87, ECF No.
112-3.   Of course, depending on the evidence at trial regarding the
Navy's offer, Lieutenant Commander Badura's initial communications to
Plaintiff might implicate 29 C.F.R. pt. 1630.9(d).   The Navy has not
raised the issue in its brief and disputes of fact surround it.
Therefore, the Court need not consider it further at this juncture.

television monitor and other alternatives were explored, the technical implementation of a VRS system proved problematic. The Navy researched at least some of the products that Plaintiff had proposed, Pl.'s Mem. Opp'n Navy's Mot. for Summ. J. Ex. A2 at 90-94; however, the Navy was uncertain of the specific accommodations Plaintiff requested, id. at 123; Navy's Mem. Supp. Mot. for Summ. J. at 9, ECF No. 83 ("On September 12, 2011, the Navy advised TCMP that it needed to have a clear concise understanding of what TCMP is requesting of the government." (internal quotation marks omitted)). In October 2011, the Navy then submitted a request for accommodation form to Plaintiff to ascertain the specific accommodations she requested. Navy's Mem. Supp. Mot. for Summ. J. at 9.

The Navy made a second attempt to accommodate Plaintiff in December 2011. On December 7, 2011, the Navy's communications manager broached whether the Virginia Relay service, combined with a TTY phone, would be a viable solution to accommodate Plaintiff. Id. Ex. 29, ECF No. 83-32. On December 8, 2011, the Navy then asked TCA to forward information about the Virginia Relay service to Plaintiff and to ask her if it would meet her needs. Id. Ex. 30, ECF No. 83-33. When the Navy received no response from TCA, on December 14, 2011, the Navy followed up with TCA and stated that it "need[ed] an answer to this to provide our department that is reviewing [Plaintiff's] case."

Id. Ex. 31, ECF No. 83-34. On December 16, 2011, TCA then offered the Virginia Relay service as an accommodation to Plaintiff. Id. Ex. 32, ECF No. 83-35. Critically, TCA communicated to Plaintiff's attorney that such accommodation "has been approved for use by the government at the Naval Hospital." Id. In Plaintiff's view, the offer of Virginia Relay that TCA transmitted cannot be considered an accommodation proposed by the Navy because the Navy did not send it directly to Plaintiff. However, the undisputed facts establish that TCA offered the Virginia Relay service to Plaintiff at the Navy's direction and that TCA communicated to Plaintiff that the Navy had approved such accommodation. In light of the undisputed evidence that the Navy asked TCA to determine whether Virginia Relay was acceptable to Plaintiff, the Court concludes that no reasonable juror could find that the December 16, 2011 email from TCA to Plaintiff was not also an offer of accommodation from the Navy, though TCA transmitted it.

Finally, as a third offer of accommodation, the Navy formally offered Plaintiff a number of accommodations in response to Plaintiff's October 2011 request for accommodations. In a May 24, 2012 letter to Plaintiff, which she received on June 15, 2012, the Navy offered Plaintiff: a supporting staff member to assist in making calls, sign language interpreter services, and the Z-150 video phone (subject to further approval

and ordering). Navy's Mem. Supp. Mot. for Summ. J. Ex. 33, ECF No. 83-36. Even if such accommodations were not identical to those that Plaintiff requested, such offer was responsive to Plaintiff's two major requested accommodations: video relay equipment and an American Sign Language interpreter. Cf. Crabill v. Charlotte Mecklenburg Bd. of Educ., 423 F. App'x 314, 324 (4th Cir. 2011) (unpublished)(holding that a genuine dispute of material fact existed as to a constructive discharge claim because of evidence that the employer completely failed to provide a transfer that the Plaintiff requested). Moreover, the undisputed facts establish that, after Plaintiff communicated, on June 19, 2012, that she was willing to try the Z-150 video phone as an accommodation if it was ultimately approved, Pl.'s Mem. Opp'n Navy's Mot. for Summ. J. Ex. B ¶ 202, ECF No. 112-3, within thirteen days of Plaintiff's response, the Navy directed its personnel to install the DSL line required to implement the Z-150 phone, Navy's Mem. Supp. Mot. for Summ. J. Ex. 34, ECF No. 83-37, on August 2, 2012, the Navy ordered the Z-150 phone, id. Ex. 37, ECF No. 83-40, and such phone was operational shortly thereafter. Although the Navy did not communicate to Plaintiff that the Z-150 video phone was operational until March 2013, no reasonable finder of fact could conclude that such failure vitiated the Navy's offer of the Z-150 phone because, on August 9, 2012 (around the same time the Navy acquired the Z-150

82

phone), Plaintiff communicated to the Navy that she had resigned as she believed that she was constructively discharged. Navy's Motion for Summ. J. Ex. 38, ECF No. 83-41. In light of the above undisputed evidence of three attempts to accommodate Plaintiff, the Court finds that no reasonable finder of fact could conclude that the Navy completely failed to accommodate Plaintiff in the face of repeated requests. See Johnson, 991 F.2d at 132. Therefore, the undisputed facts establish, as a matter of law, that Plaintiff cannot demonstrate the deliberateness element of a constructive discharge claim based on the Navy's alleged complete failure to accommodate her hearing impairment.

### b. The Record Is Devoid of Circumstantial Evidence That the Navy Intended to Force Plaintiff to Quit.

After thoroughly reviewing Plaintiff's proffered circumstantial evidence, the Court further concludes that no reasonable finder of fact could find from such evidence that the Navy intended to force Plaintiff to quit. To begin, Plaintiff has failed to submit admissible evidence to support some of her contentions. Plaintiff's evidence that the COR, Marivic Williams, allegedly withheld accommodation requests from the chain of command and misrepresented having received such requests generally does not find support in the cited paragraphs of Plaintiff's declaration, paragraphs 165 and 170-73, and, to

the extent such paragraphs do support Plaintiff's assertion, Plaintiff has not demonstrated her personal knowledge of the facts averred. See Fed. R. Civ. P. 56(c)(4). Likewise, Plaintiff's interrogatory responses regarding such alleged misrepresentations, see Pl.'s Mem. Supp. Mot. for Leave to Submit Additional Evidence Ex. B at 2, ECF No. 172-2, do not sufficiently establish Plaintiff's personal knowledge of the facts stated. Additionally, such responses rely on exhibits not present in the record before the Court (Plaintiff's Deposition Exhibits 55, 89, 90, 94, and 217). Thus, Plaintiff has not adduced admissible evidence to support her factual claim that Marivic Williams misrepresented the status of any of Plaintiff's requests for accommodation. Similarly, Plaintiff cites no evidence to support her contention that there was "internal agreement that an interpreter would be appropriate, but which was never communicated to Plaintiff." See Pl.'s Mem. Opp'n Navy's Mot. for Summ. J. at 23. Furthermore, the Court's independent review of the record did not reveal evidentiary support for the above factual assertions. See Fed. R. Civ. P. 56(c)(3). To the contrary, the record establishes that the Navy offered Plaintiff the use of interpreter services. Navy's Mem. Supp. Mot. for Summ. J. Ex. 33, ECF No. 83-36. Accordingly, Plaintiff's allegations with respect to misrepresentations regarding receipt of Plaintiff's request for accommodations and

internal agreement about interpreter services do not create a genuine dispute of fact.

With respect to the remaining circumstantial evidence upon which Plaintiff relies, only "through mere speculation or the building of one inference upon another" could the Court conclude that Plaintiff has created a genuine dispute of material fact as to the deliberateness element of her constructive discharge claim against the Navy. See Othentec Ltd. v. Phelan, 526 F.3d 135, 140 (4th Cir. 2008) (quoting Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985)). The circumstantial evidence cited by Plaintiff is insufficient individually, or as a whole, to create a genuine dispute of fact with respect to the Navy's alleged intent to force Plaintiff to quit.

