

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division

SUMMER CRUMP,

        Plaintiff,

v.                                 Civil Action No. 2:13cv707

UNITED STATES DEPT. OF NAVY,
by and through RAY MABUS,
SECRETARY OF THE DEPT. OF NAVY,

        Defendant.

## OPINION AND ORDER

Plaintiff, Summer Crump ("Plaintiff" or "Crump"), is a
hearing-impaired former employee of the United States Department
of Navy ("the Navy").[1] Plaintiff brought suit against the Navy,
alleging that the Navy violated the Rehabilitation Act by
failing to reasonably accommodate her in her work as a physician
assistant at the Navy's Sewells Point Branch Medical Clinic
("Sewells Point Clinic").[2] Following a two-week jury trial, the
jury returned a verdict in Plaintiff's favor, finding that the

---

[1] The Court notes that Plaintiff initially filed her complaint against
the Navy and third-party contractors, TCoombs & Associates, LLC and
TCMP Health Services, LLC (collectively "TCA" or "TCMP"), alleging
that they were her joint employers. The Court granted summary
judgment on the joint employer issue, finding that both the Navy and
TCA were joint employers. However, on the morning of trial, co-
defendants/joint employers TCA settled with Plaintiff, leaving the
Navy as the sole defendant at trial. Minutes of Proceedings, ECF No.
304; Stipulation of Dismissal, ECF No. 318.

[2] Plaintiff also alleged a claim of constructive discharge against the
Navy. However, the Court granted the Navy's Motion for Summary
Judgment on such claim, and the constructive discharge claim against
the Navy was dismissed. Op. & Order, ECF No. 183.

Navy failed to provide Plaintiff a reasonable accommodation, but awarded Plaintiff no compensatory damages. Verdict Form, ECF No. 314. The only matter remaining for consideration is Plaintiff's request for equitable relief in the form of back pay, front pay, and pre- and post-judgment interest. Following the conclusion of the jury trial, the Court heard additional evidence on Plaintiff's request for equitable relief and the parties have submitted post-trial briefs. Therefore, Plaintiff's request for equitable relief is ripe for decision.

## I. FACTUAL BACKGROUND[3]

Plaintiff suffers from bilateral profound sensorineural hearing loss, and has utilized cochlear implants for approximately fifteen years. See Op. & Order, 9-10, ECF No. 183; Jury Trial Tr. Excerpt Vol. I, LeMay Test. 7:11-19, Feb. 17 and 19, 2016, ECF No. 335 [hereinafter "LeMay Test."]; Jury Trial Tr. Excerpt Vol. I, Crump Test. 185:23-186:4, Feb. 17 and 19, 2016, ECF No. 335 [hereinafter "Feb. 19 Crump Trial Test."]. After obtaining such cochlear implants, Plaintiff became a licensed physician assistant and has worked as a physician assistant since she received her Masters Degree from Eastern Virginia Medical School in 2007. See Op. & Order at 10; Feb. 19 Crump Trial Test. at 190:1-3, 193:9-23.

---

[3] To the extent that the parties do not agree upon or stipulate to the following facts, the Court finds such facts by a preponderance of the evidence, unless otherwise noted.

On September 14, 2008, the Navy entered into a five-year contract with third-party contractors, TCoombs & Associates, LLC and TCMP Health Services, LLC (collectively "TCA" or "TCMP"), to provide physician extenders services to Sewells Point Clinic. Contract (N62645-08-D-5008), AX-1.[4]   TCA's contract lapsed in 2013 and, as of September 4, 2013, Chesapeake Educational Services contracted to provide physician extenders to Sewells Point Clinic.   Crump Damages Test. at 93:6-21; Contract N62645-09-D-5021-0025, Chesapeake Educational Services, PX-306.

TCA hired Plaintiff to provide physician extender services,[5] under its contract with the Navy, beginning "on or about June 3, 2010."  Letter from TCMP Offering Employment, AX-99; cf. Feb. 19 Crump Trial Test. at 195:11-196:23 (credentialing concluded May 19, 2010).   When Plaintiff began working at Sewells Point Clinic, she worked forty hours a week and received $51.00 per hour.   Feb. 19 Crump Trial Test. at 198:24-199:3; Bench Trial Tr. Excerpt, Crump Test., 3:20-4:2, Feb. 26 and 29, 2016, ECF No. 333 [hereinafter "Crump Damages Test."]; Letter from TCMP Offering Employment, AX-99.   Plaintiff was also projected to

---

[4] References to agreed trial exhibits are designated as "AX" followed by the exhibit number (i.e. AX-1).   Similarly, references to Plaintiff's exhibits are designated as "PX" and the Navy's exhibits are designated as "DX."

[5] A "physician extender" is defined by the Contract and relevant Task Orders to include a physician assistant.   Task Order 25, 8, AX-5; Task Order 68, 5, AX-6.

receive an annual raise in September of each year of her employment, equaling an additional one dollar and two cents. Crump Damages Test. at 3:20-4:2. Plaintiff received such raise in September 2010, and her pay was increased to $52.02 per hour. Id. at 64:16-20. Plaintiff testified that, while she was working at Sewells Point Clinic, she received "dental, vision, life insurance, short-term disability . . . [and] 401(k) benefits," id. at 3:20-4:2, and that TCA contributed to Plaintiff's insurance benefits, id. at 74:23-75:4.[6] Plaintiff also testified during the jury trial that she received paid time off, sick leave, a continuing medical education allowance, and a uniform allowance. Feb. 19 Crump Trial Test. at 201:13-22. Plaintiff worked at Sewells Point Clinic until she left work for cochlear implant revision surgery on April 26, 2011. Jury Trial Tr. Excerpt, Crump Test., 6:4-6, Feb. 22 and 23, 2016, ECF No. 334 [hereinafter "Feb. 22 Crump Trial Test."]. At the time she left work at Sewells Point Clinic, Plaintiff was working forty hours a week and receiving $52.02 per hour. Crump Damages Test. at 4:3-11. While out of work for her cochlear implant revision surgery, Plaintiff was on unpaid leave under the Family and Medical Leave Act ("FMLA"). Id. at 83:22-84:2.

---

[6] Plaintiff's receipt of benefits, in addition to her salary, is disputed and the Court does not make a finding regarding Plaintiff's receipt of benefits at this juncture. The Court will address Plaintiff's receipt of benefits below.

## A. Plaintiff's Accommodation Requests

Plaintiff's recovery from surgery took longer than expected, but she was cleared to return to work with no medical restrictions on July 20, 2011. LeMay Test. at 44:7-15; Feb. 22 Crump Trial Test. at 130:17-131:3; RTW Note (TCA) from LeMay, AX-8. However, as of July 2011, Plaintiff's full hearing capabilities had not yet returned. Dr. LeMay explained that, while Plaintiff was able to return to work without restrictions, Plaintiff required an accommodation to be "successful in returning to work" at Sewells Point Clinic, including reduced noise levels and use of a video relay service for communication on the telephone. LeMay Test. at 20:14-24:7, 44:4-45:18; Letter from LeMay (Clinical Audiologist) regarding Crump Diagnosis, AX-24.

Plaintiff began seeking such accommodation and to return to work in June 2011.[7] Feb. 22 Crump Trial Test. at 10:20-11:15. Plaintiff met with TCA employee Angela Green on June 27, 2011 and requested several accommodations that would allow her to

---

[7] Plaintiff was originally scheduled to return to work after her cochlear implant revision surgery in June 2011. However, after reviewing a June 16, 2011 letter from Dr. LeMay discussing Plaintiff's condition, Letter from Summer Crump's Doctor, Michael LeMay, AX-18, TCA and the Navy determined that Plaintiff was not able to return to work and could not "return to work until [she was] able to return at full duty." Email from Green to George, Robles, "re: Re: Summer Crump - RTW Status Follow-Up," AX-21. After being informed that she could not return to work until she was able to return at full duty, and before the date on which Dr. LeMay cleared her to return to work with no medical restrictions, Plaintiff began to seek accommodations.

return to work, including use of a video relay phone for making
telephone calls.  Id. at 11:19-12:15; Email from Plaintiff to
Green, "re: RE: Summer Crump Accommodations," AX-22.  However,
Plaintiff's accommodations request was not approved immediately
and she was not able to return to work as she had planned.  On
August 1, 2011, the Navy, through Commander Sarah Neill,
approved Plaintiff's accommodation requests, including the use
of a video relay phone.  Email from Marivic Williams to Cynthia
Carpenter on 8/1/11, DX-2.  Such approval was later communicated
to Plaintiff.  However, installation of the video relay phone
was delayed, and Plaintiff understood that she could not return
to work until such accommodation was in place.  Feb. 22 Crump
Trial Test. at 22:15-23:15; Crump Damages Test. at 216:7-217:15;
Email from Williams to Plaintiff, Green, "re: RE: Return of PA
Summer Crump," AX-33; Email Badura to Crump, "re: RE: RTW," AX-
101 ("Previously TCMP would not allow me to RTW without the
accommodations due to my 'limitations' under the contract.").
On August 16, 2011, Plaintiff was informed by TCA employee
Angela   Green   that   "[s]ince   the   government   approved
accommodations, we have to wait until the installation is
complete prior to you returning FTE."  Email from Williams to
Plaintiff, Green, "re: RE: Return of PA Summer Crump," 2, AX-33.
Such instruction was reiterated to Plaintiff by her supervisor,
Lieutenant Commander Lina Badura, in a personal email on August

6

16, 2011: "Bottom line, we need to wait for TCMP to coordinate with Sorenson and have all equipment available . . . so that I can coordinate with our communications dept[.] about actual installation. I guess you can't come back until all in place." Email from Badura to Crump dated 8/16/11, "re: Sorenson," PX-87; see also Email from Williams to Green, "re: FW: PA Summer Crump," AX-26 ("PA Crump cannot return to work until I receive a medical release from TCMP stating that PA Crump is fit for full duty."). Further, Plaintiff was informed by Lieutenant Commander Badura that approval/disapproval for use of particular software "may take a few months."[8] Email from Green to Jackie Harris, Williams, "re: FW: Ntouch," AX-29; see Feb. 22 Crump Trial Test. at 21:15-18.

As demonstrated at trial, throughout the following months Plaintiff continued to communicate with TCA and the Navy regarding her requested accommodations. In response to the Navy's request, in October 2011, Plaintiff again submitted her requests for accommodation on a request for accommodation form, provided to her by the Navy, and she submitted a proposed meeting agenda regarding her requests for accommodation. Email from Williams, "re: FW: Summer Crump, Attachments: Crump Accommodation Request, Completed Medical Support Information,

---

[8] For further discussion, see this Court's Summary Judgment Opinion and Order. Op. & Order, 15-23, ECF No. 183.

VRS Interpreter, Request for Reasonable Accommodation Form, Authorization to Release Medical Information," AX-48; Email from Robles to Carpenter, "re: FW: Summer Crump; Attachments: Request for Reasonable Accommodation Form, Authorization for Release of Medical Information," AX-51. However, as of February 22, 2012, Plaintiff had not received an accommodation and had not returned to work at Sewells Point Clinic. Thus, on February 22, 2012, Plaintiff (through her attorney) sent a letter to the Navy, stating that "if we do not hear from you within ten (10) days of receipt of this letter, we will consider our request for accommodation to be denied." Letter from Sullivan to Neill and Carpenter dated 2/22/12, "re: Request for Accommodation – Ms. Summer Crump," PX-165. Plaintiff did not receive a response from the Navy within the ten-day period as she demanded, and consistent with her letter, on April 11, 2012, Plaintiff initiated equal employment opportunity ("EEO") counseling with the Navy. Feb. 22 Crump Trial Test. at 38:3-18.

On May 24, 2012, the Navy sent Plaintiff a memorandum, detailing their response to Plaintiff's October 2011 requests for accommodation, and such letter included the Navy's offers of accommodation. Mem. from Navy to Crump, "Re: Status of Reasonable Accommodation Request," AX-118. In such letter, the Navy offered to (1) assign another supporting staff member to assist Plaintiff in making any telephone calls; or (2) provide

the Virginia Relay system or sign language services to assist Plaintiff in performing the essential functions of her position; or (3) provide and install the Z-150 video phone device, if such device were approved. Id. at 2. Plaintiff, however, did not receive such letter until June 15, 2012. Feb. 22 Crump Trial Test. at 41:6-20. Plaintiff was then able to meet with Commander Neill, and discuss the Navy's offers of accommodation, during an EEO mediation on June 19, 2012. Id. at 41:3-5. During the EEO mediation, Plaintiff expressed to Commander Neill that the Z-150 video phone would be acceptable and that "it sounded like a great accommodation." Id. at 42:2-10. In response, Commander Neill told Plaintiff that she would keep Plaintiff informed regarding such accommodation and would let Plaintiff know when the device was installed and when she could return to work. Id.

After the June 19, 2012 mediation, Commander Neill took steps to request and install the Z-150 video phone. On July 2, 2012, Commander Neill instructed the Communications Manager at the Naval Medical Center - Portsmouth to proceed to process the DSL line required to accommodate installation of the Z-150 video phone, and on July 9, 2012, the Navy's IT and HIPAA compliance departments approved the Z-150 video phone. Email from Landis to Washington, "re: N0018311WRNX133," AX-106; Email from Taylor to Barnes, "Re: IT Request for Utilization of Z-150 on NMED

9

Domain," AX-112. On August 2, 2012, the Navy ordered the Z-150 video phone. Email from Neill to Taylor, "re: FW: CAP Request #79522 been ordered - Z-150," AX-103. The Z-150 video phone was installed at Sewells Point Clinic as of August 15, 2012.[9] Email from Taylor to Barnes, "Re: IT request for utilization of Z-150 on NMED Domain," AX-112.

On July 27, 2012, having heard nothing from Commander Neill since their June 19, 2012 mediation, and having received no confirmation that the promised Z-150 video phone had been installed and was functional, Plaintiff resigned her position with TCA. Feb. 22 Crump Trial Test. at 6:7-8, 42:11-12; Letter from AKS to Neill, "re: Status of Reasonable Accommodation Request dated May 24, 2012," 2, AX-107. Further, on August 9, 2012, Plaintiff communicated her resignation to the Navy and formally rejected the Navy's offers of accommodation, as included in the Navy's May 24, 2012 memorandum to Plaintiff.