First, the Navy's failure to retract its August 2011 approval of a VRS phone does not permit a reasonable inference that the Navy intended to force Plaintiff to quit. As Plaintiff has admitted, the August 1, 2011 email from the Officer in Charge of BMC Sewells indicated that the Navy's approval of equipment for VRS connectivity was subject to vetting through the contract office. See Navy's Mem. Supp. Mot. for Summ. J. at 8, ECF No. 83. While the Navy evaluated the technical aspects of Plaintiff's request, it sought clarification from TCMP about the requested technology and then sent a request for accommodation form to Plaintiff for her to provide specific

85

information on the accommodations she requested.  Id. at 9. Ultimately, once the Navy received Plaintiff's request, it offered her a video phone (the Z-150), ordered it, and installed it.  Admittedly, the Navy took almost one year to install VRS equipment for Plaintiff.  However, this delay must be viewed through the prism of Plaintiff's apparent hesitance (expressed by her in an email and her attorney in a letter) to return to work while continuing the interactive process of evaluating and attempting accommodation implementation.  Moreover, from the time Plaintiff responded to the Navy's offer of the Z-150 video phone, on June 19, 2012, see Pl.'s Mem. Opp'n Navy's Mot. for Summ. J. Ex. B ¶ 202, ECF No. 112-3, it took the Navy less than two weeks to begin establishing the required DSL connectivity for the Z-150 phone.  And the Navy ordered the Z-150 on August 2, 2012, less than one month after its approval.  See Navy's Mem. Supp. Mot. for Summ. J. Ex. 36-37, ECF Nos. 83-39 to 83-40. A short time later, the Z-150 phone was operational—though Plaintiff had informed the Navy of her resignation around that same time.  Considering the above undisputed facts, the mere fact that the Navy did not revoke its tentative approval while it evaluated VRS technology does not permit a reasonable inference that the Navy intended to force Plaintiff to quit.

Second, only speculation would allow a reasonable finder of fact to conclude that any deficiency in the Navy's interactive

process with Plaintiff reflected the intent to force Plaintiff to quit because Navy personnel misunderstood Plaintiff's disability and did not seek clarification from Plaintiff. Plaintiff asserts that "[t]he Navy's failure to engage in the interactive process with Plaintiff resulted in the failure to identify an appropriate accommodation for Plaintiff, as the Navy was left with misunderstandings of her disability (as reflected by Carpenter and CDR Neill's bewildered questions posed to Navy colleagues on September 12, 2011, for which they sought no answers from [Plaintiff])." Pl.'s Mem. Opp'n Navy's Mot. for Summ. J. at 22. The emails and deposition testimony that Plaintiff cites do not permit the reasonable inference that Ms. Carpenter and Commander Neill were "bewildered" about Plaintiff's disability and chose not to reach out to Plaintiff because the Navy intended to force Plaintiff to quit. Rather, only through speculation could a reasonable finder of fact infer that they reflected anything other than a desire to determine the specific accommodations that TCMP sought to implement for Plaintiff.

Likewise, the mere fact that the Navy never held a face-to-face meeting with Plaintiff does not permit a reasonable inference that it intended to force Plaintiff to quit. Plaintiff relies heavily on the fact that the Navy instructed some of its personnel not to contact Plaintiff and that the Navy

expressed interest in a meeting between itself, TCA, and Plaintiff, but never set up such a meeting even though Plaintiff submitted an agenda for the meeting as requested. To be sure, there is evidence in the record that the Navy, at least early in the process, on July 29, 2011, instructed Lieutenant Commander Badura that Plaintiff's request for accommodation was an issue that TCMP needed to resolve with her, see Pl.'s Mem. Opp'n Navy's Mot. for Summ. J. Ex. A2 at 86, 89, ECF No. 112-2, and that Plaintiff submitted an agenda for a meeting with the Navy, but no such meeting occurred. However, the Court finds that such facts do not permit the reasonable inference that the Navy intended to force Plaintiff to quit, when considered in light of the contractual relationship between the Navy and TCA, cf. Navy's Mem. Supp. Mot. for Summ. J. Ex. 4, Attachment A, § 8.8, ECF No. 83-5 (providing that contract discrepancy reports concerning contractor performance problems are "presented to the contractor firm's designated representative, not the contractor employee who failed to perform in accordance with the contract"), and the undisputed facts regarding the Navy's attempts to accommodate Plaintiff. Even viewing the facts in a light most favorable to Plaintiff, the Navy engaged, in varying degrees at various times, in an interactive process with Plaintiff. Such process included: the dialogue between Lieutenant Commander Badura and Plaintiff in August 2011, the

Navy's October 2011 request that Plaintiff fill out a form in an attempt to determine the accommodations she requested, the Navy's offer of a number of accommodations to Plaintiff, on June 15, 2012, in response to Plaintiff's formal request on the form the Navy provided, and the Navy's implementation of the Z-150 video phone within two months of Plaintiff's June 19, 2012 indication that she was willing to try such video phone.  It appears that, in August 2011, the Navy was anxious for Plaintiff to return to work and continue the interactive process once she had done so, but Plaintiff communicated that her attorney suggested she not return until accommodations were fully in place.  While some comments by TCA suggest it agreed with this approach, it is difficult to know the degree to which Plaintiff's position may have driven or affected such position by TCA.  Indeed, such hitch in the interactive process made the remainder of such process even more difficult for all parties. The Court concludes that such facts regarding the interactive process between the Navy and Plaintiff indicate that no reasonable finder of fact could determine that any deficiency in the Navy's interactive process with Plaintiff demonstrated that the Navy intended to force Plaintiff to quit.

Third, Plaintiff's evidence regarding the Navy's failure to adequately research and submit waivers for the products Plaintiff suggested does not permit a reasonable inference of an

intent to force Plaintiff to quit.  There is evidence in the record from which a reasonable finder of fact could conclude that the Navy did not specifically research whether the VP-200 video phone that Plaintiff requested was approved for use in its network and did not transmit a "two-pager" request for approval of nTouch software by the Navy's Bureau of Medicine.  Although Anthony Roberts conducted a review of the Navy's "DON Application & Database Management" to determine whether nTouch software was approved for use in the BMC Sewells network, see Pl.'s Mem. Opp'n Navy's Mot. for Summ. J. Ex. H at 2-3, ECF No. 112-9 (Roberts Deposition); id. Ex. A2 at 90-94, ECF No. 112-2, and also reviewed whether there were Sorenson systems in the Department of Defense Network, id. Ex. H at 14-15, Mr. Roberts did not look for the Sorenson VP-200 prior to the initiation of this action, id. Ex. I at 2, ECF No. 112-10 (Roberts Deposition).  Similarly, despite Lieutenant Commander Badura filling out a "Navy Medicine New IM/IT Capability Request 2 Page Submission Form" for the nTouch software, and submitting such form to Mr. Roberts, see Pl.'s Mem. Opp'n TCA's Mot. for Summ. J. Ex. B2 at 97-103, ECF No. 113-3, no one submitted such form to the Bureau of Medicine, Pl.'s Mem. Opp'n Navy's Mot. for Summ. J. Ex. I at 4.  But the Navy's assessment of the products Plaintiff requested must be viewed in the broader context of the Navy's overall efforts to accommodate Plaintiff.  In view of the

Navy's efforts to accommodate Plaintiff, as noted above, to infer that the Navy failed to adequately research and seek approval for the products Plaintiff requested because it intended to force Plaintiff to quit, a finder of fact would have to infer that any failure on the part of Mr. Roberts and other Navy personnel was intentional and that the accommodations the Navy offered as alternatives to those that Plaintiff requested were sham accommodations designed to prolong the process, instead of resolving Plaintiff's request, thereby encouraging Plaintiff to quit. However, the Court finds that the evidence as to the Navy's research and requests for approval does not permit the reasonable inference that the Navy intended to force Plaintiff to quit and the causal link is too far attenuated.