---

[9] Lieutenant Commander Badura testified at trial that she and Plaintiff had discussed the Z-150 video phone and Plaintiff knew that the Navy was ordering the Z-150 video phone for her and having such device installed. Jury Trial Tr. Excerpt Vol. II, Badura Test., 281:6-9, 299:18-300:12, Feb. 23 and 24, 2016, ECF No. 332 [hereinafter "Badura Test."]. Lieutenant Commander Badura's testimony on this point was uncontradicted, but the record is unclear as to the date and context of such communication. On cross-examination, Lieutenant Commander Badura explained that the last time she spoke to Plaintiff was in April 2012 during a chance meeting. Badura Test. at 299:18-300:12. However, it was not until May 16, 2012, that Commander Neill provided information regarding the Z-150 video phone, via email, to the group of Navy employees working on Plaintiff's accommodation requests (including Lieutenant Commander Badura), after previously completing some background research on such device. Email from Taylor to Neill, "Re: Reasonable Accommodation ISO Hearing Impairment," AX-114.

Feb. 22 Crump Trial Test. at 6:9-10; Letter from AKS to Neill, "re: Status of Reasonable Accommodation Request dated May 24, 2012," AX-107. Lieutenant Commander Badura, Plaintiff's supervisor and the individual responsible for ordering the Z-150 video phone, was not aware that Plaintiff had resigned from TCA, or rejected the Navy's offers of accommodation, before the installation and testing of the Z-150 video phone on August 15, 2012. Jury Trial Tr. Excerpt Vol. II, Badura Test., 281:21-282:8, Feb. 23 and 24, 2016, ECF No. 332 [hereinafter "Badura Test."].

### B. Plaintiff's Employment Search

While she was unable to return to work at Sewells Point Clinic, Plaintiff began to seek work elsewhere. Crump Damages Test. at 10:25-13:1. Plaintiff testified that she began searching for jobs around September 2011 and applied to thirty-five jobs. Id. at 8:15-22. Plaintiff first obtained a temporary locum tenens position in December 2011 with CompHealth in the emergency department at the Halifax Regional Hospital in South Boston, Virginia, and after she was properly credentialed, Plaintiff began work for CompHealth on December 22, 2011. Id. at 13:2-14. After the six-week locum tenens position concluded, CompHealth asked Plaintiff to continue at Halifax Regional Hospital as a medical provider and she remained on such assignment until April 2012. Id. After April 2012, Plaintiff

11

continued to work as-needed as a contractor for CompHealth until June 2014. Id. at 17:19-18:4. While employed with CompHealth, Plaintiff made $47.00 per hour, with the opportunity to make $70.00 per hour for working over 40 hours in a week, and she did not receive any benefits. Id. at 16:8-12, 17:25-18:8, 62:8-11. Plaintiff earned $21,749.27 from CompHealth in 2012; Plaintiff earned $5,922.50 from CompHealth in 2013; and Plaintiff earned $7,625.75 from CompHealth in 2014. Final Pretrial Order, 101, ECF No. 209; Navy's Mem. Regarding Back Pay Award, 5, ECF No. 324; CompHealth 2013 W-2, PX-248.

During Plaintiff's work with CompHealth, Plaintiff continued her search for better employment closer to her family in the Hampton Roads area, submitting her resume and contacting recruiters in February, March, April, and May 2012. Plaintiff Job Search Documents, PX-213. Plaintiff was offered a part-time physician assistant position with Team Health in April 2012, working in the emergency departments at Maryview Medical Center in Portsmouth, Virginia, Harbor View Health Center in Suffolk, Virginia, and DePaul Medical Center in Norfolk, Virginia. Crump Damages Test. at 18:9-21, 62:25-64:1. Plaintiff began working for Team Health in July 2012. Feb. 22 Crump Trial Test. at 111:22-112:4; Crump Damages Test. at 62:18-19. While employed at Team Health, Plaintiff made $53.00 per hour and did not receive any benefits. Crump Damages Test. at 18:22-19:25.

12

Plaintiff remained on the roster for Team Health and took shifts from 2012 through 2015. Plaintiff earned $2,954.75 from Team Health in 2012; Plaintiff did not receive any shifts with Team Health in 2013; Plaintiff earned $13,175.00 from Team Health in 2014; and, as of May 14, 2015, Plaintiff had earned $18,060.45 at Team Health in 2015. Final Pretrial Order at 101; Navy's Mem. Regarding Back Pay Award at 5; Team Health 2012 W-2, PX-245.

During the same time period, in February 2012, Plaintiff was offered a physician assistant position with Patient First, working in urgent care/family practice centers at various Patient First locations in the local area or as-needed in Richmond or Northern Virginia. Crump Damages Test. at 20:11-21:11, 63:16-64:1, 65:16-23. Plaintiff began working for Patient First on a full-time basis in July 2012, after she resigned from TCA and the Navy. Feb. 22 Crump Trial Test. at 112:5-11. While employed at Patient First, Plaintiff made a base rate of $36.00 per hour and received additional pay based upon the percentage of collectible calls completed during a shift. Crump Damages Test. at 21:12-14, 67:3-70:21. Plaintiff did not initially receive benefits from Patient First, but began to receive benefits on October 1, 2012. Id. at 21:19-22:20. Plaintiff received a raise on August 16, 2014, and her base pay at Patient First increased to $43.00 per hour. Id. at 40:3-12.

13

Plaintiff continued to be employed at Patient First as of the date of trial; however, the parties presented limited evidence of Plaintiff's interim earnings between May 2015 and the date of trial. Pl.'s Br. Supporting Award of Back and Front Wages, 5 n.21, ECF No. 325; Crump Damages Test. at 37:9-39:20, 99:18-100:10. Plaintiff earned $35,759.51 from Patient First in 2012; Plaintiff earned $105,382.35 from Patient First in 2013; Plaintiff earned $97,687.02 from Patient First in 2014; and, as of May 14, 2015, Plaintiff had earned $13,435.31 at Patient First in 2015. Final Pretrial Order at 101; Navy's Mem. Regarding Back Pay Award at 5; Patient First 2012 W-2, PX-244; Patient First 2013 W-2, PX-247; Patient First 2014 W-2, PX-322.

Plaintiff continued to look for "better employment" during her time at Patient First. Feb. 22 Crump Trial Test. at 44:4-7. Plaintiff received an additional job offer in August 2014 with Bon Secours. Crump Damages Test. at 89:23-90:1; Plaintiff Job Search Documents, PX-213. However, Plaintiff turned down the Bon Secours job offer because the clinic where Plaintiff would have worked was not yet functional and Plaintiff was not able to begin work at such location. Crump Damages Test. at 91:3-16. Plaintiff was also offered a position with Pulmonary Critical Care Specialists in October 2014, which she turned down because she had begun considering a position with Apollo MD. Id. at 91:20-92:10.

Plaintiff was offered a position at Apollo MD on December 7, 2014; however, due to a delay in Plaintiff's credentialing process, Plaintiff was not able to begin work at Apollo MD until July 1, 2015.[10] Id. at 41:15-47:14. Plaintiff was paid $70.00 per hour for her work with Apollo MD and did not receive any benefits. Id. at 47:16-22. Plaintiff continued to be employed at Apollo MD as of the date of trial; however, as discussed above, the parties presented limited evidence of Plaintiff's interim earnings between May 2015 and the date of trial. Id. at 37:9-39:20, 99:18-100:10.

In total, Plaintiff earned $60,463.53 in wages from Patient First, CompHealth, and Team Health in 2012. Final Pretrial Order at 101. Plaintiff earned $111,304.85 in wages from Patient First and CompHealth in 2013. Id. Plaintiff earned $118,487.77 from Patient First, CompHealth, and Team Health in 2014. Finally, from January 1, 2015 to May 14, 2015, Plaintiff earned $31,495.76 from Patient First and Team Health. Id. at 100-01.

---

[10] Plaintiff argues that, as part of her back pay award, she should receive payment for the additional months that she was not able to work at Apollo MD due to the Navy's error in Plaintiff's credentialing paperwork and complications that arose with Plaintiff's credentialing process at Apollo MD. Pl.'s Br. Supporting Award of Back and Front Wages, 5-6, ECF No. 325. Any amount of back pay due based upon such credentialing error will be addressed below.

## II. LEGAL STANDARD

Plaintiff seeks an award of back pay and front pay, as well as pre- and post-judgment interest. The Court first addresses the legal standard for each category of damages in that order, and then discusses the application of such standards to the facts of the case.

### A. Back Pay

Complaints brought under Section 501 of the Rehabilitation Act incorporate the "remedies, procedures and rights" established in Title VII of the Civil Rights Act of 1964. 29 U.S.C. § 794a(a)(1); Bonnette v. Shinseki, 907 F. Supp. 2d 54, 60 (D.D.C. 2012) (noting that "section 501 of the Rehabilitation Act incorporates section 107 of the ADA, which in turn incorporates the remedies and procedures established in Title VII" (citing Woodruff v. Peters, 482 F.3d 521, 526 (D.C. Cir. 2007); 42 U.S.C. § 12117(a))); Op. & Order at 41-42.

As the Navy has been found by the jury to have engaged in an unlawful employment practice in violation of the Rehabilitation Act, "the [C]ourt may enjoin the [Navy] from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay . . . or any other equitable relief as the court deems appropriate." 42 U.S.C. § 2000e-5(g)(1). Moreover,

16

as a "general rule," the United States Supreme Court has established that a prevailing plaintiff under Title VII should be awarded back pay, Dennis v. Columbia Colleton Med. Ctr., Inc., 290 F.3d 639, 651 (4th Cir. 2002) (citing Albemarle Paper Co. v. Moody, 422 U.S. 405, 421 (1975)), and therefore this general rule applies in Rehabilitation Act cases, Szedlock v. Tenet, 139 F. Supp. 2d 725, 732 (E.D. Va. 2001), aff'd, 61 F. App'x 88 (4th Cir. 2003) (citing Albemarle Paper Co., 422 U.S. at 421). "[G]iven a finding of unlawful discrimination, back[ ]pay should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination." Albemarle Paper Co., 422 U.S. at 421 (addressing Title VII claim). "As part of the process of making the victims of employment discrimination whole, the offending employer is made responsible only for losses suffered by the claimant as a result of the discrimination." Brady v. Thurston Motor Lines, Inc., 753 F.2d 1269, 1278 (4th Cir. 1985) (citing Ford Motor Co. v. EEOC, 458 U.S. 219, 231 n.15 (1982)); see Johnson v. Shalala, 991 F.2d 126, 130 (4th Cir. 1993) (explaining in a footnote that "the specific remedies of back[ ]pay and reinstatement are dependent upon the proof of some adverse action taken by the employer"); Holmes v. Wal-Mart

17

*Stores E., L.P.*, No. 1:10cv75, 2011 WL 1842868, *8 (E.D. Va. Apr. 27, 2011) (unpublished) (explaining that "it is well-settled that back pay is an appropriate remedy where discrimination causes a loss of pay, and reinstatement is warranted where discrimination causes unlawful termination" (citations omitted)).

### 1. Commencement of the Back Pay Period

Once an award of back pay has been determined to be appropriate, the back pay period typically commences on the date that the unlawful employment practice takes place. *See McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 362 (1995) ("The beginning point in the trial court's formulation of a remedy should be calculation of back[ ]pay from the date of the unlawful discharge to the date the new information was discovered."); *Edwards v. Sch. Bd. of City of Norton, Va.*, 658 F.2d 951, 954 (4th Cir. 1981) ("Under the Labor Act the back pay period for an unlawfully terminated employee commences with the date of discharge and continues until the employer makes a valid offer of reinstatement." (citations omitted)); *Patterson v. Am. Tobacco Co.*, 535 F.2d 257, 269 (4th Cir. 1976) (explaining that a back pay award should compensate the victim of discrimination and "[t]his may be accomplished by allowing back pay for a period commencing at the time the employee was unlawfully denied a position until the date of judgment, subject to the applicable

18

statute of limitations" (citations omitted)); see also Kirsch v. Fleet St., Ltd., 148 F.3d 149, 167-68 (2d Cir. 1998) ("A plaintiff who has proven a discharge in violation of the ADEA is, as a general matter, entitled to back[ ]pay from the date of discharge until the date of judgment." (citations omitted)); Thorne v. City of El Segundo, 802 F.2d 1131, 1136-37 (9th Cir. 1986) ("Absent compelling circumstances, when an employer has refused to hire an employee in violation of that employee's rights under Title VII, the court should compute the back[ ]pay award from the date of the discriminatory act until the date of final judgment." (citations omitted)).

Where the unlawful employment action is a failure to provide reasonable accommodation, courts generally begin the back pay calculation at the point when a plaintiff begins to suffer financial loss after, and as a result of, the defendant employer's failure to accommodate. See Hudson v. Chertoff, 473 F. Supp. 2d 1292, 1300 (S.D. Fla. 2007) (starting back pay calculation on the date that the plaintiff was placed on disability leave due to the defendant's failure to provide a reasonable accommodation); Szedlock, 139 F. Supp. 2d at 734-35 (beginning back pay calculation on the date that the plaintiff left her job on medical leave because the defendant employer failed to provide her with a reasonable accommodation); James v. Frank, 772 F. Supp. 984, 997 (S.D. Ohio 1991) (allowing back pay

for work days where the plaintiff was sent home without pay due
to the defendant's failure to provide a reasonable
accommodation); cf. Holmes, 2011 WL 1842868, at *8 ("Thus, the
fact that the Fourth Circuit reversed the district court's
judgment suggests that, like hostile work environment claims,
failure-to-accommodate claims do not entitle a plaintiff to
recover back pay and reinstatement unless the failure to
accommodate causes a loss of pay or discharge.").