Fourth, the Navy's response to Plaintiff's FOIA requests does not permit a reasonable inference that the Navy failed to adequately respond to Plaintiff's request for accommodation because it intended to force Plaintiff to quit. The admissible evidence in the record does not support Plaintiff's assertion that "[t]he Navy refused to respond to Plaintiff's FOIA requests, redacting hundreds of pages, with the deliberate goal of frustrating her request for answers with the knowledge that the appeal would forestall her efforts. Pl.'s Mem. Opp'n Navy's Mot. for Summ. J. at 22, ECF No. 112. The email Plaintiff cites in support of such contention does not permit a reasonable

91

finder of fact to conclude that any inadequacy in the Navy's FOIA request response was linked to Plaintiff's request for accommodations. Indeed, the email refers to Plaintiff's FOIA request as "a separate issue" and instructs Navy personnel that "[w]hen you are gathering the documents it is very important that you give me everything, even if you think it should be released. [Navy personnel] will review each document and redact the information that cannot be released." Pl.'s Mem. Opp'n Navy's Mot. for Summ. J. Ex. A2 at 29, ECF No. 112-2. Moreover, Plaintiff's declaration only establishes that the Navy requested extensions to respond to Plaintiff's request, redacted hundreds of pages when it did respond, and only produced what she previously had received. See id. Ex. B ¶ 192. However, the Navy's April 26, 2012 response to Plaintiff's FOIA request explains, with citations to the authorities upon which the Navy relied, why the Navy withheld certain documents. Pl.'s Mem. Supp. Mot. for Summ. J. Ex. 3A, ECF No. 136-7. Such explanation weakens any inference of an intent to force Plaintiff to quit that otherwise could be drawn if the Navy had withheld relevant documents without explanation. Additionally, the portion of Plaintiff's fifth supplemental answers to the Navy's interrogatories relating to the FOIA request does not contain sufficient facts to establish that Plaintiff had personal knowledge of the facts stated, beyond those that are evident

from Plaintiff's declaration and the email upon which Plaintiff relies. See Pl.'s Mem. Supp. Mot. for Leave to Submit Additional Evidence Ex. B at 6-7, ECF No. 172-2. Accordingly, based on the evidence in the record with respect to Plaintiff's FOIA requests, the Court finds that only through speculation or the building of one inference upon another could a reasonable finder of fact infer from the Navy's redaction and withholding of certain materials in response to Plaintiff's FOIA request that the Navy did not sufficiently respond to Plaintiff's request for accommodation because it intended to force her to quit.

Fifth, the Navy's implementation of the Z-150 video phone, and communication to Plaintiff regarding such phone, do not permit a reasonable inference that the Navy intended to force Plaintiff to quit. Plaintiff asserts that a reasonable finder of fact could infer, from "the Navy's failure to make available to Plaintiff an operational video phone in the two months following the Navy's apparent offer of the very accommodation requested by Plaintiff all along" and "the Navy's failure to communicate the availability of the video phone until March, 2013," that the Navy "deliberately attempted to drive Plaintiff from her position." Pl.'s Mem. Opp'n Navy's Mot. for Summ. J. at 23. However, as noted above, after Plaintiff indicated to the Navy, on June 19, 2012, that she was willing to try the Z-

150 phone, on July 2, 2012, the Officer in Charge at BMC Sewells directed a communications manager to implement the changes necessary to allow the Z-150 video phone to operate at BMC Sewells.  Navy's Mem. Supp. Mot. for Summ. J. Ex. 34, ECF No. 83-37.  One week later, the Navy approved the use of the Z-150 as compatible with its HIPAA and security requirements.  Id. Ex. 36, ECF No. 83-39.  On August 2, 2012, the Navy ordered the Z-150, id. Ex. 37, ECF No. 83-40, and it was operational shortly thereafter.  Even if the Navy did not contact Plaintiff after June 19, 2012, those undisputed facts regarding the implementation of the Z-150 phone once Plaintiff had indicated her willingness to attempt to use such phone do not permit a reasonable inference that the Navy intended to force Plaintiff to quit.  Similarly, the failure to notify Plaintiff that the Z-150 phone was operational until March 2013, does not qualify as circumstantial evidence of deliberateness sufficient to create a genuine dispute of fact.  It is undisputed that, on August 9, 2012, Plaintiff informed the Navy that she had resigned her position at TCA.  Id. Ex. 38, ECF No. 83-41.  Thus, by the time the Navy had received the Z-150 video phone, Plaintiff already had resigned from TCA.  Furthermore, it is undisputed that, although Commander Neill had advised Plaintiff that she would keep Plaintiff updated about the status of the Z-150 video phone, Commander Neill later explained to Plaintiff that she

94

"did not do so because she was not sure if [Plaintiff] was still a TCA employee." Pl.'s Mem. Opp'n Navy's Mot. for Summ. J. Ex. B ¶ 203, ECF No. 112-3. Only pure speculation would allow a reasonable finder of fact to infer that the Navy intended to force Plaintiff to quit from the fact that the Navy did not inform her of the status of a video phone that it had obtained after she had resigned.

Sixth and finally, Plaintiff's proffered evidence regarding the Navy's responses to inquiries from Plaintiff's prospective employers does not create a genuine dispute of fact as to deliberateness. Plaintiff's declaration establishes that, after her alleged constructive discharge and EEO complaint, the Navy made inaccurate statements to future potential employers that Plaintiff's "privileges were adversely denied, suspended, limited, or revoked at [the] Naval Medical Center." Pl.'s Mem. Opp'n Navy's Mot. for Summ. J. Ex. B ¶ 216. Thereafter, in February 2015, counsel for the Bureau of Medicine told Plaintiff that the Navy had not disseminated any false information. Id. ¶ 217. However, after Plaintiff received further responses and inquiries from potential employers, she questioned the Navy once more. Id. ¶ 218. On April 1, 2015, the Navy corrected the information that it previously had stated incorrectly. Id. ¶ 219. The Navy has not corrected other inaccurate information in Plaintiff's "Performance Appraisal Report," but, instead, has

advised Plaintiff to "file an appeal to obtain corrections."
Id. The Court finds that, like the other evidence upon which
Plaintiff relies, the Navy's initial misrepresentation regarding
information in Plaintiff's personnel file, subsequent correction
of such information, and requirement that Plaintiff appeal to
obtain corrections of other information, does not permit a
reasonable inference that, when it allegedly refused to
reasonably accommodate Plaintiff, it did so with the intent to
force her to quit. The temporal disconnect between the Navy's
response to potential employers after Plaintiff's resignation
and its actions in response to Plaintiff's October 2011 request
for accommodation undermines the reasonableness of any inference
that, to the extent the Navy would misrepresent information
about Plaintiff (for example, because of a general animosity
towards her), it also would attempt to force her to quit her
position by failing to adequately respond to her request for
accommodations. See Johnson, 991 F.2d at 132 ("The evaluation
falsified by [the plaintiff's supervisor], while plainly
inexcusable, fails to demonstrate an intent by [the defendant]
to force [the plaintiff] from her position because the
evaluation was prepared only after [the plaintiff] herself
requested disability retirement."). Additionally, given that
the Navy corrected the false information, to infer that the Navy
intended to force Plaintiff to quit would require a finder of

fact, first, to infer that the Navy purposefully misrepresented information about Plaintiff and to reject the reasonable inference from the Navy's correction that it simply made an innocent mistake regarding such information, and, second, to infer from such misrepresentation that the Navy's response to Plaintiff's request for accommodation years prior reflected a similar intention to harm Plaintiff by forcing her to quit her position.   The Court finds that such chain of inferences is unreasonable based on the undisputed facts of this case and, therefore, that Plaintiff has not demonstrated a genuine dispute of material fact regarding deliberateness through her proffered evidence regarding the Navy's post-resignation representations to Plaintiff's potential employers.

Considered as a whole, and in a light most favorable to Plaintiff, the circumstantial evidence that Plaintiff has adduced would not permit a reasonable finder of fact to conclude that the Navy failed to accommodate Plaintiff because it intended to force her to quit her position as a physician extender.[17]   Therefore, Plaintiff has not demonstrated a genuine

---

[17] The Court is mindful of its obligation to view the evidence in a light most favorable to Plaintiff and of the fact that considering all of Plaintiff's circumstantial evidence regarding deliberateness together, rather than evaluating each strand in isolation, pushes Plaintiff's evidence of deliberateness closer to the point at which a reasonable jury could conclude that the Navy intended to force Plaintiff to quit.   Thus, though the Court has explained the deficiencies in Plaintiff's circumstantial evidence sequentially for ease of discussion, the Court has determined that the collective

issue of material fact as to the deliberateness element of her constructive discharge claim because the Navy did not completely fail to accommodate Plaintiff and there is no circumstantial evidence from which a finder of fact reasonably could determine that the Navy deliberately failed to accommodate Plaintiff. The undisputed facts establish that the Navy is entitled to judgment as a matter of law because no reasonable finder of fact could conclude that the Navy intended to force Plaintiff to quit her position and, therefore, Plaintiff has not demonstrated the deliberateness element of a constructive discharge claim. Accordingly, the Court will **GRANT IN PART** the Navy's motion as to Plaintiff's constructive discharge claim.[18]

### D. TCA's Motion

TCA has moved for summary judgment on both of Plaintiff's ADA claims against it. TCA argues that the undisputed facts demonstrate that Plaintiff's failure-to-accommodate claim fails because Plaintiff rejected a reasonable accommodation, namely, TCA's repeated offers to provide a TTY or other non-video TRS system, and ultimately a video TRS system, as substitutes for

---

strength of Plaintiff's evidence still falls short of creating a genuine dispute of material fact.