Generally, where an unlawful employment practice is a
discrete discriminatory act, as the Court found during this
trial, as opposed to a continuing discriminatory practice,[11] a
plaintiff may not recover damages caused by such unlawful act if
such act cannot also serve as the basis for liability, i.e. a
plaintiff may not recover damages if the unlawful conduct is
unexhausted or time-barred, even if a plaintiff may introduce
evidence of such conduct for other purposes. See Tobin v.
Liberty Mut. Ins. Co., 553 F.3d 121, 142 (1st Cir. 2009)
(explaining that "[a]lthough Liberty Mutual's [failure to
accommodate] conduct outside the limitations period does not
provide a basis for damages, evidence of such conduct and its
effects shed light on the impact of Liberty Mutual's later

---

[11] The Court has already determined, both at the summary judgment stage
and at trial, that the failure to accommodate claim in this case is
not a continuing violation. Op. & Order at 71-72; Jury Tr. Excerpt,
Rule 50 Motion, 42:13-43:20, February 25 and 26, ECF No. 330.

refusals to accommodate Tobin." (citing <u>Nat'l R.R. Passenger
Corp. v. Morgan</u>, 536 U.S. 101, 113; <u>Ocean Spray Cranberries,
Inc. v. Mass. Comm'n Against Discrimination</u>, 441 808 N.E.2d 257,
269-70 (Mass. 2004))).   For example, in ADA cases[12] several
courts have limited an award of equitable damages to damages
that arose as a result of conduct that took place <u>within</u> the
180- or 300-day period in which an ADA plaintiff must file a
charge of discrimination with the EEOC in order to properly
bring his or her claim in federal court.   See <u>McClain v. Lufkin
Indus., Inc.</u>, 649 F.3d 374, 385 (5th Cir. 2011) ("We omit
discussion of the finer details of the back pay award except to
note that damages commence on March 6, 1994, or 300 days before
<u>McClain</u> filed his EEOC claim. Title VII provides that, except
for continuing violations like harassment, damages may only be
awarded for violations that occurred 300 days before an EEOC
charge is filed." (citing 42 U.S.C. § 2000e-5(e)(1))); <u>E.E.O.C.
v. Joe's Stone Crabs, Inc.</u>, 296 F.3d 1265, 1276 (11th Cir. 2002)

---

[12] The Court views cases addressing violations of the ADA and
accompanying damages to be analogous to the present matter, because
the legal standards used to determine whether the Rehabilitation Act
has been violated and any resulting damages mirror the legal standards
for determining a violation and any resulting damages under the ADA.
<u>See</u> 29 U.S.C. § 791(f) ("The standards used to determine whether this
section has been violated in a complaint alleging nonaffirmative
action employment discrimination under this section shall be the
standards applied under [T]itle I of the Americans with Disabilities
Act of 1990 (42 U.S.C. 12111 et seq.) and the provisions of sections
501 through 504, and 510, of the Americans with Disabilities Act of
1990 (42 U.S.C. 12201-12204 and 12210), as such sections relate to
employment."); <u>see also</u> 29 C.F.R. § 1614.203(b).

(vacating award of damages for harm that took place outside of the 300-day time period in which the plaintiff was required to file an EEOC discrimination charge); cf. Mems v. City of St. Paul, Dep't of Fire & Safety Servs., 327 F.3d 771, 784 (8th Cir. 2003) (affirming limitation of damages to damages which arose as a result of unlawful acts occurring within the one-year limitations period in which the plaintiff was required to file a charge of discrimination with the EEOC). Similarly, in Rehabilitation Act cases, courts have limited the award of damages to damages that were caused by conduct that took place during the 45-day period within which a Rehabilitation Act plaintiff is required to seek EEO counseling. See Anderson v. Richardson, 145 F. Supp. 2d 1139, 1146 (D.N.D. 2001) (awarding back pay only for Rehabilitation Act claims which were properly exhausted); cf. Sutton v. Potter, No. 02cv2702, 2004 WL 603477, *6 (N.D. Ill. Mar. 22, 2004) (unpublished) (finding that the 45-day limitations period for certain discrete acts was tolled, but limiting the plaintiff's back pay award and beginning the plaintiff's back pay calculation on the date that the 45-day limitation period began). Even if a plaintiff is not bound by a limitations period, some courts have exercised their discretion to limit a plaintiff's damages to those damages which arose as a result of violations that occurred within the otherwise applicable statutory limitations period. See E.E.O.C. v. Minn.

22

Dep't of Corr., 702 F. Supp. 2d 1082, 1091 (D. Minn. 2010), aff'd in part, 648 F.3d 910 (8th Cir. 2011) (limiting damages to 300-day time period before plaintiff filed charge of discrimination with the EEOC, even though EEOC as plaintiff was not subject to that statute of limitations, because "[i]f that individual had filed suit, her damages would have been limited by the ADEA's 300-day statute of limitations"). Thus, if a Rehabilitation Act plaintiff suffers loss as a result of unlawful conduct, such plaintiff cannot recover damages based on such conduct if it takes place before the 45-day limitations period begins.

### 2. Duty to Mitigate

"When the employee fulfills the initial burden of producing evidence establishing an entitlement to back pay, the burden shifts to the employer to prove that the employee was not reasonably diligent, and that a reasonable chance of finding comparable employment existed." Ford v. Rigidply Rafters, Inc., 984 F. Supp. 386, 389 (D. Md. 1997) (citing Donnelly v. Yellow Freight Sys., Inc., 874 F.2d 402, 411 (7th Cir. 1989), aff'd, 494 U.S. 820 (1990)). "Because the failure to mitigate is an affirmative defense, defendant bears the burden of proof to show that plaintiff, a victim of unlawful discrimination, has failed to be 'reasonably diligent in seeking and accepting new employment substantially equivalent to that from which she was

23

discharged.'" Szedlock, 139 F. Supp. 2d at 734 (quoting Brady, 753 F.2d at 1273) (citing Ford Motor Co., 458 U.S. at 232); Martin v. Cavalier Hotel Corp., 48 F.3d 1343, 1358 (4th Cir. 1995)).

A Title VII plaintiff's duty to mitigate, and thus a Rehabilitation Act plaintiff's duty to mitigate, is described at 42 U.S.C § 2000e-5(g)(1), which provides in pertinent part, that "[i]nterim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable." Id. (emphasis added). "This duty [to mitigate], rooted in an ancient principle of law, requires the claimant to use reasonable diligence in finding other suitable employment." Ford Motor Co., 458 U.S. at 231 (footnote omitted). Several courts have recognized that a defendant employer may demonstrate that a plaintiff has failed to mitigate damages by "'establishing (1) that suitable work existed, and (2) that the employee did not make reasonable efforts to obtain it.'" Broadnax v. City of New Haven, 415 F.3d 265, 268 (2d Cir. 2005) (quoting Dailey v. Societe Generale, 108 F.3d 451, 456 (2d Cir. 1997)); E.E.O.C. v. Ilona of Hungary, Inc., 108 F.3d 1569, 1581 (7th Cir. 1997) (same) (citations omitted); see Hudson, 473 F. Supp. 2d at 1297 ("Generally, the burden regarding mitigation requires the defendant to prove that substantially equivalent

24

work was available and that the employee did not use reasonable diligence to obtain it." (citations omitted)); Blizzard v. Newport News Redevelopment & Hous. Auth., 635 F. Supp. 23, 26 (E.D. Va. 1985) ("As noted, the evidence here demonstrates that after December 1980, the plaintiff made little or no effort to secure employment although positions in her field were evidently available.").

"[A] 'plaintiff cannot remain idle after an unlawful discharge and receive back pay for that period where he was not actively seeking employment.'" Szedlock, 139 F. Supp. 2d at 734 (quoting Brady, 753 F.2d at 1273). "Indeed, the claimant 'forfeits his right to back pay if he refuses a job substantially equivalent to the one he was denied.' . . . It is therefore the general rule that a Title VII claimant's voluntary refusal to seek or accept substantially equivalent employment, or to remain in such a job once secured, risks or even insures a loss of back pay." Brady, 753 F.2d at 1273 (internal citations omitted). Further, "if [a] plaintiff cannot find comparable employment, she must seek a different job, even if it is lower-paying." Szedlock, 139 F. Supp. 2d at 734 (citing Ford Motor Co., 458 U.S. at 231; Brady, 753 F.2d at 1274; Donnelly, 874 F.2d at 411).

### 3. Conclusion of Back Pay Period

Back pay calculations typically conclude when judgment is entered by a court. See Kirsch, 148 F.3d at 167-68 (noting that a successful plaintiff is "entitled to back[ ]pay from the date of discharge until the date of judgment." (citations omitted)); Thorne, 802 F.2d at 1136 (explaining that "Absent compelling circumstances, . . . the court should compute the back[ ]pay award from the date of the discriminatory act until the date of final judgment." (citations omitted)); Patterson, 535 F.2d at 269 (explaining that "back pay must be allowed an employee from the time he is unlawfully denied a promotion . . . until he actually receives it," and, absent the ability to receive such promotion, a back pay period should commence "at the time the employee was unlawfully denied a position until the date of judgment"); accord Jean-Baptiste v. D.C., 958 F. Supp. 2d 37, 44 (D.D.C. 2013). However, back pay calculations may be cut short if a defendant employer demonstrates that it made a reasonable offer of reinstatement and the plaintiff failed to mitigate damages by refusing such reasonable offer. See Ford Motor Co., 458 U.S. at 232 ("Consequently, an employer charged with unlawful discrimination often can toll the accrual of back[ ]pay liability by unconditionally offering the claimant the job he sought, and thereby providing him with an opportunity to minimize damages."); Brady, 753 F.2d at 1273 ("It is therefore

26

the general rule that a Title VII claimant's voluntary refusal to seek or accept substantially equivalent employment, or to remain in such a job once secured, risks or even insures a loss of back pay."); accord Edwards, 658 F.2d at 954. Further, as noted above, an award of back pay may also be cut short if a defendant employer demonstrates that a plaintiff failed to properly mitigate damages by other means, or if a plaintiff voluntarily removed himself or herself from the labor market. See Kirsch, 148 F.3d at 168 ("The back[ ]pay period ends prior to judgment, however, if the plaintiff has theretofore retired, for 'a discriminatee is not entitled to back pay to the extent that he fails to remain in the labor market.'" (citations and quotation omitted)); Thorne, 802 F.2d at 1136 ("Our court has recognized, however, that the back[ ]pay period may terminate earlier if the plaintiff has voluntarily removed herself from the job market, or rejected the employer's unqualified offer of reinstatement to the position to which the plaintiff applied." (internal citations omitted)); cf. Brady, 753 F.2d at 1273 ("In the case of a Title VII claimant who has been unlawfully discharged, the duty to mitigate damages requires that the claimant be reasonably diligent in seeking and accepting new employment substantially equivalent to that from which he was discharged." (citing Ford Motor Co., 458 U.S. at 232)). Our Court of Appeals does not apply the "constructive discharge

27

rule," which denies back pay to "persons who leave an employer who has committed intentional discrimination unless it is under conditions of a constructive discharge." Dennis, 290 F.3d at 651 (citing Spagnuolo v. Whirlpool Corp., 641 F.2d 1109, 1114 (4th Cir. 1981)). Thus, a plaintiff does not sacrifice an award of back pay simply because he or she was not constructively discharged. "Instead, [the Fourth Circuit] simply appl[ies] the general statutory duty located at 42 U.S.C. § 2000e-5(g) to mitigate employer damages." Id. (citing Spagnuolo, 641 F.2d at 1114).

### 4. Calculating a Back Pay Award

In calculating a dollar amount for a back pay award, the Court must determine an amount that "should only make the wrongly discharged employee monetarily whole under his employment contract; it should not provide a windfall." Cline v. Roadway Exp., Inc., 689 F.2d 481, 490 (4th Cir. 1982); see Ford Motor Co., 458 U.S. at 230 ("To this end, § 706(g) aims 'to make the victims of unlawful discrimination whole' by restoring them, 'so far as possible . . . to a position where they would have been were it not for the unlawful discrimination.'" (quoting Albemarle Paper Co., 422 U.S. at 421 (internal quotation omitted))). "To make the plaintiff whole, the award of back pay should be the difference between what the employee would have earned had the wrongful conduct not occurred from the

period of termination to judgment, and the actual earnings during that period." Ford, 984 F. Supp. at 389 (citing Horn v. Duke Homes, 755 F.2d 599, 606 (7th Cir. 1985); Cline, 689 F.2d at 489). Thus, a court should calculate the amount of any back pay award and reduce it by any amount a plaintiff earns during the back pay period. If a plaintiff takes a lower paying job during the back pay period, "[t]he period of back pay entitlement continues to run during the employment at a lower paying job, with any earnings deducted from a subsequent back pay award." Brady, 753 F.2d at 1275 (citing Merriweather v. Hercules, Inc., 631 F.2d 1161, 1168 (5th Cir. 1980); Taylor v. Philips Indus., Inc., 593 F.2d 783, 787 (7th Cir. 1979)). "Indeed, under § 706(g), the rule is that the amount of the back pay award should be 'reduced by any earnings acquired during the interim period regardless of the type of work involved.'" Id.; Taylor v. Republic Servs., Inc., 968 F. Supp. 2d 768, 801 (E.D. Va. 2013) (citing Brady, 753 F.2d at 1273).

In calculating a back pay award, the Court should include other kinds of employment compensation, such as fringe benefits and reasonably anticipated salary increases, in addition to a plaintiff's base wages or salary. See Long v. Ringling Bros.-Barnum & Bailey Combined Shows, Inc., 9 F.3d 340, 343 (4th Cir. 1993) ("Under Title VII a prevailing plaintiff is entitled to 'make whole' relief. This may include the value of fringe

29

benefits." (citations omitted)); Fariss v. Lynchburg Foundry,
769 F.2d 958, 964 (4th Cir. 1985) ("Overwhelming judicial
authority recognizes that employers guilty of discrimination are
liable for fringe benefits they would have provided to employees
as well as back wages under the ADEA." (internal quotations
omitted)); Hylind v. Xerox Corp., 31 F. Supp. 3d 729, 741-42 (D.
Md. 2014), aff'd, 632 F. App'x 114 (4th Cir. 2015) (awarding
back pay based on plaintiff's "base salary, [and] the average of
the salaries she actually received in the preceding four years,
allowing increases to reflect reasonably expected salary
increases and to account for inflation and wage growth"); see
also Metz v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 39
F.3d 1482, 1493 n.13 (10th Cir. 1994) (listing cases in
support). "In light of Title VII's policy to make whole a
victim of discrimination, the award of back pay should include
not only the straight salary, but raises and fringe benefits, as
well, which Plaintiff would have received but for the
intentional discrimination." Long v. Ringling Bros.-Barnum &
Bailey Combined Shows, 882 F. Supp. 1553, 1561 (D. Md. 1995).

## B. Front Pay

Title VII, and thus the Rehabilitation Act, also allows for
an award of front pay, as "other equitable relief," pursuant to
42 U.S.C. § 2000e-5(g)(1), to compensate a prevailing plaintiff
for future loss of pay. "Although courts have defined 'front

30

pay' in numerous ways, front pay is simply money awarded for lost compensation during the period between judgment and reinstatement or in lieu of reinstatement." Pollard v. E.I. du Pont de Nemours & Co., 532 U.S. 843, 846 (2001); accord Duke v. Uniroyal Inc., 928 F.2d 1413, 1423 (4th Cir. 1991). For example, "[i]n cases in which reinstatement is not viable because of continuing hostility between the plaintiff and the employer or its workers, or because of psychological injuries suffered by the plaintiff as a result of the discrimination, courts have ordered front pay as a substitute for reinstatement." Pollard, 532 U.S. at 846 (citing cases in support); accord Duke, 928 F.2d at 1423 (citing Whittlesey v. Union Carbide Corp., 742 F.2d 724, 728 (2d Cir. 1984)).