[18] The Court's conclusion with respect to the deliberateness element renders unnecessary any consideration of the Navy's alternative contention that it is entitled to summary judgment on Plaintiff's constructive discharge claim because Plaintiff has failed to demonstrate a genuine dispute of material fact regarding the intolerability element of such claim.

telephonic communications and, in the alternative, because it was impossible for TCA to provide the accommodations Plaintiff requested. Relatedly, TCA contends that Plaintiff's constructive discharge claim fails because it depends on TCA's alleged failure to accommodate Plaintiff. The Court will consider each claim in turn.

### 1. Failure to Accommodate

Through the ADA, Congress and the President have prohibited employers from discriminating against persons with disabilities. The ADA provides: "No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Additionally, the ADA defines "discriminate against a qualified individual on the basis of disability" to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity . . . ." Id. § 12112(b)(5)(A). Thus, the ADA establishes a cause of action for failure to accommodate an otherwise qualified individual's

known physical limitations.[19]   To establish a prima facie claim for failure to accommodate, Plaintiff must show:

> (1) that [s]he was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of [her] disability; (3) that with reasonable accommodation [s]he could perform the essential functions of the position; and (4) that the employer refused to make such accommodations.

Wilson v. Dollar Gen. Corp., 717 F.3d 337, 345 (4th Cir. 2013) (ellipsis and alterations omitted) (quoting Rhoads v. Fed. Deposit Ins. Corp., 257 F.3d 373, 387 n.11 (4th Cir. 2001)).

With respect to the fourth element of a claim for failure to accommodate, the refusal to make a reasonable accommodation, to defeat an employer's motion for summary judgment, a plaintiff "need only show that an 'accommodation' seems reasonable on its face, i.e., ordinarily or in the run of cases." U.S. Airways, Inc. v. Barnett, 535 U.S. 391, 401-02 (2002) (citations omitted); Reyazuddin v. Montgomery Cty., 789 F.3d 407, 414 (4th Cir. 2015). A "reasonable accommodation" may include:

> (A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and
> (B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and

---

[19] The ADA defines a "qualified individual" as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

> other similar accommodations for individuals with
> disabilities.

42 U.S.C. § 12111(9). Additionally, under EEOC regulations, an employer has a duty to engage in an interactive process to identify a reasonable accommodation:

> To determine the appropriate reasonable accommodation
> it may be necessary for the covered entity to initiate
> an informal, interactive process with the individual
> with a disability in need of the accommodation. This
> process should identify the precise limitations
> resulting from the disability and potential reasonable
> accommodations that could overcome those limitations.

29 C.F.R. pt. 1630.2(o)(3). However, the Fourth Circuit has suggested that "liability for failure to engage in an interactive process depends on a finding that, had a good faith interactive process occurred, the parties could have found a reasonable accommodation that would enable the disabled person to perform the job's essential functions." Wilson, 717 F.3d at 347 (quoting Jones v. Nationwide Life Ins. Co., 696 F.3d 78, 91 (1st Cir. 2012)). That said, "the interactive process 'is not an end in itself; rather it is a means for determining what reasonable accommodations are available to allow a disabled individual to perform the essential job functions of the position sought.'" Id. (quoting Rehling v. City of Chicago, 207 F.3d 1009, 1015 (7th Cir. 2000)). Moreover, ADA regulations establish that, if an employee rejects a reasonable accommodation necessary to enable her to perform the essential

functions of her position, she will not be considered a qualified individual (as required to establish liability under the ADA for failure to accommodate):

> An individual with a disability is not required to accept an accommodation, aid, service, opportunity or benefit which such qualified individual chooses not to accept. However, if such individual rejects a reasonable accommodation, aid, service, opportunity or benefit that is necessary to enable the individual to perform the essential functions of the position held or desired, and cannot, as a result of that rejection, perform the essential functions of the position, the individual will not be considered qualified.

29 C.F.R. pt. 1630.9(d). Furthermore, in guidance interpreting its regulations, the EEOC has suggested that:

> Once potential accommodations have been identified, the employer should assess the effectiveness of each potential accommodation in assisting the individual in need of the accommodation in the performance of the essential functions of the position. If more than one of these accommodations will enable the individual to perform the essential functions or if the individual would prefer to provide his or her own accommodation, the preference of the individual with a disability should be given primary consideration. However, the employer providing the accommodation has the ultimate discretion to choose between effective accommodations, and may choose the less expensive accommodation or the accommodation that is easier for it to provide.

29 C.F.R. pt. 1630, App. at 406 (2015).

With respect to Plaintiff's failure-to-accommodate claim against TCA, the parties' dispute turns on whether TCA's offer of a TTY or other non-video TRS system qualified as a reasonable accommodation that would permit Plaintiff to perform her

position's essential function requiring the use of a telephone.[20] In particular, the parties dispute whether Plaintiff's rejection of a TTY or other non-video TRS system constituted a rejection of a reasonable accommodation that was necessary for Plaintiff to use the telephone, such that, under 29 C.F.R. pt. 1630.9(d), Plaintiff no longer can be considered a qualified individual and, therefore, cannot succeed on her claims under the ADA.

TCA's contentions regarding the reasonableness of a TTY and other non-video TRS systems are two-fold. First, TCA contends that such accommodation was reasonable as a matter of law because Plaintiff's deposition testimony establishes that she could communicate accurately using TTY, that any problems with accountability for mistakes by an interpreter are equally present in any system involving an interpreter, including VRS, and that a TTY and other non-video TRS systems permit an interactive, two-way conversation between the hearing-impaired individual and recipient of the call. See TCA's Mem. Supp. Mot. for Summ. J. at 15-19, ECF No. 86. Second, TCA contends that other accommodations that Plaintiff requested were impossible for TCA to provide because TCA could not install any

---

[20] TCA has not contested whether the use of a telephone was an essential function of Plaintiff's position. Thus, for the purposes of this motion, the Court assumes, without deciding, that use of a telephone was an essential function. However, the Court does note that Plaintiff represented in her Affidavit that while she was assigned to the Primary Care Clinic, she made "approximately three to five phone calls daily," though some days required more. ECF No. 112-3, ¶ 75.

accommodation without the assistance of the Navy. According to TCA, it relayed all of Plaintiff's requested accommodations to the Navy and depended on the Navy to approve such accommodations. Thus, to the extent the Navy did not approve the VRS accommodations Plaintiff proposed, given that TCA relayed them to the Navy, it was impossible for TCA to provide such accommodations because TCA depended on the Navy's approval.

In response, first, Plaintiff contends that TTY and other non-video TRS systems were not a reasonable accommodation in the context of Plaintiff's position as a physician assistant. In particular, Plaintiff asserts that it would be difficult for Plaintiff to relay medical information over a TTY or other non-video TRS systems, the purportedly detached and non-interactive nature of communication through a TTY and other non-video TRS systems would impair the patient-client relationship and diminish trust between Plaintiff and her patients, and Plaintiff had concerns that the TRS communications assistants ("CAs") would not accurately relay her TTY and non-video TRS responses. Additionally, Plaintiff argues that an at least eight-second delay, between the time at which a call is connected through a TTY, or other non-video TRS, system and the time at which the recipient of the call hears the CA speak, renders a TTY or other non-video TRS system unreasonable because call recipients often disconnect the call prematurely due to the delay. Second,

Plaintiff contends that she has adduced sufficient evidence for a reasonable jury to conclude that TCA is liable because it failed to engage in good faith in an interactive process with Plaintiff to find an effective accommodation and that the parties could have found a reasonable accommodation had a good faith interactive process occurred.  Third, Plaintiff contends that it was not impossible for TCA to provide a VRS system or interpreter.  Plaintiff asserts that it was not impossible for TCA to provide a VRS system because the VP-200 phone was in use at other Navy facilities and could be installed with minimal security concerns, and the Navy ultimately installed the Z-150 video phone as an accommodation for Plaintiff.  Plaintiff's counsel also stated during the September 21, 2015 on-the-record telephonic Status Conference that the VRS system Plaintiff requested included an option for her to verbally introduce the call once connected and the recipient answered, thus overcoming her concerns about the delay experienced on TTY calls between the time of connection with the call recipient and the CA first speaking.  Tr. of Telephonic Proceedings (Status Conference), 18:21-25, Sept. 21, 2015, ECF No. 181.  As to the impossibility of interpreter services, Plaintiff argues that TCA's own policy states that TCA will provide interpreters as an accommodation and that the Navy "never expressed an objection to this

accommodation if TCA paid for it." Pl.'s Mem. Opp'n TCA's Mot. for Summ. J. at 23, ECF No. 113.