However, an award of front pay under Title VII is discretionary. See Hartnett v. Sch. Bd. of Brunswick Cty., No. 3:08cv128, 2008 WL 5381350, *1 (E.D. Va. Dec. 23, 2008) (citing Duke, 928 F.2d at 1424). Courts have denied front pay in cases where a plaintiff has failed to mitigate his or her damages by refusing a reasonable offer of reinstatement. See Hurley v. Racetrac Petroleum, Inc., 146 F. App'x 365, 368 (11th Cir. 2005) (unpublished) ("[W]here a plaintiff requests reinstatement or back pay, once an employer makes a "good faith" offer of reinstatement, a plaintiff who rejects the offer forfeits his right to such equitable relief unless his refusal of the

31

employer's offer was reasonable." (citing Stanfield v. Answering Serv., Inc., 867 F.2d 1290, 1296 (11th Cir. 1989))); Graefenhain v. Pabst Brewing Co., 870 F.2d 1198, 1203 (7th Cir. 1989) ("The accrual of damages for a discriminatory discharge is not terminated merely because the employee refuses an offer of reinstatement; instead, it is only 'an unreasonable refusal . . . [which] will preclude recovery of front pay.'" (quoting McNeil v. Econ. Lab., Inc., 800 F.2d 111, 118 (7th Cir. 1986))); Xiao-Yue Gu v. Hughes STX Corp., 127 F. Supp. 2d 751, 755-57 (D. Md. 2001) ("Ordinarily, the receipt of a good faith offer for reinstatement to a comparable position ends the employer's liability for front pay. Yet, refusal of reinstatement does not necessarily preclude the award of front pay if a plaintiff has reasonably refused the offer." (citing Ford Motor Co., 458 U.S. at 232; Smith v. World Ins. Co., 38 F.3d 1456, 1464 (8th Cir. 1994))). Courts have also denied front pay in cases where a plaintiff has failed to mitigate their damages by seeking substantially equivalent employment with reasonable diligence. See Reneau v. Wayne Griffin & Sons, Inc., 945 F.2d 869, 870 (5th Cir. 1991) ("Front pay may be denied or reduced when the employee fails to mitigate damages by seeking other employment." (citing Hansard v. Pepsi-Cola Metro. Bottling Co., 865 F.2d 1461, 1470 (5th Cir. 1989)); Caulfield v. Ctr. Area Sch. Dist., 133 F. App'x 4, 11 (3d Cir. 2005) ("When

32

an employer successfully proves a failure to mitigate, any back[ ]pay award to an aggrieved employee will be cut off or reduced beginning at the time of the employee's failure to mitigate and any front[ ]pay award will be foreclosed."). Further, front pay may be denied if such award would result in a windfall for the plaintiff. See Duke, 928 F.2d at 1424 ("While reinstatement, which is clearly an equitable remedy, is the much preferred remedy, front pay may serve as a substitute or a complement. Because of the potential for windfall, however, its use must be tempered."); Taylor, 968 F. Supp. 2d at 803 ("The Fourth Circuit has cautioned courts to award front pay damages sparingly as it can result in an unfair windfall for the plaintiff." (citing Duke, 928 F.2d at 1424)).

## C. Pre- and Post-Judgment Interest

As explained above, "[t]he back[ ]pay award authorized by § 706(g) of Title VII, as amended, 42 U.S.C. § 2000e-5(g), is a manifestation of Congress' intent to make 'persons whole for injuries suffered through past discrimination.' Pre[-]judgment interest, of course, is 'an element of complete compensation.'" Loeffler v. Frank, 486 U.S. 549, 558 (1988) (quoting Albemarle Paper Co., 422 U.S. at 421; West Virginia v. United States, 479 U.S. 305, 310 (1987)). Our Court of Appeals has recognized that an award of pre-judgment interest is not mandatory, but may be awarded in the Court's discretion. See Maksymchuk v. Frank, 987

33

F.2d 1072, 1077 (4th Cir. 1993) (citing United States v. Gregory, 818 F.2d 1114, 1118 (4th Cir. 1987), cert. denied, 484 U.S. 847 (1987); Domingo v. New England Fish Co., 727 F.2d 1429, 1446 (9th Cir. 1984), modified, 742 F.2d 520 (9th Cir. 1984)). However, the Fourth Circuit has explained that there are few circumstances that would justify the denial of pre-judgment interest. For example, the Fourth Circuit has found denial of pre-judgment interest to be appropriate "when the back pay award is not readily determinable or when the plaintiff fails to raise the issue in a timely or an appropriate manner." Maksymchuk, 987 F.2d at 1077 (citing Scales v. J.C. Bradford & Co., 925 F.2d 901, 909 (6th Cir. 1991); Domingo, 727 F.2d at 1446)); accord Donnelly, 874 F.2d at 411-12 (reversing a denial of pre-judgment interest because "[w]hether or not an award of interest should be granted turns upon whether the amount of damages is easily ascertainable, not whether the issue of mitigation was 'close'" (citations omitted)), aff'd, 494 U.S. 820 (1990).

The appropriate pre-judgment interest rate for cases involving federal questions is also an issue left to the Court's discretion. See Quesinberry v. Life Ins. Co. of N. Am., 987 F.2d 1017, 1031 (4th Cir. 1993) (en banc). The local state interest rate, as provided by state law, may be an appropriate rate of pre-judgment interest, and our Court of Appeals has affirmed awards of pre-judgment interest at the interest rate

provided by local state law. See Quesinberry, 987 F.2d at 1031 (affirming application of Virginia's statutory interest rate); Hyland, 31 F. Supp. 3d at 742, aff'd, 632 F. App'x 114 (applying Maryland's statutory interest rate); Cooper v. Paychex, Inc., 960 F. Supp. 966, 974 (E.D. Va. 1997), aff'd, 163 F.3d 598 (4th Cir. 1998) (applying Virginia statutory interest rate). Contra Ford, 984 F. Supp. at 391 (calculating pre-judgment interest at a rate corresponding to the average inflation rate for the back pay time period). Virginia's statutory interest rate is six percent (6%). Va. Code Ann. § 6.2-302. In circumstances where back pay accrues over time, as with the loss of wages payable in bi-weekly or monthly installments, a court may award "pre-judgment interest on each installment of salary from the date it would have been due, less outside earnings." Hyde v. Land-of-Sky Reg'l Council, 572 F.2d 988, 993 (4th Cir. 1978); see Smith v. Waverly Partners, LLC, No. 3:10cv00028, 2014 WL 3105366, *3 (W.D.N.C. July 7, 2014) (unpublished). Further, unless principals of equity counsel otherwise, a court may award pre-judgment interest, compounded annually. See Cooper, 960 F. Supp. at 974-75 (explaining that "common sense and the equities dictate an award of compound interest"); Hyland, 31 F. Supp. 3d at 742 (awarding interest, compounded annually, at the Maryland statutory interest rate); cf. Quesinberry, 987 F.2d at 1031 n.13 (noting that its ruling "only directs the post-judgment award of

interest on interest, but it does not require compound pre-judgment interest").

With respect to post-judgment interest, a plaintiff that obtains a money judgment in a civil case is entitled to post-judgment interest at the statutory rate from the date of judgment.  See 28 U.S.C. § 1961(a) ("Interest shall be allowed on any money judgment in a civil case recovered in a district court.").

### III. DISCUSSION

As noted above, Plaintiff seeks equitable damages for the Navy's failure to accommodate, including back pay, front pay, pre- and post-judgment interest.  With respect to back pay, Plaintiff argues that such award should include back wages, certain fringe benefits, paid holidays, and lost wages due to the Navy's incorrect submission of credentialing information to Apollo MD.  Pl.'s Br. Supp. Award of Back and Front Wages at 2. Further, Plaintiff argues that the back pay period should commence on June 27, 2011 and end on the date of judgment.  Id. With respect to front pay, Plaintiff argues that she should receive three years of front pay in lieu of reinstatement.  Id. at 29.

In response, the Navy raises several arguments.  First, the Navy asserts that Plaintiff is not entitled to back pay or front pay because the Navy's unlawful employment action, that is, the

36

Navy's failure to accommodate Plaintiff, did not cause
Plaintiff's losses.  Second, the Navy argues that Plaintiff
failed to mitigate her damages.  Third, the Navy asserts that,
if Plaintiff is entitled to back pay, the back pay period should
be limited to damages suffered between February 26, 2012 (the
date after which the Navy was found liable by the jury) and July
27, 2012 (the date that Plaintiff resigned from her position
with TCA), and Plaintiff should not receive front pay.  Finally,
the Navy argues that any award of back pay should be minimal
because Plaintiff's full wages received for interim employment
must be deducted from such award and the Navy is entitled to a
set-off of any back pay wages that Plaintiff received from TCA
in settlement.  The Court will first address the Navy's argument
regarding causation before determining any applicable back pay
or front pay period.  The Court will then address the Navy's
defense regarding mitigation and conclude by determining any
damages amount due to Plaintiff.

### A. Causation of Harm

As explained above, "[a]s part of the process of making the
victims of employment discrimination whole, the offending
employer is made responsible only for losses suffered by the
claimant as a result of the discrimination."  Brady, 753 F.2d at
1278 (citing Ford Motor Co., 458 U.S. at 231 n.15).  "Back pay
is an appropriate remedy where discrimination causes a loss of

37

pay, and reinstatement is warranted where discrimination causes unlawful termination." Holmes, 2011 WL 1842868, at *8. However, "it is clear that not every failure-to-accommodate claim gives rise to a claim for back pay and reinstatement." Id. In the present case, the Navy argues that it did not cause Plaintiff's damages because the jury found that the Navy failed to accommodate Plaintiff after February 26, 2012 (45 days prior to when Plaintiff initiated EEO counseling), and "Plaintiff was at home and 'losing pay' well before any legal liability of the Navy could have attached." Navy's Mem. Regarding Back Pay Award at 16. The Navy asserts, instead, that Plaintiff's absence from the workplace was "by her own choice," because, even after receiving offers of accommodation she did not return to work. Id. In response, Plaintiff argues that she was "not able to work (and lost pay) specifically and clearly because Defendant did not accommodate her (as found by the jury) and would not permit her to return to work until all accommodations were in place." Pl.'s Resp. to Def.'s Mem. Regarding Back Pay Award, 3, ECF No. 328.

The Court finds that the Navy's conduct, and the Navy's instruction not to return to work until an accommodation was in place, prior to Plaintiff's resignation, caused Plaintiff's failure to return to work at Sewells Point Clinic and the resulting loss of pay. The evidence at trial demonstrated that

Plaintiff was instructed by the Navy, or individuals who Plaintiff reasonably understood to speak for the Navy, not to return to work until an accommodation was put in place. See Crump Damages Test. at 216:7-217:15; Email from Williams to Green, "re: FW: PA Summer Crump," AX-26; Email from Williams to Plaintiff, Green, "re: RE: Return of PA Summer Crump," AX-33; Email from Badura to Crump dated 8/16/11, "re: Sorenson," PX-87. The Navy, over an extended period of time, undertook accommodation efforts, but ultimately failed to accommodate Plaintiff. Due to the Navy's extended and disjointed accommodation process, and the Navy's instruction not to return to work until an accommodation was put in place, Plaintiff was not able to return to work at Sewells Point Clinic before she resigned. It follows, then, that Plaintiff's lost wages through the date of her resignation were caused by Defendant's unlawful conduct. See Tobin, 553 F.3d at 141 ("However, the employer may be held responsible for the entire amount of lost salary notwithstanding the employee's failure to obtain another job '[i]f the employer's unlawful conduct caused the employee's inability to mitigate damages.'" (quoting Johnson v. Spencer Press of Me., Inc., 364 F.3d 368, 384 (1st Cir. 2004))); Hudson, 473 F. Supp. 2d at 1299 (finding that plaintiff was entitled to back pay because defendant had placed plaintiff on leave without pay, and later, "AWOL" status, due to plaintiff's disability,

which the jury found that defendant failed to accommodate);
Szedlock, 139 F. Supp. 2d at 733 (rejecting defendant's argument
regarding causation because defendant's failure "over an
extended period of time" to accommodate plaintiff's disability
caused plaintiff to pursue and accept medical disability).
Further, to the extent that the Navy contends that Plaintiff's
understanding of the Navy's instructions was mistaken, the Navy
did not correct such mistake with Plaintiff or arrange a time
for Plaintiff to return to work.  Therefore, Plaintiff's
inability to return to work at Sewells Point Clinic, and the
resulting loss of pay, was due to the Navy's instruction not to
return to work until an accommodation was in place and the
Navy's ultimate failure to accommodate Plaintiff — as determined
by the jury.

### B. Back Pay or Front Pay Period

### 1. Commencement of Back Pay Period

Plaintiff asserts that the back pay period should begin on
June 27, 2011 — the date she first requested accommodations,
during a meeting with TCA employee Angela Green, to return to
work at Sewells Point Clinic.  However, the Court cannot begin
its back pay calculation on the date proposed by Plaintiff
because the Navy was not, and — as instructed — the jury could
not find the Navy, liable for violating the Rehabilitation Act

prior to February 26, 2012 (the date 45 days prior to the date Plaintiff initiated EEO counseling). Jury Instr. 22.

As discussed at trial, and in the Court's summary judgment Opinion and Order, Plaintiff was required to prove that the Navy "failed to make or offer [Plaintiff] a reasonable accommodation on or after February 26, 2012" (the date 45 days before Plaintiff initiated EEO counseling on April 11, 2012) in order to be found liable for violating the Rehabilitation Act. Jury Instr. 22; Op. & Order at 70-74. Further, as discussed above, the starting point for calculation of a back pay award related to a discrete unlawful employment action is tied to the date upon which such discrete act takes place. Therefore, because a failure to accommodate is a discrete discriminatory act, the Navy could not be found liable for such conduct before February 26, 2012. Thus, Plaintiff may not receive back pay for lost wages that arose before the Navy failed to accommodate Plaintiff or before the Navy could be found liable for such failure to accommodate. Accordingly, Plaintiff may not recover for lost wages incurred before February 26, 2012.