To begin, although the Court must view the disputed evidence in a light most favorable to Plaintiff, the Court need not resolve, in favor of Plaintiff, inconsistencies between Plaintiff's declaration in opposition to TCA's motion for summary judgment and her deposition testimony. "A genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct." Barwick v. Celotex Corp., 736 F.2d 946, 960 (4th Cir. 1984) (citation omitted). Thus, a party cannot create a genuine dispute of material fact by using a summary judgment affidavit to contradict her previous sworn statement in a deposition. See Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 806-07 (1999) (collecting cases and noting that "[t]he lower courts . . . have held with virtual unanimity that a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity"); Stevenson v. City of Seat Pleasant, 743 F.3d 411, 421-22 (4th Cir. 2014). Accordingly, to the extent

Plaintiff's declaration contradicts her deposition testimony, the Court will disregard her declaration.

Plaintiff's sworn deposition testimony belies many of her contentions regarding the reasonableness of a TTY or other non-video TRS system. In her deposition, Plaintiff confirmed that she could transmit complicated medical information using a TTY or non-video TRS system. For example, by typing into a TTY, Plaintiff could communicate with an ophthalmologist regarding a patient's diagnosis of "post open-angle glaucoma" and schedule an appointment between the patient and specialist. TCA's Mem. Supp. Mot. for Summ. J. Ex. 2 at 6, ECF No. 86-11 (Crump Deposition). Similarly, using a TTY, Plaintiff could request x-rays and lab results, "formulate a health care plan for patients referred to the Urgent Care Center," receive directions and responses from a specialist, "relay lab results and test results," "prescribe new medications," and "instruct regarding dosages and usages." Id. at 6, 10-11. Additionally, although the other party would need to wait until the TRS operator had finished transmitting the message from Plaintiff, the other person could clarify misunderstandings about Plaintiff's communications and "say whatever they want to say" to Plaintiff. See id. at 9. Accordingly, Plaintiff's own deposition testimony establishes that a TTY or non-video TRS system could allow Plaintiff to accurately communicate complicated medical

information and would permit a two-way communication between

Plaintiff and the recipient of the phone call.[21]

---

[21] In her deposition, with respect to a TTY or non-video TRS system, Plaintiff expressed that "the biggest concern that I have is the accuracy." TCA's Mem. Supp. Mot. for Summ. J. Ex. 2 at 7. Although FCC regulations generally prohibit TRS CAs "from intentionally altering a relayed conversation" and provide that TRS CAs "must relay all conversation verbatim unless the relay user specifically requests summarization, or if the user requests interpretation of an ASL call," 47 C.F.R. § 64.604(a)(2)(ii), Plaintiff has suggested that "she herself experienced problems in the past with accuracy of information relayed by CAs." Pl.'s Mem. Opp'n TCA's Mot. for Summ. J. at 18, ECF No. 113. However, though the record is somewhat sparse, it appears that all of the alternatives to a TTY and non-video TRS system proposed by Plaintiff, including VRS, present similar concerns regarding accuracy. Although a VRS system might permit Plaintiff to verify that a CA has accurately relayed her communications to the recipient of Plaintiff's call, it appears that, just as with TTY, there is no way for Plaintiff to ensure that the CA has accurately communicated the recipient's responses to Plaintiff. In other words, if there are concerns that a TRS CA will disregard federal regulations (intentionally or unintentionally) and fail to accurately translate, the same concerns exist, though possibly to a lesser extent, with a VRS CA because VRS still does not allow Plaintiff to verify the accuracy of the CA's interpretation of the call recipient's responses.   But Plaintiff's argument may cut both ways.   To the extent Plaintiff now emphasizes the possibility of inaccurate communication for a hearing-impaired physician assistant relying on some form of relay service or interpreter to make phone calls in a medical context, such evidence may be probative of other aspects of Plaintiff's ADA claim.   Indeed, the possibility of miscommunication inherent in the use of any form of interpreter, and Plaintiff's inability to verify completely that an interpreter has accurately relayed communications, raises the specter that no accommodation can effectively permit Plaintiff to perform the essential functions of her position in a situation depending on accurate telephonic communications in the provision of medical care, including for patients in need of urgent or emergency care. Therefore, if the ability to make accurate phone calls in such a situation actually is an essential function of Plaintiff's position, Plaintiff's concerns about accuracy, if well founded, (perhaps perversely) call into question whether Plaintiff is a "qualified individual" within the meaning of the ADA and whether she can safely perform the essential functions of the job.   See 42 U.S.C. § 12111(8); Wright v. Hospital Authority of Houston Cty., C.A. No. 5:07-cv-281, 2009 U.S. Dist. LEXIS 7504 *34-35 (M.D. Ga. 2009) (discussing "direct threat" doctrine in medical context involving nurse with profound bilateral hearing loss).   At this point, the parties have presented

Nevertheless, the evidence in the record would permit a reasonable finder of fact to determine that there is an at least eight-second delay between the time when a person picks up a call sent from a TTY through a TRS operator/CA and the time when the TRS operator/CA informs such person that he is receiving a call from a hearing-impaired individual. No evidence in the record cited by TCA—or unearthed in the Court's independent exploration of the voluminous record, see Fed. R. Civ. P. 56(c)(3)—contradicts Plaintiff's statement in her declaration that "[t]here is at least an eight second delay when someone speaks after the call is connected resulting in the receiver to disconnect the call prematurely." Pl.'s Mem. Opp'n TCA's Mot. for Summ. J. Ex. D ¶ 122(A), ECF No. 113-6; see also TCA's Mem. Supp. Mot. for Summ. J. Ex. 1, Ex. B at 2, ECF No. 86-3 (detailing, in an email from Plaintiff to TCA, that "when making calls, there is at LEAST an 8 second delay when someone speaks after the call is connected and hence, most calls become disconnected as most people do not wait several seconds before someone speaks." Admittedly, the Court surely would prefer a more detailed exposition of the delay between the time at which the recipient of a TTY or other non-video TRS call picks up the

---

limited evidence regarding this issue and have not addressed it in their briefing. That said, if evidence at trial demonstrates problems regarding the accuracy of TRS, VRS, and/or interpreter services, Plaintiff should be prepared to address the issue should it arise.

phone and the time at which a TRS operator/CA first communicates to the recipient, as well as a discussion of whether there are similar delays in video-based TRS such as those ultimately offered.   However, Plaintiff has averred that she is "experienced with different telecommunication devices including TTY, IP-Relay, [and] SIPRelay," id. ¶ 7, and that she was a "former user of . . . text telephone devices prior to the developments of the video relay systems," id. ¶ 122(D). Plaintiff's counsel maintained at the September 21, 2015 on-the-record telephonic Status Conference that Plaintiff has experience with TTY and other non-video TRS, that based on her experience such delay exists, and that no such delay exists with the kind of VRS system she requested because such systems allow for the caller to immediately introduce themselves in their own voice.   Tr. of Telephonic Proceedings (Status Conference), 20:21-25, Sept. 21, 2015, (ECF No. 181). Based on such sworn statements, the Court finds that Plaintiff's declaration presents a sufficient factual basis for the Court to conclude that Plaintiff has adequate personal knowledge to testify that, in her experience with TTY and other non-video TRS systems, "[t]here is at least an eight second delay when someone speaks after the call is connected resulting in the receiver to disconnect the call prematurely." See id. ¶ 122(A).[22]