Plaintiff urges the Court to recognize a dichotomy between the liability and remedy portions of a discrimination claim, and to find that, while a statutory limitations period is important for determining liability, such limitations period is less relevant for determination of a damages period. However, the

41

cases cited by Plaintiff in support of her argument are unavailing in a "discrete act" case such as this. The cases cited by Plaintiff simply demonstrate that a relaxing of the limitations period for consideration of damages takes place in cases of continuing violations — that is, where "[t]he 'unlawful employment practice' . . . occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." Morgan, 536 U.S. at 115 (emphasis added); see Miller v. Miami Prefabricators, Inc., 438 F. Supp. 176, 181 (S.D. Fla. 1977) (explaining that while Congress provided a two-year limitation on back pay in 42 U.S.C. § 2000e-5(g)(1), such limitation was included "to limit the back pay which could be recovered from employers who have been engaged in discrimination for many years" and "[w]here the defendant has been engaged in such unlawful practices for such an extended period of time"). In cases seeking damages for a continuing violation, a period of damages that extends beyond the 180- or 300-day ADA statutory period for seeking resolution, or 45-day period in Rehabilitation Act cases, is a reasonable means of remedying a defendant employer's continuing violation which, by definition, is pervasive and ongoing, but perhaps not easily detectable or demonstrable based upon a single instance. Often, a plaintiff suffering a continuing violation is unaware of the

discrimination and would not necessarily know that he or she should seek redress by initiating EEO counseling or filing a charge of discrimination. See Morgan, 536 U.S. at 113-19 (describing the differences between continuing violations and discrete act violations). In contrast, a discrete act violation, "such as termination, failure to promote, denial of transfer, or refusal to hire[,] are easy to identify,"[13] and "[e]ach incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice'" which a plaintiff might recognize as a point from which to begin seeking resolution. Id. Thus, as Plaintiff's failure to accommodate claim is not a continuing violation, the Court is not persuaded by Plaintiff's argument regarding the purported distinction between the liability and remedy phases of a discrimination claim.[14]

Plaintiff further argues that the "make whole" purpose of back pay requires calculation of back pay in this case to begin

---

[13] Our Court of Appeals has stated, in an unpublished opinion, that a "failure to accommodate constitutes a discrete act rather than an ongoing omission." Hill v. Hampstead Lester Morton Court Partners LP, 581 F. App'x 178, 181 (4th Cir. 2014); accord, e.g., Ayala v. Shinseki, 780 F.3d 52, 57 (1st Cir. 2015); Mayers v. Laborers' Health & Safety Fund of N. Am., 478 F.3d 364, 368-69 (D.C. Cir. 2007).

[14] Further, as Plaintiff's claim is against a government entity and the Rehabilitation Act constitutes a limited waiver of the government's sovereign immunity from suit, questions regarding such waiver must be "strictly construed, in terms of its scope, in favor of the sovereign." Lane v. Pena, 518 U.S. 187, 192 (1996) (citations omitted).

43

at the point when Plaintiff first sought accommodation, and
Plaintiff lists several cases in support of such argument.
However, such cases do not undermine the Court's conclusion that
the back pay period may not begin prior to the date on which the
Navy may be found liable for its discrete discriminatory act.
For example, Plaintiff cites Fannie v. Chamberlain Mfg. Corp.,
Derry Div., 445 F. Supp. 65 (W.D. Pa. 1977) and Berry v. Bd. of
Supervisors of L.S.U., 715 F.2d 971 (5th Cir. 1983), for the
proposition that an administrative limitation (such as the 45-
day requirement to seek EEO counseling in this case) is not a
limitation on the period for which a plaintiff can recover
equitable damages.   However, Fannie addressed a continuing
violation involving sex discrimination.   See 445 F. Supp. at 69
("Counts One and Two of the complaint allege a historical and
continuing pattern and practice of discrimination against female
employees based upon their sex.").   Berry, further, ordered
remand to the district court for determination whether the
plaintiff's Equal Pay Act claim was a continuing violation
because "[t]he theory may also be relevant to a plaintiff's
remedy, for it has been stated that '[o]nce having shown
discrimination continuing into the actionable period, . . . the
plaintiffs may also recover for portions of the persistent
process of illegal discrimination that antedated the limitations
period.'"   715 F.2d at 979-80 (quoting Laffey v. Nw. Airlines,

567 F.2d 429, 472 (D.C. Cir. 1976)). Plaintiff's citation to
Marinelli v. City of Erie, 25 F. Supp. 2d 674, 679 (W.D. Pa.
1998), is equally unpersuasive because the district court's back
pay award, beginning on the date "the jury determined that the
City became aware that the plaintiff needed an accommodation,"
was vacated by the Court of Appeals for the Third Circuit.[15] See
Marinelli v. City of Erie, Pa., 216 F.3d 354 (3d Cir. 2000).
Further, Plaintiff's citations to Arlt v. Missouri Dep't of
Corr., 229 F. Supp. 2d 938 (E.D. Mo. 2002) and E.E.O.C. v.
Yellow Freight Sys., Inc., No. 98cv2270, 2002 WL 31011859
(S.D.N.Y. Sept. 9, 2002) (unpublished), which awarded back pay
for losses that began while plaintiffs were seeking
accommodation, are unconvincing because it is unclear whether,
as Plaintiff asserts here, the plaintiffs' damages in Arlt and
Yellow Freight arose outside of the applicable statutory time
period.[16]     Arlt, 229 F. Supp. 2d at 940 (finding that

---

[15] The Court notes that the Third Circuit's opinion does not address
the award of back pay at all because the Third Circuit vacated the
jury's finding of liability, making any discussion of back pay
unnecessary.

[16] It is further unclear whether the E.E.O.C., as the plaintiff in
Yellow Freight, is bound by the ADA statutory limitations period. Due
to the E.E.O.C.'s ability to bring an enforcement action, not only to
benefit specific individuals but to "vindicate the public interest in
preventing employment discrimination," several courts have held that
the 180- or 300-day ADA statutory limitation applicable to private
party claims does not apply when the E.E.O.C. brings an enforcement
action on behalf of the same parties.   See E.E.O.C. v. Sterling
Jewelers, Inc., No. 08cv706, 2010 WL 86376, *6 (W.D.N.Y. Jan. 6, 2010)
(finding that the 300-day statute of limitations did not apply to the
E.E.O.C. as plaintiff); cf. E.E.O.C. v. Freeman, No. 09cv2573, 2010 WL

Rehabilitation Act plaintiff should receive back pay starting on the date he lost his premium-pay job, but explaining that plaintiff lost such position in July 1999, then filed an "Informal Resolution Request" detailing his requests for accommodation, and received a denial of his Request in October 1999); Yellow Freight, 2002 WL 31011859, at *7-10 (finding that ADA plaintiff should receive back pay beginning on the date he was cleared to return to work but was not allowed to do so, September 23, 1994, but explaining that plaintiff filed a grievance with the union in September 1994).

Therefore, the Court will begin the back pay period in this case on February 26, 2012 — the first day on which the Navy could be found liable for violating the Rehabilitation Act. The Court recognizes that the jury's verdict simply found that the Navy had failed to accommodate Plaintiff "on or after February 26, 2012," see Jury Instr. 22, and did not provide a specific date upon which it determined the Navy to have committed the pertinent unlawful employment practice. However, the Court will begin the back pay period on February 26, 2012 because, as the Court explained above, the Navy's instruction not to return to work and its lengthy accommodation process, which the jury ultimately found to be a failure to accommodate, predated

1728847, *2 (D. Md. Apr. 27, 2010) (stating that courts are split on whether the 300-day statute of limitations applies when the E.E.O.C. brings an enforcement action and listing cases for comparison).

February 26, 2012 and prevented Plaintiff from returning to work at Sewells Point Clinic, and Plaintiff had not returned to work as of February 26, 2012. See McClain v. Lufkin Indus., Inc., 649 F.3d 374, 385 (5th Cir. 2011) (explaining that back pay award commenced 300 days before the plaintiff filed his EEOC claim); Sutton, 2004 WL 603477, at *6 (beginning the plaintiff's back pay calculation on the date that the 45-day limitation period began).[17]

## 2. Conclusion of Back Pay Period

Plaintiff argues that she is entitled to an award of back pay through the date of judgment. In response, the Navy asserts that, if Plaintiff is entitled to any back pay, the back pay period should end on July 27, 2012 — the date that Plaintiff resigned from her position with TCA at Sewells Point Clinic. The Court agrees with the Navy on this point and finds that the appropriate date on which to conclude Plaintiff's back pay period is July 27, 2012, the date on which Plaintiff effectively

---

[17] The Court notes that it is possible that the jury, having been instructed that they could not award damages before February 26, 2012 if liability was determined, found no reason to rely on such instruction because they coincidentally found that the discrete act of failure to accommodate just so happened to occur on February 26, 2012. Moreover, based on the evidence presented at trial, such a coincidental finding would be reasonable because, due to the Navy's long-delayed interactive accommodations process, the jury could have easily found that it culminated with a failure to accommodate on February 26, 2012. See Jury Instr. 28 ("An employer's delay in providing reasonable accommodation may violate the Rehabilitation Act."). Thus, the Court finds that beginning the back pay period on February 26, 2012 is appropriate.

deprived herself of joint employment with the Navy and rejected
the Navy's offers of accommodation, because such joint
employment and accommodations would have allowed Plaintiff to
return to work at Sewells Point Clinic in a "substantially
equivalent" position to the one that Plaintiff sought in June
2011.

     As explained above, back pay calculations typically
conclude when judgment is entered by a court.  However, back pay
calculations may be cut short if a defendant employer
demonstrates that it made a reasonable offer of reinstatement,
and the plaintiff failed to accept a "substantially equivalent"
position by refusing such reasonable offer.  See Ford Motor Co.,
458 U.S. at 232; Brady, 753 F.2d at 1273.  The Supreme Court has
stated, in the context of an unlawful termination, that
"[a]lthough the unemployed or underemployed claimant need not go
into another line of work, accept a demotion, or take a
demeaning position, he forfeits his right to back[ ]pay if he
refuses a job substantially equivalent to the one he was
denied."  Ford Motor Co., 458 U.S. at 231-32 (emphasis added).
The Court finds the facts in Ford to be analogous to the present
case where: (1) Plaintiff was unable to return to work due to
the Navy's failure to provide an accommodation, (2) the Navy
tardily made an offer of accommodation that would have allowed
Plaintiff to return to work (on terms substantially equivalent

to those requested by Plaintiff), and (3) Plaintiff refused such offer of accommodation.[18]  See Aston v. Tapco Int'l Corp., 631 F. App'x 292, 298 (6th Cir. 2015) (unpublished) (affirming decision to cut off back pay in failure to accommodate and disability discrimination suit because plaintiff rejected defendant employer's unconditional offer for reinstatement).

The Navy has demonstrated that it made a reasonable offer of reinstatement to Plaintiff in its May 24, 2012 memorandum, which Plaintiff received and discussed with Commander Neill in June 2012.  The Navy's May 24, 2012 memorandum offered to Plaintiff the accommodation of ordering and installing the Z-150 video phone device, if such device was approved.  Mem. from Navy to Crump Re: Status of Reasonable Accommodation Request, AX-118. Though belated, the Navy's offer was reasonable because, while implementation of such offer, that is, approval and installation of the Z-150 video phone, required additional time, the Navy did not withdraw or modify its offer at any point before Plaintiff resigned or condition its offer on any action by Plaintiff. Further, Plaintiff conceded at trial that such accommodation sounded like a "great accommodation," and, during her meeting

---

[18] The Court does not address here whether the other accommodations offered in the Navy's May 24, 2012 Memorandum were sufficient to provide Plaintiff with a reasonable accommodation.  Instead, the Court merely addresses the Navy's offer to provide the Z-150 video phone as such offer would have allowed Plaintiff to return to work on the terms almost identical to those she originally requested.

49

with Commander Neill, Plaintiff communicated her agreement to try such accommodation. Feb. 22 Crump Trial Test. at 42:2-10. Based on Plaintiff's apparent cooperation and agreement with such accommodation, the Navy moved forward with getting the Z-150 video phone approved, ordered, and installed at the Sewells Point Clinic.

However, while the Z-150 video phone was being ordered and installed, communication between the Navy and Plaintiff again went awry. Plaintiff did not contact the Navy after the June 19, 2012 mediation with Commander Neill to determine the status of her accommodation and the installation of the Z-150 video phone. Having resigned from TCA on July 27, 2012, Plaintiff then submitted such resignation letter to the Navy and refused the Navy's offers of accommodation, including the offer of the Z-150 video phone, via letter dated August 9, 2012. Letter from AKS to Neill re: Status of Reasonable Accommodation Request dated May 24, 2012, AX-107. Plaintiff's August 9, 2012 letter explained that Plaintiff believed that she had been constructively discharged from TCA and the Navy due to the failure to respond to Plaintiff's request for accommodation for over 13 months. Id. Plaintiff submitted her resignation to TCA, and sent such resignation letter to the Navy, before installation of the Z-150 video phone was complete on August 15, 2012. Similarly, Commander Neill did not reach out to Plaintiff

during the time between the June 19, 2012 mediation and Plaintiff's July 27, 2012 resignation letter to TCA, or the later August 9, 2012 letter communicating such resignation to the Navy, or the actual functioning installation of the Z-150 video phone on August 15, 2012.

Plaintiff may not reject a reasonable offer of accommodation that would have allowed her to mitigate her damages by returning to her position at Sewells Point Clinic, even if the Navy had previously denied her an accommodation or if implementation of a suitable accommodation was not immediate. While Plaintiff was out of work, she was required to be "reasonably diligent in seeking and accepting new employment substantially equivalent" to that of which she was deprived due to the Navy's unlawful employment conduct. Brady, 753 F.2d at 1273; see Ford Motor Co., 458 U.S. at 231. The Navy has demonstrated that it ultimately made an offer of accommodation that would have allowed Plaintiff to return to her position at Sewells Point Clinic with an accommodation almost identical to the one that Plaintiff sought. Plaintiff, however, rejected the Navy's offer and, in doing so, failed to mitigate her damages by refusing a "substantially equivalent," i.e. identical, position to the one that she sought with her requests for accommodation.