---

[22] By letter of September 18, 2015, Plaintiff's counsel advised the

The eight-second delay discussed above, coupled with the case-specific facts regarding Plaintiff's responsibilities at BMC Sewells, and her other concerns about TTY and other non-video TRS systems, preclude the Court from holding that the TTY and other non-video TRS systems that TCA offered to Plaintiff were reasonable as a matter of law. The eight-second delay discussed above would permit a reasonable finder of fact to

---

Court that she may have misspoken during oral argument about a federal standard. Letter, ECF No. 180. The Federal Communications Commission ("FCC") standard for TRS requires that "TRS providers must answer 85 percent of all calls within 10 seconds (but there are different answer speed rules for VRS." FCC Telecommunications Relay Service Guide, Id. at pg. 3 (paraphrasing 47 CFR 64.604(b)(2)(ii)). Notwithstanding this clarification, "Plaintiff continues to maintain that there is a delay in connecting to the remote recipient." Id. at pg. 1. Plaintiff also noted in her letter that the "hang up" factor, which formed part of her objection to services utilizing an introduction by a CA, and referenced in her brief, is discussed in the FCC TRS guide attached to her letter. Id. During the September 21, 2015 on-the-record telephonic Status Conference, Plaintiff's counsel reiterated that there is a delay of up to 8 seconds between the time a TTY call connects with the recipient and the time the recipient actually hears any voice introducing the call—thus resulting in many hang ups. Plaintiff's counsel also contends there is no such delay in VRS when the caller exercises the "inherent" VRS option to speak herself to introduce the call. In response, counsel for the Navy contends that Plaintiff never requested, and no such VRS option existed, when Plaintiff requested her accommodations, and therefore, the requested VRS accommodation suffered from the same inadequacy allegedly experienced with TTY and other non-video TRS. In support of such assertion, counsel for the Navy cited deposition testimony from a Sorenson representative that is less than clear on this point. Tr. of Telephonic Proceedings (Status Conference), pgs. 23-24. He also notes that without a VRS voice carry over option, the slower time guidelines for VRS, versus TTY, outlined at 47 CFR 64.604(b)(2)(iii), suggest that there might be slower connectivity with VRS than with TTY, though such guidelines involve answering of calls by VRS providers, not the time within which a VRS call is audibly introduced to the call recipient. Plaintiff responds that TCA and the Navy understood she wanted a voice carry over option for the VRS accommodation she requested as they ultimately offered her a Z-150 video phone which is a "video based voice carry over system. Id. at p. 32.

conclude that a TTY and non-video TRS system were not reasonable accommodations for Plaintiff in her position as a physician extender at times dealing with complex medical issues and emergent situations. Construing the disputed facts in a light most favorable to Plaintiff, a reasonable juror could conclude that Plaintiff's position as a physician extender required her to make telephone calls in situations where the eight-second delay described above (and the attendant possibility that the recipient of the call would hang up the phone because of such delay) would not allow Plaintiff to effectively perform her job responsibilities. For example, as part of her duties, "on more than one occasion," the Navy informed Plaintiff "that in order for an urgent or emergent referral to be processed, [Plaintiff] was required to conduct a provider-to-provider consult," and that "[t]hese referrals would not be processed without the actual provider overseeing the care of the patient contacting the specialist directly to request that he or she accept the referral." Id. ¶ 77. Thus, there is evidence in the record from which a finder of fact reasonably could conclude that the Navy required Plaintiff to make time-sensitive phone calls to effectively provide medical care while serving as a physician extender.

The uncontroverted facts regarding the eight-second delay would permit a reasonable fact finder to determine that the

substantial likelihood that a specialist receiving a TTY or other non-video TRS call from Plaintiff would hang up the phone prior to the TRS operator/CA informing him that he is receiving a call from a hearing-impaired person would prevent Plaintiff from effectively making referrals via telephone for patients in need of urgent or emergency care. In such situations, where even minor delays in communication might be critical, the likelihood that Plaintiff might have to repeat her attempt to contact a specialist, after such specialist prematurely disconnected Plaintiff's prior TTY or other non-video TRS call because of the eight-second delay, would allow a reasonable juror to conclude that a TTY or other non-video TRS system was insufficient to permit Plaintiff to perform her job as a physician extender. Consequently, while a TTY or other non-video TRS system might qualify as a reasonable accommodation for hearing-impaired individuals in most jobs because it permits such individuals to communicate information accurately and in a two-way dialogue over a telephone, cf. U.S. Equal Emp. Opportunity Comm'n, EEOC Notice No. 915.002, Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act (2002), 2002 WL 31994335, at *3 (stating, as an example, that a TTY might be a reasonable accommodation to permit an employee with a hearing disability to perform the essential function of contacting the public by

113

telephone), on the specific facts of this case, the Court cannot find, as a matter of law, that a TTY or other non-video TRS system was a reasonable accommodation to Plaintiff.[23] Because a reasonable finder of fact could conclude that a TTY or other non-video TRS system was not a reasonable accommodation, there is a genuine dispute of material fact regarding whether Plaintiff's rejection of such accommodations rendered her no longer a qualified individual and, therefore, prevented her from establishing a failure-to-accommodate claim. See 29 C.F.R. pt. 1630.9(d).

The Court also concludes that there is a genuine dispute of material fact regarding whether it was impossible for TCA to provide the accommodations that Plaintiff requested because TCA relied on the Navy to implement such accommodations. TCA correctly notes that courts generally have held that an employer

---

[23] The Court has found no evidence in the record regarding the extent of the delay when a person communicates using a VRS, rather than a non-video TRS, system. However, at least based on the parties' explanation of a TTY and other non-video TRS systems, and a VRS system, while VRS may improve the quality of communications between a hearing-impaired user and the recipient of a phone call, it is not imminently clear that VRS systems would reduce the eight-second delay discussed above with respect to non-video TRS systems. This was the subject of much discussion at the September 21, 2015 on-the-record telephonic Status Conference, but at the end of that telephone Status Conference, it appeared to the Court that there was an incomplete evidentiary record on this issue. As with Plaintiff's doubled-edged argument with respect to accuracy, see supra note 21, if the VRS system Plaintiff requested involves delays similar to those present in TTY and other non-video TRS systems, the logic of Plaintiff's current position regarding the delay present in a TTY and non-video TRS system implicates a different element of Plaintiff's failure-to-accommodate claim: the requirement that she satisfy the ADA's definition of a qualified individual.

cannot be held liable for failing to provide an ADA plaintiff with a requested accommodation that is impossible for it to provide. See, e.g., Wilson, 717 F.3d at 347 ("[a]n employer who fails to engage in the interactive process will not be held liable if the employee cannot identify a reasonable accommodation that would have been possible."); Webb v. Clyde L. Choate Mental Health & Dev. Ctr., 230 F.3d 991, 1000 (7th Cir. 2000). However, in this case, there is sufficient evidence in the record from which a reasonable finder of fact could conclude that it was not infeasible or impossible for TCA to provide "all of the accommodations requested by [Plaintiff]," see TCA's Mem. Supp. Mot. for Summ. J. at 22, ECF No. 86, because TCA did not adequately cooperate with the Navy to facilitate the Navy installing an accommodation for Plaintiff. For example, although Sorenson's VP-200 was Plaintiff's preferred accommodation from the outset, on August 22, 2011, when Ms. Robles communicated potential accommodations to the COR for the contract, she indicated that Sorenson had denied the use of the VP-200 in the workplace environment. See Navy's Mem. Supp. Mot. for Summ. J. Ex. 21, ECF No. 83-24. Moreover, there is at least some evidence in the record suggesting that the Navy relied on such representation about the VP-200 system, because in a follow-up email, Commander Neill only requested information about the two options other than the VP-200 and the nTouch