Plaintiff also has not demonstrated that the Navy's offer of accommodation was unreasonable, insufficient, or made in bad

faith such that she might continue to accrue back pay even though she rejected the Navy's offer. See Brown v. Ala. Dep't of Transp., 597 F.3d 1160, 1183 (11th Cir. 2010) (explaining that a plaintiff's rejection of an employer's unconditional job offer may not end the accrual of potential back pay liability where the employer's offer is not made in good faith, or where the employee's rejection of the offer is reasonable (citations omitted)); Toledo v. Nobel-Sysco, Inc., 892 F.2d 1481, 1493 (10th Cir. 1989) ("Moreover, a rejected offer of reinstatement does not end ongoing back[ ]pay liability if the claimant's rejection of the offer was reasonable given the form of the offer and the circumstances surrounding it." (citations omitted)); Hopkins v. Shoe Show of Virginia, Inc., 678 F. Supp. 1241, 1246 (S.D.W. Va. 1988) (granting summary judgment on the issue of back pay because "[t]he Plaintiff has not raised any facts to contradict the Defendant's position that an unconditional offer was made by Shoe Show and was rejected by her. Furthermore, she has not pointed to any special circumstances giving her reason to reject the offer."). Plaintiff's argument that the Navy's offer of accommodation was unreasonable because, as of June 19, 2012, the Z-150 video phone had not yet been approved and installed, is unpersuasive, particularly because Plaintiff knew, as of that date, that such installation had not yet taken place, yet she still found the Z-

150 video phone to be a "great accommodation." Feb. 22 Crump
Trial Test. at 42:2-10. Further, as of July 27, 2012 when she
resigned, Plaintiff had no indication, and did not do any
additional investigation to determine, whether approval or
installation of the Z-150 video phone was being delayed.[19]

Thus, Plaintiff's failure to accept the Navy's offer of
accommodation, regarding the Z-150 video phone, and opportunity
for reinstatement, results in the forfeiture of the remainder of
Plaintiff's back pay damages. Therefore, because Plaintiff's
resignation from TCA effectively deprived her of the Navy's
joint employment, the Court will conclude the back pay period on
July 27, 2012, the date that Plaintiff resigned her position at
Sewells Point Clinic and effectively refused the Navy's offer of
accommodation that would have allowed Plaintiff to mitigate her
damages and return to work with the accommodation that she
originally sought.

### 3. Front Pay

An award of front pay is discretionary and courts have
refused to award front pay where a plaintiff fails to mitigate
her damages by unreasonably refusing a good faith offer of
reinstatement. See Hurley, 146 F. App'x at 368; Graefenhain,

---

[19] The Court notes that, during summary judgment in this matter,
Plaintiff stated that she did not learn that the Z-150 video phone was
approved, installed, or operational until March 2013. See Pl.'s Mem.
of Law in Opp'n to Def. Navy's Mot. for Summ. J., Ex B, Affidavit of
Summer Crump, ¶¶ 142, 205, ECF No. 112-3.

870 F.2d at 1203. As the Court found above, Plaintiff failed to mitigate her damages by refusing the Navy's offer of accommodation, which would have allowed Plaintiff to return to work with an accommodation that was almost identical to the accommodation that Plaintiff requested. The Court further finds that Plaintiff's refusal of the Navy's offer of accommodation was unreasonable. Plaintiff knew that, as of June 19, 2012, the Z-150 video phone was not yet approved, installed, or functional, but she still found the Z-150 video phone to be a "great accommodation" and agreed to try such accommodation. Additionally, at the time Plaintiff resigned and refused the Navy's offer of accommodation, Plaintiff had no indication, and did not do any additional investigation to determine, whether approval of the Z-150 video phone had been denied or when installation would be completed. Finally, the Court finds Plaintiff's refusal of the Navy's offer of accommodation regarding the Z-150 video phone to be unreasonable because the evidence at trial demonstrated that Plaintiff's need for any accommodation was temporary and dwindling. Plaintiff's ability to use a telephone without accommodation improved throughout the year following her cochlear implant revision surgery — so much so that she did not "require an accommodation" when she began work at Patient First or Team Health in July and August 2012.[20]

---

[20] Plaintiff explains in her Response to the Navy's Brief that

Feb. 22 Crump Trial Test. at 129:22-130:14.  Further, Plaintiff stated at trial that, by September 2012, she no longer needed any assistance with telephone calls.  Id. at 113:11-16.  For all these reasons, Plaintiff's refusal of the Navy's offer of accommodation also prevents an award of front pay because Plaintiff unreasonably refused the Navy's offer of accommodation and opportunity for reinstatement.

Further, the Court finds that an award of front pay is not appropriate because such award would result in a windfall to Plaintiff.  The evidence at trial demonstrated that Plaintiff's interim earnings in 2013, 2014, and a portion of 2015 either met or exceeded the amount she otherwise would have earned if she were working at Sewells Point Clinic.[21]  While it appears that

---

Plaintiff did not need to request an accommodation at Patient First or Team Health because she had purchased an iPad and was able to use the NTouch Mobile program while working with CompHealth.  See Pl.'s Resp. to Def.'s Mem. Regarding Back Pay Award, 5 n.7, ECF No. 328; Feb. 22 Crump Trial Test. at 35:21-36:8.  However, such argument is unpersuasive because Plaintiff provided no evidence that she used the NTouch Mobile program on her iPad while working at Patient First or Team Health, or that the reason why she did not need to request an accommodation at Patient First or Team Health was because she provided her own video phone device.

[21] The Court is unpersuaded by Plaintiff's assertion that the Court should not consider Plaintiff's "productivity bonuses" from Patient First or Plaintiff's earnings from "supplemental employment" in determining the amount of Plaintiff's interim earnings.  First, with respect to Plaintiff's "productivity bonuses," the evidence at trial demonstrated that such bonuses were an expected part of Plaintiff's compensation from Patient First and in fact were included in every one of Plaintiff's paychecks from Patient First that were provided to the Navy and discussed at trial.  Crump Damages Test. at 67:3-70:21 Further, such bonuses are not detailed separately on Plaintiff's W-2s, but are included as part of Plaintiff's yearly income in 2012, 2013,

Plaintiff's positions with CompHealth, Team Health, Patient First, or Apollo MD are not a "substantial equivalent" to her position at Sewells Point Clinic, due to the increased hours, travel requirements, pay differences, and increased productivity requirements, Plaintiff's interim earnings from such positions provided Plaintiff with comparable or higher pay than she received at Sewells Point Clinic. An award of front pay, as Plaintiff requests, would therefore provide Plaintiff with a windfall of up to double the amount of wages she would have earned working at Sewells Point Clinic. Thus, even if an award

---

and 2014. Patient First 2012 W-2, PX-244; Patient First 2013 W-2, PX-247; Patient First 2014 W-2, PX-322. As explained above, "the amount of the back pay award should be 'reduced by any earnings acquired during the interim period regardless of the type of work involved.'" Brady, 753 W-2d at 1275 (quoting Merriweather, 631 F.2d at 1168) (emphasis added). Thus, the Court must consider Plaintiff's bonuses from Patient First, particularly as such bonuses were a constant part of Plaintiff's wages, in determining the amount of interim pay Plaintiff received from Patient First. Second, with respect to Plaintiff's "supplemental employment," the evidence at trial demonstrated that Plaintiff's work with CompHealth and Team Health was not mere "moonlighting," which she could have performed while employed at Sewells Point Clinic. See Lilly v. City of Beckley, W.Va., 797 F.2d 191, 196 (4th Cir. 1986) (explaining that courts have held that "if the plaintiff could have held both the supplemental job and the job he did not receive because of discrimination, the earnings from the supplemental job will not be used to reduce the back pay award" (citations omitted)). Instead, Plaintiff's shifts with CompHealth and Team Health were sporadic and were scheduled in a highly different fashion from Plaintiff's work at Sewells Point Clinic, indicating that Plaintiff could not have held such positions while working at Sewells Point Clinic. Additionally, Plaintiff testified that she took the CompHealth job because it was a short term position that would allow her to easily return to work at Sewells Point Clinic, and Plaintiff's employment at Team Health began only shortly before her resignation from Sewells Point Clinic, demonstrating that such positions were not mere moonlighting jobs, but were intended to be a flexible replacement for Plaintiff's income from Sewells Point Clinic.

of front pay were not foreclosed by Plaintiff's choice to resign and refuse the Navy's offer of accommodation, front pay would not be appropriate because such award would place Plaintiff in a better financial circumstance than she would have enjoyed had the Navy not failed to provide her an accommodation.  Therefore, the Court denies Plaintiff's request for front pay.

## C. Mitigation

Having determined the appropriate back pay period, the Court now addresses the issue of mitigation during that time period.  The Navy argues that Plaintiff has failed to mitigate her damages because, as the Navy's expert witness Dr. James Koch testified at trial, there were a number of physician assistant positions available in Hampton Roads in 2011 and 2012 and Plaintiff failed to pursue such positions with "reasonable diligence."   In response, Plaintiff does not dispute that physician assistant positions were available, but explains that "Plaintiff was not able to find a job in her field (family practice) and had to shift her search into other fields of practice . . . ."  Pl.'s Resp. to Def.'s Mem. Regarding Back Pay Award at 7.   Plaintiff argues that she reasonably pursued employment, even while she was waiting for the Navy to respond to her requests for accommodation, which resulted in Plaintiff initially taking a temporary position so that she could return to work at Sewells Point Clinic once the requested accommodation

was in place. Id. While Plaintiff's award of back pay ends as
of the date she resigned, thereby refusing the Navy's offer of
accommodation regarding the Z-150 video phone, the Court finds
that the Navy has not demonstrated that, during the February 26,
2012 to July 27, 2012 back pay period, Plaintiff failed "to be
'reasonably diligent in seeking and accepting new employment
substantially equivalent to that from which she was
discharged.'" Szedlock, 139 F. Supp. 2d at 734 (quoting Brady,
753 F.2d at 1273).

The Court limits its consideration of Plaintiff's
mitigation efforts to the back pay period discussed above.
First, 42 U.S.C. § 2000e-5(g)(1) states that "[i]nterim earnings
or amounts earnable with reasonable diligence by the person or
persons discriminated against shall operate to reduce the back
pay otherwise allowable." Id. (emphasis added). Thus,
consideration of mitigation, and deduction of Plaintiff's
interim earnings, is tied to the determination of "back pay
otherwise allowable." If back pay is not allowable, Plaintiff's
duty to mitigate such back pay is inapplicable. The Navy has
not demonstrated otherwise, and appears to concede as much in
its brief. See Navy's Mem. Regarding Back Pay Award at 28 ("Any
final award using the gross wages method also would have to be
mitigated to account for the $5,226.00 in wages Plaintiff earned
from CompHealth during the February 26, 2012 to July 27, 2012

time period.").  As the back pay allowable in this case begins
on February 26, 2012 and ends on July 27, 2012, only Plaintiff's
interim earnings during such period will operate to reduce the
award of back pay.  Second, the Court notes that, much like a
defendant employer's pre-violation conduct is of limited
relevance after determining the back pay period, see McClain,
649 F.3d at 385; Joe's Stone Crabs, Inc., 296 F.3d at 1276, so a
plaintiff's pre-violation conduct is of limited relevance in
determining whether he or she engaged in reasonable mitigation
during the applicable back pay period.  Here, Plaintiff sought
to mitigate her losses by seeking employment even before she was
required to do so.  Cf. N.L.R.B. v. Cmty. Health Servs., 812
F.3d 768, 773 (10th Cir. 2016) (explaining that "employees who
believe they have been unlawfully terminated have a duty to seek
out substitute employment while they await a Board decision on
that issue," but "employees who are not unlawfully terminated
but suffer other labor injuries — e.g., reduction in hours or
wage — have no duty to seek secondary employment pending a
decision on their unfair labor practices claim" (citing Phelps
Dodge Corp. v. NLRB, 313 U.S. 177, 199-200 (1941); 88 Transit
Lines, Inc., 314 N.L.R.B. 324, 325 (1994))).  Thus, the Court
will not penalize Plaintiff for her efforts to mitigate her lost
wages by deducting the amounts she earned before the back pay
period — a time frame before the Navy could be found liable for

59

violation of the Rehabilitation Act — from the award of back pay.

As discussed above, the evidence at trial demonstrated that Plaintiff began looking for employment in September 2011 and applied to approximately thirty-five jobs, in a variety of locations, between February and May 2012.  The Court finds that the number of applications, and the geographic range of such applications, demonstrate that Plaintiff was "reasonably diligent" in attempting to mitigate her damages during the relevant period.  See Benson v. Thompson Cadillac-Oldsmobile, Inc., 287 F. App'x 249, 255 (4th Cir. 2008) (unpublished) (affirming back pay award and finding that plaintiff's efforts were sufficient to mitigate damages when "from April 21, 2003, until March 18, 2004, Plaintiff Benson submitted applications for approximately eighty-two separate positions, including F & I manager positions at automobile dealerships, as well as positions at banks, restaurants, and retail businesses" (internal citations omitted)).  Plaintiff's applications, and her continued efforts to find employment, were clearly successful because Plaintiff began working with CompHealth prior to commencement of the back pay period.[22]  The evidence at trial

---

[22] The Navy argues that Plaintiff should have sought out a permanent position when she began searching for employment in 2011.  Navy's Mem. Regarding Back Pay Award, 18, ECF No. 324.  However, the Navy's argument is unavailing.  When Plaintiff began her temporary position with CompHealth in December 2011, she was still hopeful that the Navy

further demonstrates that, during the back pay period, Plaintiff worked as many shifts as she could with CompHealth and that she often worked more than forty hours a week when she was on assignment for CompHealth.[23]   Plaintiff was also offered, and accepted, two additional employment positions with Team Health and Patient First between February and July 2012.   Finally, in addition to the three positions Plaintiff held when she resigned from Sewells Point Clinic, Plaintiff was offered an additional three positions in 2014, one of which she accepted.

Therefore, the Court finds that the Navy has failed to demonstrate that Plaintiff's award of back pay should be reduced or eliminated completely for failure to mitigate damages during the back pay period.

_____

would provide her an accommodation and, indeed, Plaintiff had limited information with which to determine whether the Navy had denied her requests for accommodation.   The Court notes that Plaintiff's decision to accept a temporary position with CompHealth during the back pay period was not unreasonable because such position would have allowed Plaintiff to return to her position at Sewells Point Clinic once an appropriate accommodation was put in place.   See Boyd v. SCM Allied Paper Co., No. 84cv241, 1986 WL 15558, *15 (N.D. Ind. June 16, 1986) (unpublished) ("Under the circumstances that surround Boyd's lay off it was reasonable for him to be self-employed and not seek a permanent position because he expected to be recalled at any time. By November 1983, however, when it became clear to Boyd that he would not be rehired, Boyd had a duty to mitigate his damages.").

[23] The Court limits its discussion of Plaintiff's work hours here to the hours Plaintiff worked for CompHealth, because evidence at trial demonstrated that such position was the only job from which Plaintiff earned income during the back pay period.   See Bench Trial Tr. Excerpt, Koch Test., 123:16-124:15, Feb. 26 and 29, 2016, ECF No. 333 [hereinafter "Koch Damages Test."].