software (which the Navy already had found to be unapproved).
See id. Ex. 23, ECF No. 83-26. However, a reasonable fact-
finder could conclude based on a September 12, 2011 email from a
Sorenson representative to two TCA employees, not only that VP-
200 was available for a workplace setting, but also would be the
representative's "first choice" for Plaintiff to use at her work
desk. Pl.'s Mem. Opp'n TCA's Mot. for Summ. J. Ex. B2 at 27-31,
ECF No. 113-3. Similarly, it is undisputed that on December 8,
2011, the Navy requested that TCA ask Plaintiff questions
regarding: Virginia Relay, whether another staff member could
make phone calls for Plaintiff, and whether a hard-of-hearing
handset to amplify sound would be sufficient to assist
Plaintiff, even though it appeared that she required "visual
communication to help her understand conversations," Navy's Mem.
Supp. Mot. for Summ. J. Ex. 30, ECF No. 83-33, but TCA did not
ask Plaintiff to answer such questions until March 19, 2012,
Pl.'s Mem. Opp'n TCA's Mot. for Summ. J. Ex. B3 at 23, ECF No.
113-4, or provide the Navy with Plaintiff's responses to such
questions until March 26, 2012, id. Ex. B2 at 84-87, 119-21.
Furthermore, the undisputed facts also establish that, instead
of forwarding the Navy's May 24, 2012 formal offer of
accommodations to Plaintiff, as the Navy requested, see id. Ex.
B3 at 46, ECF No. 113-4, TCA only summarized the Navy's proposed
accommodations for Plaintiff, id. at 32. Accordingly, viewing

the evidence in a light most favorable to Plaintiff, the Court cannot find, as a matter of law, that no reasonable finder of fact could conclude that it was possible or feasible for TCA to provide the accommodations Plaintiff requested because of evidence that TCA did not adequately facilitate the Navy's efforts to accommodate Plaintiff.   Thus, there is a genuine dispute of material fact as to whether it was impossible for TCA to provide the accommodations Plaintiff requested.[24]

Genuine disputes of material fact prevent the Court from holding either that a TTY or other non-video TRS system was a reasonable accommodation as a matter of law, or that it was impossible for TCA to provide Plaintiff with the accommodations she requested.   Therefore, the Court will **DENY** TCA's motion with respect to Plaintiff's failure-to-accommodate claim.

## 2. Constructive Discharge

Lastly, the Court will turn to TCA's motion as to Plaintiff's constructive discharge claim.   The standard applicable to Plaintiff's ADA constructive discharge claim

---

[24] The Court notes that its conclusion regarding impossibility is consistent with the EEOC's interpretative guidance.   U.S. Equal Emp. Opportunity Comm'n, EEOC Notice No. 915.002, Enforcement Guidance: Application of the ADA to Contingent Workers Placed by Temporary Agencies and Other Staffing Firms (2000), 2000 WL 33407189, at *10 ("Where a staffing firm and its client are joint employers of a staffing firm worker with a disability, may one entity claim undue hardship where providing the accommodation is solely within the other's control? Yes, if it can demonstrate that it has made good faith, but unsuccessful, efforts to obtain the other's cooperation in providing the reasonable accommodation.").

against TCA is identical to that discussed above with respect to Plaintiff's Rehabilitation Act constructive discharge claim against the Navy. See supra Part III.C.2.

TCA contends that Plaintiff has failed to adduce sufficient evidence to establish a prima facie constructive discharge claim because Plaintiff has demonstrated neither the deliberateness nor intolerability elements of such a claim. In TCA's view, Plaintiff's constructive discharge claim is predicated on TCA's alleged complete failure to accommodate Plaintiff. Thus, TCA argues that Plaintiff's constructive discharge claim fails for the same reason Plaintiff's failure-to-accommodate claim allegedly fails, namely, because TCA did not completely fail to accommodate her. Rather, according to TCA, it offered Plaintiff a TTY and other TRS systems at least five times, and, although Plaintiff already had submitted her resignation, offered Plaintiff the opportunity to return to work with a TTY device, an interpreter, or the Z-150 video phone. Similarly, TCA contends that its repeated efforts to accommodate Plaintiff preclude a finder of fact from concluding that it intended to force Plaintiff to quit. Additionally, regarding intolerability, TCA asserts that Plaintiff has failed to submit any evidence that its alleged failure to accommodate Plaintiff caused her to suffer objectively intolerable work conditions. In particular, TCA argues that Plaintiff cannot demonstrate

intolerability because she never returned to work and, therefore, never experienced any intolerable working condition.

Plaintiff responds by arguing that her constructive discharge claim is not contingent on her failure-to-accommodate claim. According to Plaintiff, she has adduced sufficient evidence to establish a genuine dispute of fact as to whether, by failing to adequately respond to her request for accommodation, TCA intended to force her to quit. Specifically, Plaintiff asserts that a finder of fact could reasonably infer such intent from TCA: completely failing to provide any effective accommodation for thirteen months; actively delaying accommodating Plaintiff by delaying communications with the Navy; failing to forward communications to and from the Navy; misrepresenting communications with Plaintiff; forbidding Plaintiff from contacting the Navy directly; showing "demonstrated hostility towards Plaintiff's disability in its emails to Plaintiff;" threatening legal action against Plaintiff in response to her FOIA request to the Navy; and "misrepresenting its obligations under the law." Plaintiff's Mem. Opp'n TCA's Mot. for Summ. J. at 24, ECF No. 113. As to intolerability, Plaintiff contends that she has presented sufficient evidence to create a genuine dispute of fact whether a reasonable person in her position would have felt compelled to resign. In Plaintiff's view, TCA's alleged failure to

119

accommodate her hearing impairment prevented her from communicating by telephone with patients and providers, which was an essential function of her position. According to Plaintiff, this created an objectively intolerable environment because it precluded her from returning to work and, therefore, required her to go unpaid while TCA failed to accommodate her.

As an initial matter, the Court's conclusion with respect to the failure-to-accommodate claim against TCA prevents it from holding that TCA is entitled to summary judgment on Plaintiff's constructive discharge claim based on the theory that TCA, in fact, offered a reasonable accommodation to Plaintiff. Given the genuine dispute of material fact as to the reasonableness of a TTY or other non-video TRS system, the Court cannot find, as a matter of law, that TCA met its obligation to reasonably accommodate Plaintiff and, therefore, that Plaintiff cannot establish a constructive discharge claim based on a failure to accommodate. However, the Court notes that, at trial, if the jury concludes that TCA did not fail to reasonably accommodate Plaintiff, Plaintiff's constructive discharge claim predicated on a failure to accommodate necessarily will fail. See Ward v. McDonald, 762 F.3d 24, 35-36 (D.C. Cir. 2014).

For reasons similar to those discussed above with respect to the Navy, the Court finds that no reasonable finder of fact could conclude that Plaintiff has demonstrated a triable issue

120

with regard to deliberateness through her contention that TCA completely failed to accommodate Plaintiff. The undisputed facts establish that, on multiple occasions from August 16, 2011 until August 1, 2012, TCA offered Plaintiff a TTY or other non-video TRS system as an accommodation for her inability to use a conventional telephone. As noted above, on this record, the Court cannot hold, as a matter of law, that a TTY or other non-video TRS system constitutes a reasonable accommodation. However, even if a jury ultimately concludes that such accommodation was not reasonable and that TCA should have done more to accommodate Plaintiff, given TCA's repeated offers of a TTY or other non-video TRS system, as well as a later offer of a video VRS, and (as the Court noted at the hearing) the challenges presented by Plaintiff's persistent hesitance to return to BMC Sewells and work though the accommodation interactive process on the job, no reasonable finder of fact could conclude that TCA completely failed to accommodate Plaintiff. See Johnson, 992 F.2d at 132. The mere fact that Plaintiff believed that a TTY or other non-video TRS system was an unreasonable accommodation does not negate TCA's offer thereof. However, the Court's analysis regarding the deliberateness element of Plaintiff's constructive discharge claim against TCA does not end with whether TCA completely failed to accommodate her because Plaintiff also asserts that

she has presented sufficient circumstantial evidence from which a reasonable juror could find that TCA failed to accommodate her because it intended to force her to quit.