## D. Back Pay Award

In calculating a back pay award, the back pay amount is calculated by determining "the difference between what the employee would have earned had the wrongful conduct not occurred . . . and the actual earnings during that period." Ford, 984 F. Supp. at 389 (citations omitted); see Brady, 753 F.2d at 1275. Thus, as determined above, Plaintiff is entitled to an award of back pay for losses incurred between February 26, 2012 and July 27, 2012. Such losses will be reduced by any interim earnings that she received during the same time period.

With respect to the calculation of such back pay award, Plaintiff seeks an amount accounting for her lost pay, annual raises, and loss of fringe benefits, including contribution for health, vision, life, dental, and disability insurance and paid holidays.[24] In response, the Navy argues, first, that Plaintiff failed to demonstrate that she should receive back pay for continuing raises or insurance benefits. Second, the Navy argues that, because Plaintiff is seeking lost wages for full 40-hour work weeks, an award for holiday pay would be double counting. Third, the Navy argues that an award of back pay

---

[24] Plaintiff also requested back pay related to loss of wages from Apollo MD due to the Navy's submission of an incorrect credentialing report to Apollo MD. However, as Plaintiff was not offered a position with Apollo MD until December 2014, and the purported damages related to Apollo MD's credentialing period arose in 2015, such damages are far outside the back pay period determined above. Thus, such damages are not included as part of the Court's back pay award.

should be offset by any amount of back pay addressed by Plaintiff's settlement with TCA. The Court will address each of the Navy's arguments in turn before detailing its calculation of the back pay award in this matter.

### 1. Raises and Fringe Benefits

First, regarding Plaintiff's raises and fringe benefits, the Court may include reasonably anticipated salary increases or fringe benefits in its back pay award if Plaintiff demonstrates that such raises or benefits were part of the earnings she lost as a result of the Navy's unlawful employment action. See Long, 9 F.3d at 343; Hylind, 31 F. Supp. 3d at 741-42; Ford, 984 F. Supp. at 389. With respect to Plaintiff's anticipated raises, the Court finds that Plaintiff's award of back pay should include consideration of Plaintiff's annual raise. Plaintiff demonstrated at trial that she was scheduled to receive a raise of $1.02 in September of each year of her employment at Sewells Point Clinic. Crump Damages Test. at 3:20-4:2. Plaintiff received such pay raise in September 2010, and, at the time Plaintiff left work for her cochlear implant revision surgery, she earned $52.02 per hour. Thus, had Plaintiff been able to return to work after her revision surgery, and received her pay raise in September 2011, Plaintiff would have earned $53.04 per hour during the back pay period. Further, the Navy concedes that, at least for the limited back pay period of February 26,

2012 to July 27, 2012, a base pay rate of $53.00 per hour is acceptable and the Navy's expert witness, Dr. Koch, relied on a figure of approximately $53.00 per hour as a basis for his back pay opinion. Navy's Mem. in Opp'n to Pl.'s Br. Supporting Award of Back Pay and Front Pay, 8, ECF No. 327. Thus, the Court will calculate Plaintiff's back pay award based upon a base rate of $53.04 per hour.

With respect to Plaintiff's requested reimbursement for lost insurance benefits, the Court finds that Plaintiff's back pay award does not include losses related to her insurance benefits. "Back pay generally includes lost salary and lost benefits. However, the burden is on Plaintiff to present evidence to establish the amount of back pay and lost benefits to which she is entitled." Herring v. Thomasville Furniture Indus., Inc., No. 4:96cv00081, 1999 WL 1937352, *5 (M.D.N.C. Aug. 31, 1999) (unpublished); see Edwards, 658 F.2d at 956 ("After an unlawfully discharged employee produces evidence in support of her claim for back pay . . . the employer has the burden of showing that she did not exert reasonable efforts to mitigate her damages." (citations omitted)). Plaintiff has failed to adequately demonstrate that her earnings at Sewells Point Clinic included contributions to her health, vision, and dental insurance benefits. Further, Plaintiff has failed to

demonstrate the value of any contribution to her insurance benefits for purposes of calculating a back pay award.

Plaintiff testified at trial that she received health, dental, vision, life insurance and disability insurance benefits while employed at Sewells Point Clinic and that TCA contributed to the costs for such benefits.[25]   However, when questioned about such benefits on cross-examination, Plaintiff could not remember how much TCA contributed to her insurance benefits, nor could she point to a document or piece of evidence that demonstrated that TCA contributed to Plaintiff's health, dental or vision insurance benefits at all, or that demonstrated the amount or value of TCA's contributions.[26]   Crump Damages Test. at 74:23-83:7; see Letter to Plaintiff from TCMP Offering Employment, AX-99.   The Navy concedes that there is some evidence that TCA paid

---

[25] Plaintiff also testified that she received other benefits (CME allowance, uniform allowance, paid vacation, etc.) while employed at Sewells Point Clinic.   However, Plaintiff is not seeking back pay related to such other benefits; thus, the Court does not address such benefits here.

[26] On re-direct Plaintiff was able to refresh her memory and she testified that TCA contributed $317.12 bi-weekly to her health, dental, and vision insurance.   Crump Damages Test. at 100:12-105:3. Plaintiff, however, was not able to point to any evidence, other than her own testimony, that supported her assertion that TCA contributed $317.12 bi-weekly to Plaintiff's health, dental, and vision insurance. Instead, the figure provided by Plaintiff on re-direct mirrors the amount that she paid for her medical insurance (excluding dental and vision insurance) while on medical leave during summer 2011.   TCA/TCMP Benefit Tracking Summer Crump, PX-259.   However, even if the Court were to credit Plaintiff's testimony that TCA contributed $317.12 bi-weekly to her health, dental, and vision insurance, the resulting contribution benefit per hour amount, $3.96 per hour, is markedly less than the figure proposed by Plaintiff in her post-trial briefing.

for Plaintiff's group life and disability insurance. Navy's Mem. in Opp'n to Pl.'s Br. Supporting Award of Back and Front Pay at 20 n.12. However, Plaintiff failed to provide any evidence demonstrating the value of TCA's contributions to her group life and disability insurance benefits. The only evidence Plaintiff provided at trial regarding the value or amount of any of her insurance benefits was a document detailing the amount of insurance premiums that Plaintiff paid while on medical leave. Crump Damages Test. at 84:5-86:15; TCA/TCMP Benefit Tracking Summer Crump, PX-259. Further, Plaintiff testified that, pursuant to the "Leave of Absence" provision in the TCA handbook, she understood that "if [she] elect[ed] not to return to work at the end of the leave period, [she would] be required to reimburse [TCA] for the costs of the premiums paid by [TCA] for providing coverage during [her] leave . . . ." TCMP Employee Handbook, 20, AX-2. However, after Plaintiff resigned from Sewells Point Clinic, she was not required to reimburse TCA for any insurance benefits to which TCA contributed, suggesting that TCA did not contribute to any health insurance benefits for Plaintiff. Crump Damages Test. at 86:16-87:12. Thus, as Plaintiff has failed to adequately demonstrate that she actually received contributions for the cost of her health, vision, or dental benefits while working at Sewells Point Clinic, and as Plaintiff has failed to demonstrate the value of any asserted

66

contributions to the insurance benefits she received while working at Sewells Point Clinic, the Court will not award Plaintiff back pay for the loss of such insurance benefit contributions.[27]   See E.E.O.C. v. Nutri/Sys., Inc., 685 F. Supp.

---

[27] Plaintiff argued at trial that the reason why she presented limited evidence regarding the insurance benefits and contributions she received while employed at Sewells Point Clinic was because the Navy "stipulated that plaintiff was eligible and enrolled in various employee benefits offered and paid for by TCMP . . . ." Crump Damages Test. at 94:23-95:6.   In support of such contention, Plaintiff referred the Court to the Navy's Statement of Undisputed Facts, included in the Navy's Memorandum in Support of Summary Judgment, ECF No. 83. The Navy's Memorandum states, at paragraph 22, that:

> Plaintiff was eligible for and enrolled in various employee benefits offered (and paid for) by TCMP, including a 401(k) plan, health insurance, dental insurance benefits, vision care benefits, group life insurance and short term disability benefits while working at BMC Sewells.   DEX 1, #26-27, 32-33, 35-36, 38-39, 43-44, 67-68.   Plaintiff was not eligible for and did not enroll in any federal retirement plan, thrift savings plan, or health insurance program offered through the Navy or the federal government. Id., #29-31, 41-42.

Id. at 6.   However, the Court does not interpret such statement to be a stipulation regarding TCA's payment of benefits.   Instead, the Court reads such paragraph, made in the context of counter-motions for summary judgment regarding the Navy's status as Plaintiff's joint employer, to state that TCA was responsible for offering, and paying for the offering, of certain employee benefits.   While the Court agrees that litigation, or the presentation of evidence on an issue, may be foreclosed when an issue has been waived due to a judicial admission, the Navy's statement quoted above is not a judicial admission.   A judicial admission includes "'intentional and unambiguous waivers that release the opposing party from its burden to prove the facts necessary to establish the waived conclusion of law.'"   Everett v. Pitt Cty. Bd. of Educ., 788 F.3d 132, 141 (4th Cir. 2015) (quoting Minter v. Wells Fargo Bank, N.A., 762 F.3d 339, 347 (4th Cir. 2014)).   "A purported judicial admission is binding only if the statement is 'deliberate, clear, and unambiguous.'"   Id. (quoting Minter, 762 F.3d at 324).   The Navy's statement, made during summary judgment briefing, is not a "deliberate, clear, and unambiguous" stipulation that TCA paid, or contributed payment, for Plaintiff's employee benefits.   Further, even if such statement were a stipulation, as Plaintiff claims, Plaintiff failed to demonstrate the

568, 571 (E.D. Va. 1988) (denying request for expenses and fringe benefits because "evidence on these fringe benefits and expenses was meager and unpersuasive" (citing <u>Hunter v. Westinghouse Elec. Corp.</u>, 576 F. Supp. 704, 727 (S.D. Ohio 1983))).

Alternatively, even if Plaintiff had provided sufficient proof that she received contributions to her insurance benefits while employed at Sewells Point Clinic, Plaintiff has failed to demonstrate that she should receive the per hour value of such benefits as requested in her post-trial briefing. In her Brief Supporting Award of Back and Front Pay, Plaintiff argues that the fringe benefits she received at Sewells Point Clinic are equal to a value of $17.64 per hour. However, the $17.64 per hour figure, as discussed by Dr. Koch at trial, represents the national average value of fringe benefits for a private sector employee in March 2014, as reported by the Bureau of Labor Statistics. Jury Trial Tr. Excerpt, Koch Test., 246:21-247:3, Feb. 22 and 23, 2016, ECF No. 334; Bench Trial Tr. Excerpt, Koch Test., 114:12-18, Feb. 26 and 29, 2016, ECF No. 333 [hereinafter "Koch Damages Test."]. Plaintiff presented no evidence or testimony that the value of the insurance benefit contributions that she received while working at Sewells Point Clinic were at

value of TCA's contribution to such benefits, leaving the Court unable to calculate a back pay amount including the loss of such contributions.

68

all comparable to such national average, much less how such figure, which encompasses a national average for a variety of fringe benefits (sick pay, vacation pay, retirement contributions, insurance benefits, etc.), compares to Plaintiff's limited claim for health, vision, dental, life, and disability insurance and holiday pay. Plaintiff's reliance on such a figure as proof of the value of her lost benefit contributions is untenable. Further, such figure is inconsistent with the fringe benefit amount that Plaintiff ultimately requested at trial. Crump Damages Test. at 100:12-105:3 (stating on re-direct, and upon being able to refresh her recollection, that TCA contributed $317.12 bi-weekly to Plaintiff's health, dental, and vision insurance). Therefore, the Court will not award Plaintiff back pay for the loss of any contributions to her insurance benefits.

## 2. Holiday Pay

Second, regarding holiday pay, the Court finds that Plaintiff is not entitled to reimbursement for holiday pay during the back pay period. As Plaintiff is seeking to recover lost wages related to her inability to work forty hours per week at Sewells Point Clinic, she cannot recover pay for holidays that occurred during a forty-hour work week, for which she would not have worked but would have received pay. Such recovery would be, as the Navy argues, double-counting, because the

Court's back pay award already includes lost wages for any
particular work day (holiday or not) during a forty-hour work
week within the back pay period.   See generally E.E.O.C. v.
Waffle House, Inc., 534 U.S. 279, 297 (2002) ("As we have noted,
it 'goes without saying that the courts can and should preclude
double recovery by an individual.'" (quoting Gen. Tel. co. of
the Nw., Inc. v. E.E.O.C., 446 U.S. 318, 333 (1980))); Evans v.
Larchmont Baptist Church Infant Care Ctr., Inc., 956 F. Supp. 2d
695, 707 (E.D. Va. 2013) (declining to award multiple monetary
awards related to front pay because to do so would "permit
double recovery amounting in [sic] a windfall").   Plaintiff has
not demonstrated that she is entitled to holiday pay in
circumstances when such pay is already included in the award for
back pay.   Plaintiff further has not demonstrated that, had she
chosen to work on a given holiday at Sewells Point Clinic, in
lieu of taking paid holiday time off, such holiday pay would
have been banked or paid to her in some other way.[28]   Therefore,

---

[28] The Court recognizes that there may be circumstances where vacation
pay or sick pay, which accrues during employment, may be included as a
fringe benefit in a back pay award.   See   Nichols v. Frank, 771 F.
Supp. 1075, 1080 (D. Or. 1991) (awarding annual and sick leave that
would have accrued during the time that the plaintiff was out of work
due to discrimination), aff'd, 42 F.3d 503 (9th Cir. 1994).   Contra
McKenna v. City of Phila., 636 F. Supp. 2d 446, 459 (E.D. Pa. 2009)
(rejecting back pay request for "banked" sick time, vacation time, and
holidays that the plaintiff argued he lost due to wrongful
termination).   Plaintiff, however, has not demonstrated that her
holiday pay accrued in such a fashion.

the Court will not award Plaintiff back pay for her loss of holiday pay.