After carefully considering the evidence in this case and the parties' submissions, the Court finds that Plaintiff has adduced sufficient circumstantial evidence to create a genuine dispute of material fact as to whether TCA failed to accommodate her because it intended to force her to quit—assuming, of course, that the jury concludes that TCA failed to accommodate Plaintiff.  This is a very close case on such issue.  Much of Plaintiff's circumstantial evidence, if considered alone or even in combination with other circumstantial evidence, would not permit a reasonable finder of fact to infer from TCA's actions that it intended to force Plaintiff to quit.  For example, given the contractual relationship between TCA and the Navy, the fact that TCA requested that Plaintiff refrain from contacting the Navy directly does not, itself, permit a reasonable inference that TCA intended to force Plaintiff to quit.  Likewise, considered in isolation, TCA's delay in relaying communications between the Navy and Plaintiff would not allow a reasonable fact finder to conclude that TCA intended to force Plaintiff to quit. Similarly, while Plaintiff produced two emails from TCA that contain statements that might be viewed as hostile towards Plaintiff's request for accommodation, see Pl.'s Mem. Opp'n

TCA's Mot. for Summ. J. Ex. B1 at 47, ECF No. 113-2 (stating, in an email from TCA to the Navy, "[w]e realize this has gotten bigger than we expected so we understand if it just can't be done"); id. Ex. B3 at 54, ECF No. 113-4 (noting in an email from TCA to the Navy that "[u]nfortunately under our Nation's laws we have to ensure that we uncover every stone"), those isolated, offhand remarks alone would not permit a reasonable jury to find that TCA did not adequately accommodate Plaintiff because it intended to force her to quit. However, at this stage, the Court's "function is not [itself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249. Instead, the Court must construe the facts and all "justifiable inferences" in the light most favorable to Plaintiff. Id. at 255. Accordingly, while each sliver of circumstantial evidence Plaintiff has submitted, if considered individually, might not permit a reasonable finder of fact to conclude that TCA intended to force Plaintiff to quit, the Court cannot discount the stronger inference of intent that a juror might draw from the evidence when considering Plaintiff's circumstantial evidence as a whole. In this case, the Court finds that, considering all of the evidence in the record, including the statements in the emails noted above, TCA's communications with the Navy and TCA's delay in forwarding the Navy's questions and offer of

accommodation to Plaintiff, even though TCA had asked that Plaintiff not communicate directly with the Navy, Pl.'s Mem. Opp'n TCA's Mot. for Summ. J. Ex. B1 at 18-19, ECF No. 113-2, and TCA's letter threatening legal action against Plaintiff for filing a FOIA request with the Navy and for directly contacting the Navy, id. Ex. B3 at 22, ECF No. 113-4, a reasonable finder of fact could conclude that, if TCA failed to accommodate Plaintiff, it did so with the intent to force her to quit. Therefore, the Court concludes that there is a genuine dispute of material fact regarding the deliberateness element of Plaintiff's constructive discharge claim against TCA.

The Court further finds that Plaintiff has created a genuine dispute of material fact regarding the intolerability element of her constructive discharge claim against TCA. In the Court's Opinion and Order denying the Navy's motion to dismiss Plaintiff's constructive discharge claim against it, assuming the truth of Plaintiff's allegations, the Court held that "[a] reasonable jury could conclude that a complete inability to communicate with patients and providers by telephone would render Plaintiff's working conditions 'intolerable,' as using the telephone is vital to her ability to 'communicate with patients and other providers,' 'relay lab and test results' to patients, 'prescribe new medications and instruct regarding dosage/usage, and explain new tests and lab results.'" Opinion

124

and Order at 23, ECF No. 23 (quoting Am. Compl. ¶¶ 14, 17, ECF No. 11-1). For the same reason, based on the evidence Plaintiff has adduced, the Court concludes that Plaintiff has created a genuine dispute of material fact regarding intolerability with respect to her constructive discharge claim against TCA. Viewing the evidence in a light most favorable to Plaintiff, "[w]hile assigned to the Primary Care Clinic, [Plaintiff] made approximately three to five phone calls daily," and "[s]ome days required more calls." Pl.'s Mem. Opp'n TCA's Mot. for Summ. J. Ex. D ¶ 75, ECF No. 113-6. In addition, as explained above, evidence in the record indicates that Plaintiff needed to use a telephone to refer patients needing urgent or emergency care to another provider. Id. ¶ 77. Indeed, for the purposes of this motion, TCA has not challenged Plaintiff's assertion that making telephone calls was an essential function of her position. In light of the evidence that Plaintiff needed to use a telephone to perform the essential functions of her position (including in situations involving patients in need of urgent and emergency care), if a finder of fact ultimately concluded that TCA failed to offer Plaintiff a reasonable accommodation that would permit her to make such telephone calls, a reasonable finder of fact also could find that such failure created objectively intolerable working conditions—particularly in light of Plaintiff's licensure requirements. If TCA failed to

125

accommodate Plaintiff, on this record, a jury could find that a reasonable person in Plaintiff's position—unable to return to work without accommodation and having not received any pay while TCA failed to provide an adequate accommodation—could have felt compelled to resign because of such failure. Accordingly, the Court concludes that a genuine dispute of material fact exists regarding the intolerability element of Plaintiff's constructive discharge claim against TCA.

In short, Plaintiff has presented sufficient evidence to create genuine disputes of material fact as to both the deliberateness and intolerability elements of her constructive discharge claim against TCA. Therefore, the Court will **DENY** TCA's motion for summary judgment as to such claim.

The Court has considered and resolved the parties' summary judgment motions. However, sometimes the formal resolution of the issues presented for decision does not paint the complete picture of a case. So here. As the Court explained at the summary judgment hearing and September 21, 2015 telephone on-the-record Status Conference, the evidence presented thus far portrays each party in this action in an unflattering light. If Plaintiff had returned to work and sought to work through accommodation alternatives with TCA and the Navy, she might have quickly and easily found resolution for her accommodation concerns. Despite Plaintiff's suggestion that the August 16,

126

2011 email from Lieutenant Commander Badura justified such failure on her part, a fair reading of the record before the Court reflects a hesitance on Plaintiff's part to return to work until her demands were completely met and accommodations were in place, rather than returning to work immediately at BMC Sewells while the parties attempted to put an effective accommodation into place. On the other hand, equally, TCA and the Navy might have quickly and easily found resolution for Plaintiff's unfortunate post-surgery hearing challenges if they had convened an in-person meeting between themselves and Plaintiff. The lengthy back and forth between Plaintiff, TCA, and the Navy, appears to have understandably damaged Plaintiff's confidence in their ability to resolve her request for accommodation and dampened her desire to engage in an on-the-job interactive process. While the Court recognizes that hindsight is 20/20, it is sometimes helpful for parties to be reminded of the challenges in their case—even those that are not susceptible to disposition by summary judgment motion. Sometimes such recognition leads to resolution; if not, it should allow the parties to better prepare to present their case at trial. These observations are offered in such a vein, because the challenges for all sides in this case are considerable.

## IV. CONCLUSION

For the forgoing reasons, the Court **DENIES IN PART** and **DENIES IN PART AS MOOT** Plaintiff's Motion for Leave to Submit Additional Evidence, ECF No. 171. The Court **DENIES** such motion as to the additional evidence Plaintiff sought to submit in opposition to TCA's motion for summary judgment and the Court **DENIES AS MOOT** such motion as to the evidence Plaintiff sought to submit in opposition to the Navy's motion for summary judgment.

The Court **GRANTS** Plaintiff's Motion for Summary Judgment, ECF No. 135, regarding the Navy's status as Plaintiff's employer. For the purposes of Rehabilitation Act liability, the Navy was Plaintiff's employer under the joint employer doctrine.

The Court **GRANTS IN PART** and **DENIES IN PART** the Navy's Motion for Summary Judgment, ECF No. 82. The Court **DENIES** such motion with respect to the joint employer doctrine and the defense of administrative exhaustion because the Court has determined that the Navy employed Plaintiff and that there is a genuine dispute of material fact as to whether Plaintiff timely initiated EEO counseling with the Navy. The Court **GRANTS** the Navy's motion with respect to Plaintiff's constructive discharge claim because no reasonable finder of fact could conclude that, if the Navy failed to accommodate Plaintiff, it did so with the intent to force Plaintiff to quit.

The Court **DENIES** TCA's Motion for Summary Judgment, ECF No. 85.  Plaintiff has adduced evidence creating genuine disputes of material fact as to both her failure-to-accommodate and constructive discharge claims against TCA.

The Clerk is **REQUESTED** to send a copy of this Opinion and Order to all counsel of record.

**IT IS SO ORDERED.**

/s/ _[signature]_
_____
Mark S. Davis
UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
September 22 , 2015