### 3. Settlement Offset

Finally, with respect to the Navy's argument that the Court should reduce Plaintiff's recovery by any back pay amount TCA paid her in settlement, the Court finds that such an offset is not appropriate in the instant case. While the "one satisfaction rule," an "equitable doctrine [that] operates to reduce a plaintiff's recovery from the non[-]settling defendant to prevent the plaintiff from recovering twice from the same assessment of liability," is traditionally employed in cases involving joint tort-feasors, Chisholm v. UHP Projects, Inc., 205 F.3d 731, 737 (4th Cir. 2000), our Court of Appeals has noted an exception to such rule. With respect to discrimination claims brought under the Fair Housing Act, a non-settling defendant, against whom a monetary judgment is entered, is not entitled to a set-off of such judgment amount for settlement payments made by a codefendant who settled before judgment. See Pinchback v. Armistead Homes Corp., 907 F.2d 1447, 1453 (4th Cir. 1990) (affirming denial of non-settling defendant's offset request because there was no federal law which suggested that the judgment amount should be reduced and a settlement agreement releases a non-settling defendant only if the parties to the agreement intended it to have such effect (citing Zenith Radio

71

Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 343-48 (1971); Avery v. United States, 829 F.2d 817, 819 (9th Cir. 1987))); accord Edwards v. Etowah Timberlane Condo. Ass'n No. 1, No. 1:01cv85, 2002 WL 1794719, *1 (W.D.N.C. July 31, 2002) (unpublished) ("In the context of cases under the Fair Housing Act, it appears that any defendants that remain until judgment are not entitled to a reduction of that judgment based on the settlements by former codefendants." (citing Pinchback, 907 F.2d at 1453)); Balt. Neighborhoods, Inc. v. LOB, Inc., 92 F. Supp. 2d 456, 475 (D. Md. 2000) (holding that "LOB is liable for the full amount of the judgment notwithstanding the fact that plaintiffs will also receive $240,000 from the settling defendants"). Contra Smith v. Waverly Partners, LLC, No. 3:10cv00028, 2012 WL 4086774, *1 (W.D.N.C. Sept. 17, 2012) (unpublished) (noting that damages related to claims for employment discrimination and breach of contract may overlap and that defendant was entitled to argue for an offset of wage-based damages, to the extent that plaintiff's discrimination settlement compensated for such lost wages).

The Court finds the Fourth Circuit's reasoning and holding in Pinchback, while not directly on point, to be persuasive authority in the present case. Similar to the facts in Pinchback, there is no federal statute at issue requiring that a judgment against the Navy be offset by TCA's earlier settlement

with Plaintiff in this matter. While there is disagreement among federal courts regarding whether a settlement offset is available in a Title VII action, absent the existence of a federal statute addressing the issue, see Evans v. Weiser Sec. Servs., Inc., No. 09cv445, 2012 U.S. Dist. LEXIS 124750, *10-11 n.7 (S.D. Ala. Mar. 15, 2012) (unpublished) and Mavrinac v. Emergency Med. Ass'n. of Pittsburgh, No. 04cv1880, 2007 WL 4190714, *4 (W.D. Pa. Nov. 21, 2007) (unpublished), the Court finds that the silence of such federal statute counsels against allowing a set-off for settlement in the Title VII context because Congress has not manifested an intent that such set-off apply.[29] See Sears v. Atchison, Topeka & Santa Fe Ry., Co., 749

---

[29] Even if the Court were to find that it should look beyond the statutory silence to federal common law to determine whether a judgment in the Title VII context should be offset by a pre-judgment settlement amount, an issue the Court has not fully analyzed, courts that have done so have looked to the 42 U.S.C. § 1988 framework and found that such federal common law must be compared to state law and, if the two bodies of law are inconsistent, state law must be applied. See Mavrinac, 2007 WL 4190714, at *5 (discussing the application of a settlement offset rule in the Title VII context and looking to the analogous circumstances and language of 42 U.S.C. § 1988 to determine how to resolve such issue (citing Goad v. Macon Cty., 730 F. Supp. 1425, 1426 (M.D. Tenn. 1989))). As the court in Mavrinac v. Emergency Medical Association of Pittsburgh found, "the federal law, as well as the legislative history of Title VII, are silent on the issue of the availability of set[-]off to a non[-]settling defendant in a Title VII action." Id.; see also Evans, 2012 U.S. Dist. LEXIS 124750, at *11 n.7. Virginia law, however, allows offset "when a release or a covenant not to sue is given in good faith to one of two or more persons liable for the same injury to a person or property, or the same wrongful death . . . ." Va. Code Ann. § 8.01-35.1(A); see William H. Gordon Assocs., Inc. v. Heritage Fellowship, United Church of Christ, 291 Va. 122, 784 S.E.2d 265, 276-78 (2016). To the extent that Virginia law applies to the issue of settlement offset in this case, the Navy has not demonstrated that the instant back pay award

73

F.2d 1451, 1454-55 (10th Cir. 1984) (rejecting non-settling defendant's request for contribution in Title VII action from codefendant who had previously settled, relying on the Supreme Court's refusal to find a federal common law right of contribution against a non-party union in the Title VII context (citing Nw. Airlines, Inc. v. Transport Workers Union, 451 U.S. 77, 98 (1981))). Thus, the Navy is not entitled to a set-off from the present back-pay award for any settlement payments made by TCA.

Alternatively, even if application of the "one satisfaction rule," recognized in Chisholm, were applicable in this case, the Navy has not demonstrated that it should receive a set-off related to TCA's settlement with Plaintiff. "The essential requirement for the 'one satisfaction rule' is that the amounts recovered by settlement and the judgment must represent common damages arising from a single, indivisible harm." Chisholm, 205 F.3d at 737 (citing Howard v. General Cable Corp., 674 F.2d 351, 358 (5th Cir. 1982); Harris v. Union Elec. Co., 846 F.2d 482, 485 (8th Cir. 1988)).

> A non[-]settling defendant may claim an offset for amounts paid in settlement by other defendants only if two conditions are met. First, the non[-]settling defendant must demonstrate that the settlement and award (against which the offset is sought) were for the same injury. . . . Second, the injury must be

should be offset by TCA's settlement with Plaintiff because the Navy has not demonstrated that it and TCA are liable for the "same injury."

> indivisible such that there is joint and several
> liability among the settling and non[-]settling
> defendants.

Velez v. Roche, 335 F. Supp. 2d 1022, 1042 (N.D. Cal. 2004)
(discussing a Title VII suit for gender discrimination)
(citations omitted).

The Navy fails to satisfy the first step noted above,
because it has not demonstrated that TCA's settlement and the
back pay award at issue address the same injury. While the Navy
invites the Court to "inquire into the settlement between
Plaintiff and TCA to determine whether any portion of the
settlement is allocated to back pay," Navy's Mem. Regarding Back
Pay Award at 29, the Navy has not provided any evidence
regarding such settlement agreement or what portion of
Plaintiff's claims against TCA, and resulting injuries, such
agreement was intended to address. As discussed above,
Plaintiff and TCA entered into settlement shortly before trial,
and Plaintiff and TCA concluded their settlement discussions the
morning that trial began. Absent such settlement, Plaintiff
presumably would have proceeded to trial on her ADA claim
regarding TCA's alleged failure to accommodate and her claim for
constructive discharge against TCA, in addition to Plaintiff's
Rehabilitation Act claim against the Navy. Had Plaintiff's
claims against TCA proceeded to trial, and TCA been found
liable, TCA may have been subject to an award of compensatory

damages, equitable damages (including front pay or other
benefit-related damages not found to be applicable here), or
attorneys' fees. Additionally, had Plaintiff proceeded to trial
against TCA, Plaintiff's ADA claim and constructive discharge
claim against TCA would have significantly longer statutes of
limitations. TCA's liability, and any award of compensatory or
equitable damages against TCA, would not have been limited to
the 45-day limitations period applicable to Plaintiff's
Rehabilitation Act claim against the Navy. See 42 U.S.C.
§ 2000e-5(e)(1) (detailing the 180-day or 300-day limitations
period). Thus, the potential injuries and damages that may have
been addressed in the settlement agreement between Plaintiff and
TCA are significantly broader than the limited back pay amount
related to Plaintiff's lost wages between February 26, 2012 and
July 27, 2012 that the Court awards here. Moreover, the Navy
had the opportunity during the bench portion of the trial to
seek to inquire into the specifics of the Plaintiff's settlement
with TCA, but did not do so. Therefore, even if application of
the "one satisfaction rule" were appropriate in this case, the
Navy has not demonstrated that TCA's settlement and the back pay
award at issue address the same injury such that the instant
back pay award against the Navy should be offset by TCA's
settlement with Plaintiff.[30]

---

[30] The Court does not address the second step noted above, i.e. whether

#### 4. The Court's Calculation

Having addressed the Navy's contentions, the Court now details its award of back pay damages owed to Plaintiff. As determined above, Plaintiff's back pay award will be calculated at a base rate of $53.04 per hour, with no additions related to fringe benefits (insurance benefit contributions or holiday pay). Using such figure, Plaintiff's weekly lost wages amount is $2,121.60 ($53.04 per hour times forty hours) and Plaintiff's bi-weekly lost wages amount is $4,243.20 ($53.04 per hour times eighty hours, or Plaintiff's weekly lost wages amount times two). As Dr. Koch testified at trial, Plaintiff was paid on a bi-weekly basis and the back pay period, beginning on February 26, 2012 and concluding on July 27, 2012, is equal to 10.857 bi-weekly pay periods. Koch Damages Test. at 111:8-112:11, 141:22-142:10. The Court finds Dr. Koch's testimony on this point to be reliable. Thus, Plaintiff's gross back pay award, not including any deductions for Plaintiff's interim earnings, equals $46,068.42, or a bi-weekly wage amount of $4,243.20 for 10.857 bi-weekly pay periods ($4,243.20 times 10.857).

At trial, Dr. Koch further testified that, based upon his review of Plaintiff's interim earnings, he determined that during the February 26, 2012 to July 27, 2012 back pay period

the injury is indivisible, because it determines that the Navy has failed to demonstrate that TCA's settlement and the instant back pay award address the same injury.

Plaintiff earned $5,226.00 from CompHealth. Koch Damages Test. at 123:16-124:15. Dr. Koch further testified that, in review of Plaintiff's 2012 W-2 statements, Plaintiff reported more than $60,000 of income during 2012. Dr. Koch, however, did not account for such amount in calculating Plaintiff's interim earnings because he could not determine what portion of that amount, other than the $5,226.00 from CompHealth, was earned during the back pay period.[31] Id. Dr. Koch's testimony on the amount of Plaintiff's interim earnings during the back pay period was uncontradicted by Plaintiff. The Court finds Dr. Koch's uncontradicted testimony on this point to be reliable. Therefore, the Court will deduct Plaintiff's interim earnings from CompHealth received during the back pay period, in the amount of $5,226.00, from Plaintiff's gross back pay ($46,068.42) award, for a back pay award of $40,842.42.[32]

---

[31] As noted above, Plaintiff testified at trial that she began work with Team Health in July 2012. Feb. 22 Crump Trial Test. at 111:22-112:4; Crump Damages Test. at 62:18-19. However, as the Navy has failed to demonstrate that Plaintiff received any interim earnings from Team Health during the February 26, 2012 to July 27, 2012 back pay period, the Court will not reduce Plaintiff's back pay award for earnings received from Team Health.

[32] The Navy also argues, in a footnote, that any back pay award must be reduced by the amount of federal and state taxes, social security and Medicare taxes that would have been deducted from Plaintiff's wages. Navy's Mem. Regarding Back Pay Award at 28 n.26. The Court agrees that the back pay awarded herein may be subject to certain federal and state taxes. See Hemelt v. United States, 122 F.3d 204, 210-11 (4th Cir. 1997) (addressing withholding of FICA and federal income tax from wages received in settlement of class-action ERISA lawsuit); Thompson v. C.I.R., 866 F.2d 709, 712 (4th Cir. 1989) (discussing the potential applicability of various tax consequences for damages awarded under

## E. Pre- and Post-Judgment Interest

Plaintiff has also requested that the Court award pre-judgment interest, compounded annually at the Virginia statutory rate of six percent, and post-judgment interest, on any award of back pay. The Navy does not dispute that, in general, "a successful plaintiff is eligible for pre-judgment interest." Navy's Mem. in Opp'n to Pl.'s Br. Supporting Award of Back and Front Pay at 22. The Navy further does not dispute that the Virginia six percent statutory interest rate would be the appropriate interest rate to apply in this matter, and the Navy does not address the issue of compound interest. Id. Therefore, the Court will award pre-judgment interest on Plaintiff's award of back pay damages, as discussed above, and

---

the Equal Pay Act and Title VII). However, the applicability of such taxes does not require the Court to reduce its back pay award. Instead, the Court finds that it is the parties' responsibility to withhold or pay the applicable federal and state taxes from such back pay award and seek any applicable return from the appropriate taxing authorities. See Thomas v. Cty. of Fairfax, Va., 758 F. Supp. 353, 367 n.26 (E.D. Va. 1991) (noting that, in general, employer-paid back pay generally constitutes wages for purposes of federal and state withholding, tax authorities should receive their due, neither party should receive a windfall, and such principles were best satisfied "by having the County withhold taxes and remit them to the appropriate revenue authorities; plaintiffs may then seek to reclaim any excess withholding according to their individual circumstances"); Curl v. Reavis, 608 F. Supp. 1265, 1269 (W.D.N.C. 1985) (rejecting defendant's request to reduce back pay award to reflect plaintiff's state and federal withholdings and stating that "the Plaintiff's tax liability is a matter between the Plaintiff and the respective taxing authority"). Thus, the Court will not reduce Plaintiff's back pay award for payment of applicable federal and state taxes, but will expect the parties to make the necessary withholdings and pay the necessary taxes from such award as required by law.

such pre-judgment interest will be compounded annually. The award of pre-judgment interest will be calculated on each installment of Plaintiff's wages, less interim earnings, from the date they would have been due. See, e.g. Hyde, 572 F.2d 988, 993 (4th Cir. 1978) (rejecting argument that "interest on the entire sum is due from the date of the breach, [because] interest would only have been payable on monthly salary payments as they became due"). The accrual of pre-judgment interest will begin on the first day of the back pay period, February 26, 2012, and will conclude on the date of this Opinion and Order.

Further, pursuant to 28 U.S.C. § 1961, the Court will also award post-judgment interest and such interest shall be calculated as required by § 1961.

### IV. CONCLUSION

For the reasons stated above, the Court **ORDERS** that Plaintiff be awarded back pay damages in the amount of $40,842.42 and pre-judgment interest thereon at a rate of six percent (6%) to be compounded annually. As set forth above, pre-judgment interest is to be calculated on each separate installment of Plaintiff's salary, less interim earnings, from the date it would have been due to the date of this Opinion and Order. The Court further **ORDERS** an award of post-judgment interest beginning on the date of this Opinion and Order.

Having resolved Plaintiff's request for equitable damages, and as the jury verdict in this matter has already been entered, ECF No. 314, the Clerk is **REQUESTED** to enter judgment on the jury's verdict in favor of Plaintiff.

The Clerk is **REQUESTED** to send a copy of this Opinion and Order to all counsel of record.

It is so **ORDERED**.

/s/

Mark S. Davis
United States District Judge

Norfolk, Virginia
September  8  , 2016

81